**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | |
| | ) | **Case No. 1:21-cr-39** |
| HERTEL & BROWN PHYSICAL | ) | |
| AND AQUATIC THERAPY, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM ORDER

Pending before the Court in this criminal action are several motions to dismiss the Superseding Indictment following the publication of certain information set forth in the Government's July 17, 2023 filing, which became the subject of a July 19, 2023 newspaper article published in the Erie Times-News. The moving Defendants contend that they cannot receive a fair trial in this matter because of the Government's conduct. For the reasons set forth below, the motions to dismiss the Superseding Indictment will be denied.

## I.      BACKGROUND

On February 23, 2021, during the execution of a search warrant at the offices of Hertel & Brown Physical and Aquatic Therapy ("H&B"), certain H&B employees -- including Defendants Jacqueline Exley and Julie Johnson -- were questioned by law enforcement agents. The Government has maintained that both Exley and Johnson made incriminating statements at that time, an allegation which Exley and Johnson strenuously deny.

Johnson and Exley were subsequently charged with conspiracy and fraud charges, along with 19 other co-Defendants. A grand jury returned a superseding indictment on May 10, 2022, bringing these same charges against the same twenty-one Defendants.

1

Approximately one year later, Exley and Johnson filed motions to suppress the statements they had allegedly made to law enforcement on February 23, 2021. *See* ECF Nos. 771 and 773 and n.1, *supra*. Both suppression motions rely solely on arguments that Exley and Johnson were subjected to custodial interrogations on February 23, 2021, and that the statements they gave were not voluntary.[1] Neither Exley nor Johnson disclosed in their motions the details of their alleged statements.

On July 17, 2023, the Government filed its responses to Exley's and Johnson's motions. ECF Nos. 792 and 793. In the "factual background" section of its responses, the Government expounded on the substance of the incriminating statements Johnson and Exley had supposedly made to law enforcement. Two days later, on July 19, 2023, the Erie Times-News published an article detailing the Government's filing, with the headline: "'Everyone turned a blind eye': Feds unveil 'smoking-gun' evidence in Hertel & Brown case." The article set forth the evidence the Government had disclosed concerning the contents of Johnson's and Exley's alleged statements to law enforcement on February 23, 2021. *See* ECF No. 800-1.

Based on these developments, Exley and Johnson now jointly move for the dismissal of the Superseding Indictment. ECF No. 800. They maintain that the Government had no legal reason or need for disclosing the content of their alleged statements. They assert that the disclosure violated both the Local Rules of this Court and the Pennsylvania Rules of Professional Conduct. They insist that the Government's disclosure was particularly prejudicial in this case because it concerns alleged confessions which they deny ever making and which may ultimately

---

[1] The Court has scheduled a hearing to address the pending suppression motions and makes no determination at this time concerning the Defendants' "custodial" or "non-custodial" status.

prove to be inadmissible at trial.  And because of this unfair prejudice, Exley and Johnson argue, the potential jury pool has been irreparably tainted, thereby infringing their right to a fair trial.

On August 4, 2023, Defendants Hertel, Brown, and H&B filed their own motion to dismiss the superseding indictment, based on the same disclosures that serve as the grounds for Exley's and Johnson's motion.  *See* ECF No. 803.  That same day, Defendants Berchtold, Dudenhoefer, Bowes, Hull, and Morphy joined in the motions to dismiss that were filed by their co-Defendants.  ECF No. 804.

The Government has responded to each of the pending motions, and certain moving Defendants have filed their replies.  *See* ECF Nos. 805, 810, 811, 812, 814.  As a result, the issues are now sufficiently joined and ripe for adjudication.

## II.   DISCUSSION

### A.   Presumed Prejudice Analysis

Among the rights guaranteed by the Sixth Amendment is the right of every criminally accused individual to be tried by an impartial jury.  *See* U.S. Const. amend. VI; *see also Estes v. Texas*, 381 U.S. 532, 540 (1965) (characterizing the right to a fair trial as the "most fundamental of all freedoms").  Accordingly, a criminal defendant's Sixth Amendment rights are implicated whenever pretrial publicity or media attention threatens to impair the defendant's ability to seat a fair and impartial jury.  According to the moving Defendants, the Court should presume that no fair and impartial jury can be empaneled in this case.

"Where media or other community reaction to a crime or a defendant engenders an atmosphere so hostile and pervasive as to preclude a rational trial process, a court reviewing for constitutional error will presume prejudice to the defendant without reference to an examination

3

of the attitudes of those who served as the defendant's jurors." *Rock v. Zimmerman*, 959 F.2d

1237, 1252 (3d Cir. 1992), *overruled on other grounds, Brecht v. Abrahamson*, 507 U.S. 619

(1993). "In such cases, a change of venue is required and the failure to grant it deprives the

defendant of due process." *Robinson v. Beard*, No. 06-CV-00829, 2020 WL 5362133, at *31

(E.D. Pa. Sept. 8, 2020) (citations omitted).

Prejudice to a criminal defendant may be presumed where the conviction was "obtained

in a trial atmosphere that was utterly corrupted by press coverage." *Skilling v. United States*, 561

U.S. 358, 380 (2010) (quotation marks omitted); *see United States v. Grinnage*, 486 F. App'x

325, 328 (3d Cir. 2012). But this occurs only where "[t]he community and media reaction . . .

have been so hostile and so pervasive as to make it apparent that even the most careful *voir dire*

process would be unable to assure an impartial jury." *Rock v. Zimmerman*, 959 F.2d at 1252

(citations omitted). "Such cases are exceedingly rare." *Id.* at 1253 (citation omitted); *see*

*Skilling*, 561 U.S. at 381 ("A presumption of prejudice, our decisions indicate, attends only the

extreme case."); *United States v. De Peri*, 778 F.2d 963, 972 (3d Cir.1985) ("It is the rare case in

which adverse pretrial publicity will create a presumption of prejudice that overrides the jurors'

assurances that they can be impartial.").

By way of example, the United States Supreme Court found that a presumption of juror

prejudice was warranted in *Rideau v. Louisiana*, 373 U.S. 723 (1963), *Estes v. Texas*, *supra*, and

*Sheppard v. Maxwell*, 384 U.S. 333 (1966). The Court has summarized its rulings in these cases

as follows:

> Wilbert Rideau robbed a bank in a small Louisiana town, kidnapped three bank
> employees, and killed one of them. Police interrogated Rideau in jail without
> counsel present and obtained his confession. Without informing Rideau, no less
> seeking his consent, the police filmed the interrogation. On three separate occasions
> shortly before the trial, a local television station broadcast the film to audiences

ranging from 24,000 to 53,000 individuals. Rideau moved for a change of venue, arguing that he could not receive a fair trial in the parish where the crime occurred, which had a population of approximately 150,000 people. The trial court denied the motion, and a jury eventually convicted Rideau. The Supreme Court of Louisiana upheld the conviction.

We reversed. "What the people [in the community] saw on their television sets," we observed, "was Rideau, in jail, flanked by the sheriff and two state troopers, admitting in detail the commission of the robbery, kidnaping, and murder." *Id.*, at 725, 83 S.Ct. 1417. "[T]o the tens of thousands of people who saw and heard it," we explained, the interrogation "in a very real sense was Rideau's trial—at which he pleaded guilty." *Id.*, at 726, 83 S.Ct. 1417. We therefore "d[id] not hesitate to hold, without pausing to examine a particularized transcript of the voir dire," that "[t]he kangaroo court proceedings" trailing the televised confession violated due process. *Id.*, at 726–727, 83 S.Ct. 1417.

We followed *Rideau's* lead in two later cases in which media coverage manifestly tainted a criminal prosecution. In *Estes v. Texas*, 381 U.S. 532, 538, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965), extensive publicity before trial swelled into excessive exposure during preliminary court proceedings as reporters and television crews overran the courtroom and "bombard[ed] ... the community with the sights and sounds of" the pretrial hearing. The media's overzealous reporting efforts, we observed, "led to considerable disruption" and denied the "judicial serenity and calm to which [Billie Sol Estes] was entitled." *Id.*, at 536, 85 S.Ct. 1628.

Similarly, in *Sheppard v. Maxwell*, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966), news reporters extensively covered the story of Sam Sheppard, who was accused of bludgeoning his pregnant wife to death. "[B]edlam reigned at the courthouse during the trial and newsmen took over practically the entire courtroom," thrusting jurors "into the role of celebrities." *Id.*, at 353, 355, 86 S.Ct. 1507. Pretrial media coverage, which we characterized as "months [of] virulent publicity about Sheppard and the murder," did not alone deny due process, we noted. *Id.*, at 354, 86 S.Ct. 1507. But Sheppard's case involved more than heated reporting pretrial: We upset the murder conviction because a "carnival atmosphere" pervaded the trial, *id.*, at 358, 86 S.Ct. 1507.

*Skilling,* 561 U.S. at 379-80.  In each of these cases, the Court overturned the defendant's conviction because the trial atmosphere had been "utterly corrupted by press coverage." *Id.* at 380.

At the same time, however, the Supreme Court has rejected the proposition that "'juror exposure to ... news accounts of the crime ... alone presumptively deprives the defendant of due

5

process.'" *Skilling,* 561 U.S. at 380 (quoting *Murphy v. Florida*, 421 U.S. 794, 798–799 (1975)) (ellipsis in the original). Jurors are not required to be "totally ignorant of the facts and issues involved," because "scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case." *Irvin v. Dowd*, 366 U.S. 717, 722 (1961). Indeed, "[n]otorious crimes are 'almost, as a matter of necessity, brought to the attention' of those informed citizens who are 'best fitted' for jury duty." *United States v. Tsarnaev,* 595 U.S. 302, 312 (2022) (quoting *Reynolds v. United States*, 98 U.S. 145, 155–156 (1879)).

The Supreme Court has admonished that the "relevant question is not whether the community remembered the case, but whether the jurors at [the] trial had such fixed opinions that they could not judge impartially the guilt of the defendant." *Patton v. Yount*, 467 U.S. 1025, 1035 (1984) (rejecting fair trial argument even though pretrial publicity revealed defendant's previous murder confession and his plea of temporary insanity). "Even if the juror has heard of or about the case and of the allegations of a defendant's guilt, he may sit if he is still capable of abandoning his prior impressions and rendering a fair verdict on the evidence." *United States v. Provenzano*, 620 F.2d 985, 995 (3d Cir.1980); *see Gov't of Virgin Islands v. Riley*, 973 F.2d 224, 227 (3d Cir. 1992). In short, "pretrial publicity—even pervasive, adverse publicity—does not inevitably lead to an unfair trial." *Skilling*, 561 U.S. at 384 (citation omitted).

In determining whether a presumption of prejudice is warranted, we consider the following factors:  (1) the size and characteristics of the community where the crime occurred; (2) the general content of the news coverage (e.g., whether the stories referenced the defendant's confession or other similarly prejudicial information, whether the news account was factual and objective versus sensational, inflammatory, or slanted toward the prosecution, and whether the stories focus on the defendant personally as opposed to the crime itself); (3) the timing of the

media coverage relative to the commencement of the trial; and (4) whether there was any media interference with actual courtroom proceedings. *See United States v. Rodriguez*, No. CR 2004-0105, 2023 WL 4582618, at *6 (D.V.I. July 18, 2023); *Robinson,* 2020 WL 5362133, at *31; *United States v. Savage*, No. CRIM. A. 07-550-03, 2012 WL 2376680, at *3-4 (E.D. Pa. June 25, 2012); *United States v. Diehl-Armstrong*, 739 F. Supp.2d 786, 793 (W.D. Pa. 2010)).

(i)

The first consideration is the size and characteristics of the community where the crime occurred and from whence the relevant jury pool will be drawn. In *Skilling*, the Court contrasted the city of Houston, where more than 4.5 million individuals were eligible for jury duty, with the Louisiana parish at issue in *Rideau*, which had a population of approximately 150,000 residents. The Court found that Houston's large, diverse pool of potential jurors undermined any presumption that 12 impartial jurors could not be empaneled. 561 U.S. at 382.

In this case, jurors will be drawn from the seven counties comprising the Erie Division of the Western District of Pennsylvania. Based on the 2020 census, the total population of these counties exceeds 520,000 individuals.[2] The moving Defendants contend that the size of the prospective jury pool is small enough to support a presumption of prejudice.

The Court disagrees. As was observed in *United States v. Diehl-Armstrong* based on similar estimations of the prospective jury pool size, "the Erie Division of the Western District of Pennsylvania . . . is considerably more populous than the communities at issue in *Rideau, supra* (prospective jurors drawn from a Louisiana parish of about 150,000 citizens who had been repeatedly exposed to the defendant's televised confession to extremely violence crimes), or *Irvin*

---

[2] *See* https://www.census.gov/library/visualizations/interactive/2020-population-and-housing-state-data.html.

7

*v. Dowd*, 366 U.S. 717, 81 S. Ct. 1639, 6 L.Ed.2d 751 (1961) (prospective jurors for a trial involving six different murders were drawn from a county of about 30,000 people and the defendant's confession had been highly publicized within the area)." 739 F. Supp. 2d at 793-94 (noting that the seven counties comprising the Erie Division covered approximately 5,610.9 square miles and had a population of 545,615 individuals).  The Court therefore finds that the size and characteristics of the community weigh against any presumption of prejudice among prospective jurors.  *See, e.g., Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1044 (1991) (plurality opinion) (finding a reduced likelihood of prejudice where the venire was drawn from a pool of over 600,000 individuals) (cited in *Skilling*, 561 U.S. at 382); *Robinson*, 2020 WL 5362133, at *32 (state court which declined transfer of venue in a murder trial did not unreasonably apply federal constitutional law, where the community in question was comprised of over 500,000 individuals); *cf. Rodriguez*, 2023 WL 4582618, at *6 ("At the time of the trial, the total population for St. Croix—comprising 84 square miles in geographic area—was 53,234, which is considerably smaller than those communities in which courts have found a likelihood of prejudice.").

(ii)

Next, the Court must examine the nature and content of the news account at issue.  We must consider, for example, whether the news coverage involved blatantly prejudicial information, whether it was factual and objective in nature versus sensational, inflammatory, or slanted toward the prosecution, and whether it focused on any defendant personally as opposed to the alleged crime itself.  *Diehl-Armstrong,* 739 F. Supp. 2d at 793.

Here, Johnson and Exley argue that the publication of their alleged statements to law enforcement is irreparably prejudicial because: their statements have been improperly

characterized as "confessions"; the substance of their statements as reported by the prosecution is strongly disputed; there was no need for the prosecution to make the disclosures; and their allegedly inculpatory statements may ultimately be deemed inadmissible in any event. Defendants Berchtold, Dudenhoefer, Bowes, Hull, and Morphy posit that they are equally prejudiced by the July 19, 2023 news account because the breadth of the reported statements broadly implicates all H&B employees, including themselves. They add that the alleged statements of Johnson and Exley present *Bruton* problems[3] and will likely be inadmissible in the form presented by the Government and reported by the press. Defendants Hertel, Brown, and H&B argue that they are also unfairly prejudiced by the Government's disclosures and the July 19, 2023 article in two respects: (1) the news account attributes certain inculpatory, multi-level hearsay statements to Defendant Hertel and Defendant Brown, which they strongly deny making; and (2) the article includes inappropriate references to the decisions of Defendant Hertel and Defendant Brown to *not* speak to law enforcement officers on February 23, 2021. Indeed, the moving Defendants contend that the prosecution's disclosures in these regards violated both Rule 83(A) of this Court's Local Criminal Rules[4] and Rule 3.6(a) of the Pennsylvania Rules of Professional Conduct.[5]

---

[3] *See Bruton v. United States*, 391 U.S. 123-24 (1968).

[4] According to Local Criminal Rule 83(A):

> A lawyer . . . shall not release or authorize the release of information or opinion that a reasonable person would expect to be disseminated by means of public communication, in connection with pending or imminent criminal litigation with which he or she . . . is associated, if there is a substantial likelihood that such release would materially prejudice ongoing criminal proceedings.

Among the subjects that the rule deems "likely to be materially prejudicial" are "extrajudicial statements by a lawyer . . . associated with the prosecution . . . that a reasonable person would expect to be disseminated by means of public communication relating to," among other things, "the existence or contents of any confession, admission, or statement given by the accused, or the refusal or failure of the accused to make any statement." LCrR 83(C)(2).

[5] Pennsylvania Rule of Professional Conduct 3.6(a) provides that:

This Court can certainly appreciate the Defendants' concerns about the content of the July 19, 2023 news article.  Indeed, the Supreme Court has suggested that news accounts of confessions are a form of "blatantly prejudicial information."  *Skilling,* 561 U.S. at 382.  But acknowledging the prejudicial effect that arises from publication of an alleged confession does not end the Court's inquiry. The central issue before the Court is whether the Defendants can receive a fair trial notwithstanding any news accounts that have been published concerning this case or whether, on the contrary, the trial atmosphere has been "utterly corrupted" by press coverage.  To that end, several observations are relevant.

First, as the Government points out, most of the major news publications in the seven counties of the Erie Division have not covered these proceedings. Similarly, no party has alleged that the purported confessions were the subject of televised news accounts.  At present, it appears that the July 19, 2023 Times-News article is the only story to mention the content of Exley's and Johnson's alleged inculpatory statements, and the precise reach of that article is unclear.  The moving Defendants submit that the prejudice from the July 19, 2023 news account is exacerbated by the fact that all Times-News online stories link to other articles covering this case. Thus, Defendants note, future news articles will offer a link to the "smoking gun" headline of the July 19, 2023 article, inviting online readers to revisit that story as coverage of the case continues. But it is entirely speculative for this Court to infer, on the basis of the present record, that the

A lawyer who is participating or has participated in the investigation or litigation of a matter shall not make an extrajudicial statement that the lawyer knows or reasonably should know will be disseminated by means of public communication and will have a substantial likelihood of materially prejudicing an adjudicative proceeding in the matter.

The rule recognizes "certain subjects that are more likely than not to have a material prejudicial effect on a proceeding," including "the existence or contents of any confession, admission, or statement given by a defendant or suspect or that person's refusal or failure to make a statement[.]" PA ST RPC Rule 3.6 (Explanatory Comment).

presence of an online link will inevitably result in a corrupted jury pool when this case ultimately proceeds to trial. *See Mammone v. Jenkins*, 49 F. 4th 1026, 1044 (6th Cir. 2022) (court noting that, even if habeas petitioner's letter, in which he confessed to aggravated murders, remained available on the internet up to the point of trial, "it presumably had its greatest impact when first printed"). At least at this point in time, the record does not suggest widespread, repeated coverage of the Defendants' alleged confessions.

With respect to the July 19, 2023 news article itself, the Court notes that the first fourteen paragraphs outline the contents of the Defendants' alleged statements in considerable detail. However, the article also notes that Exley and Johnson deny making the statements attributed to them, and it further reports that the Defendants have moved to suppress their statements on the grounds that they were obtained unlawfully. In fact, one of the "Key Points" noted at the beginning of the piece is: "Two of the 21 defendants are disputing what the FBI says the two told them." ECF No. 800-1 at 2. The article also makes clear that the statements attributed to Johnson and Exley are taken from FBI summaries, and their "interviews were not recorded." On balance, the article is factual in the sense that it reports on information obtained from the parties' filings and/or court proceedings. It does not report anything salacious about the Defendants personally, nor does it engage in excessive speculation or editorializing about the case. As a general rule, publicity that is "'factual in nature, but prejudicial and inflammatory only to the extent arising from the normal and natural reaction to any purely factual news item about a very serious crime' . . . does not create a presumption of prejudice." *Robinson*, 2020 WL 5362133, at *31 (quoting *Flamer v. State of Del.*, 68 F.3d 736, 754 (3d Cir. 1995)); *see, e.g., Diehl-Armstrong*, 739 F. Supp. 2d at 789 (prejudice not presumed where publicity "ha[s] focused on factual, albeit salacious, information derived from official sources, court documents and

proceedings, or other publicly available records rather than on conjecture, innuendo, or editorial

content"). And it must also be noted that, here, the alleged criminal activity is not nearly as

salacious as, *e.g.,* conduct involving crimes of violence. Thus, any reported admissions of

wrongdoing in terms of alleged insurance fraud is probably less likely to "engender[ ] an

atmosphere so hostile and pervasive as to preclude a rational trial process." *Rock*, 959 F2d at

1252.

Even in cases where pretrial publicity includes highly prejudicial information such as a

defendant's confession, it does not necessarily follow that juror prejudice must be presumed.

*Patton v. Yount*, 467 U.S. 1025 (1984), for example, concerned a highly publicized case in which

the defendant, a high school mathematics teacher, stood accused of murdering an eighteen-year-

student. The defendant's first trial ended in a conviction which was later overturned when the

Pennsylvania Supreme Court determined that the defendant's uncounseled confession had been

obtained in violation of his *Miranda* rights. Pretrial publicity in that case included reports of the

defendant's inadmissible confession and plea of temporary insanity. But the United States

Supreme Court ultimately upheld the defendant's conviction, because "the voir dire testimony

and the record of publicity [did] not reveal the kind of 'wave of public passion' that would have

made a fair trial unlikely by the jury that was empaneled as a whole." 467 U.S. at 1040. *See also*

*Mammone v. Jenkins*, 49 F.4th 1026 (6th Cir. 2022), *cert. denied*, 143 S. Ct. 2568 (2023)

(state court did not unreasonably apply clearly established federal law in rejecting criminal

defendant's claim that pretrial publicity in aggravated murder case prejudiced his ability to

receive fair trial by impartial jury, despite the fact that newspapers printed the defendant's letter

in which he confessed to the murders, and video of his confession had aired less than two months

before trial); *Karenbauer v. Klem*, No. 05-CV-1586, 2009 WL 473860, at *21 (W.D. Pa. Feb. 25,

2009) (denying habeas relief in case where Pennsylvania Supreme Court found no presumed or actual prejudice among jurors, despite the fact that two jurors had read a news article on the weekend prior to trial which included mention of the defendant's confessions), *aff'd sub nom. Karenbauer v. Beard*, 390 F. App'x 73 (3d Cir. 2010).

Here, the nature and content of the pretrial publicity is materially distinguishable from "the spectacle of [the defendant] personally confessing in detail to the crimes with which he was later to be charged" as found in *Rideau*, 373 U.S. at 726. *Accord Mammone*, 49 F.4th at 1044 (distinguishing *Rideau* from the petitioner's criminal case, which "involved substantially less publicity" and community exposure "to the written word" rather than to "a televised spectacle").

This case is also unlike *Estes*, where "massive pretrial publicity totaling 11 volumes of press clippings . . . had given [the case] national notoriety," 381 U.S. at 535, and the local community was "bombarded . . . with the sights and sounds of a two-day hearing during which the original jury panel, the petitioner, the lawyers and the judge were highly publicized." *Id.* at 538. Also distinguishable is *Sheppard*, where

> For months the virulent publicity about Sheppard and the murder had made the case notorious. Charges and countercharges were aired in the news media besides those for which Sheppard was called to trial. In addition, only three months before trial, Sheppard was examined for more than five hours without counsel during a three-day inquest which ended in a public brawl. The inquest was televised live from a high school gymnasium seating hundreds of people. Furthermore, the trial began two weeks before a hotly contested election at which both Chief Prosecutor Mahon and Judge Blythin were candidates for judgeships.

384 U.S. at 354.

In sum, the fact that the news coverage of this case has included certain inherently prejudicial information is not dispositive of whether the moving Defendants can expect to receive a fair trial in this judicial district. Other relevant considerations must be weighed as well.

13

(iii)

The third factor requires the Court to consider the timing of the relevant media coverage in relation to the commencement of trial. "Potential prejudice can be dissipated if there is a large lapse in time between the widespread publicity and the trial." *Hetzel v. Lamas*, 630 F.Supp.2d 563, 570 (3d Cir. 2009). Thus, in *Skilling,* the Court rejected any presumption of jury prejudice partly because more than four years had elapsed between the time of Enron's bankruptcy and Skilling's trial. Although reporters had covered Enron-related news throughout the four-year period, the Court noted that "the decibel level of media attention diminished somewhat in the years following Enron's collapse." 561 U.S. at 383. The Court contrasted Skilling's situation with "cases in which trial swiftly followed a widely reported crime," *id.,* as in *Rideau.*

In this case, a definitive trial date has not yet been established due to ongoing motions practice and various impending pretrial rulings. The commencement of trial is likely to be months away, given the current procedural posture of this case and the anticipated filing of additional pretrial motions. Any prejudicial effect from the July 19, 2023 news article is likely to dissipate considerably in the intervening time period. Other federal courts have declined to presume juror prejudice where there exists a considerable "cooling off" period between a prejudicial news account and the trial date. *See, e.g., Murphy v. Florida*, 421 U.S. 794, 802 (1975) (finding that media coverage did not serve to prejudice petitioner because the articles about the petitioner's crimes were published seven months prior to jury selection); *Altawarh v. Wetzel*, No. CV 17-1303, 2017 WL 4855858, at *10 (E.D. Pa. Aug. 31, 2017) (passage of five months' time between the pretrial publicity and the start of trial was "a sufficient cooling off period to dissipate the effect of even significantly prejudicial publicity"), *report and recommendation adopted*, No. CV 17-1303, 2017 WL 4838730 (E.D. Pa. Oct. 26, 2017); *Foy v.*

14

*Lamas*, No. 2:12-0088, 2013 WL 838191, at *25 (W.D. Pa. Mar. 6, 2013) (extensive media coverage that ended seven months before trial did not justify presumption of prejudice); *Pursell v. Horn*, 187 F. Supp. 2d 260, 302-03 (W.D. Pa. 2002) (six-month period between adverse publicity and trial militated against presumption of prejudice).

Given the present posture of this case, any prejudice arising from the July 19, 2023 article is likely to dissipate considerably by the time trial commences. Accordingly, the timing of the pretrial publicity weighs against any presumption of prejudice in the prospective jury pool.

(iv)

Finally, courts assessing pretrial prejudice also consider whether there has been any media interference with actual courtroom proceedings. Unlike *Sheppard*, *e.g.*, where "bedlam reigned at the courthouse" and a "carnival atmosphere" pervaded the trial, 384 U.S. at 355, 358, there has been no media interference with any court proceeding thus far in the instant case. Certain members of the media have attended various arguments and court proceedings, but their presence has been subdued and professional. And, although this case has been described as the Erie Division's largest white collar criminal prosecution, this has not resulted in a significant community presence at court proceedings.

(v)

Based upon all of the foregoing observations, the undersigned cannot conclude that the media or other community reaction to this case or to any particular Defendant has "engender[ed] an atmosphere so hostile and pervasive as to preclude a rational trial process." *Rock*, 959 F.2d at 1252. Nor can the Court say that the atmosphere of these proceedings has been "utterly corrupted by press coverage," 561 U.S. at 380, such that prejudice among prospective venire-persons must be presumed.

15

Further, even if the circumstances of this case *did* support a presumption of prejudice among the prospective jury pool, the appropriate remedy would not be dismissal of the instant criminal charges but, rather, a change of venue or venire. *See Rideau,* 373 U.S. at 727 (stating that "due process of law in this case required a trial before a jury drawn from a community of people who had not seen and heard Rideau's televised 'interview'"); *Robinson,* 2020 WL 5362133, at *31 ("In such cases [where prejudice to the defendant is presumed], a change of venue is required and the failure to grant it deprives the defendant of due process.") (citations omitted); *Altawarh v. Wetzel*, No. CV 17-1303, 2017 WL 4855858, at *8 (E.D. Pa. Aug. 31, 2017) (noting same), *report and recommendation adopted*, 2017 WL 4838730 (E.D. Pa. Oct. 26, 2017) (citing *Rideau*, 373 U.S. at 727); *Pursell v. Horn*, 187 F. Supp. 2d 260, 301 (W.D. Pa. 2002) ("[W]hen prejudicial pretrial publicity wholly undermines the impartiality of the jury, the trial court should take steps to assure a fair trial, usually by granting a change of venue.") (citing *Sheppard*, 384 U.S. at 363 and *Rideau, supra*).

Presently, it is premature for the Court to evaluate any putative challenges to venue in this case. "Because the doctrine of presumed prejudice is given such rare application, courts have expressed a preference for deferring ruling on change-of-venue motions until after potential prejudice can been meaningfully assessed via the *voir dire* process." *Diehl-Armstrong*, 739 F. Supp. 2d at 793 (citing authority). Indeed, it may be that the Court will be able to sufficiently remediate any potential prejudice to the defense through precautionary measures such as summoning a larger than usual jury pool, engaging in extensive *voir dire* concerning pretrial publicity, and giving appropriate cautionary instructions to the empaneled jury. *See, e.g., Skilling*, 561 U.S. at 384 (noting the "efficacy" of the trial court's "extensive screening questionnaire and followup *voir dire*" in terms of identifying and inspecting prospective jurors'

connections to Enron); *United States v. Claxton*, 766 F.3d 280, 299 (3d Cir. 2014) (noting that district court "provided a further level of insurance against prejudice" by instructing the jurors that the defendants were to be presumed innocent until the government was able to prove each defendant's guilt beyond a reasonable doubt, and the jurors were instructed to decide the case based solely on the evidence presented in the courtroom, disregarding anything that they may have seen or heard prior to trial); *Gov't of Virgin Islands v. Riley*, 973 F.2d 224, 227 (3d Cir. 1992) (rejecting defendant's argument that he did not receive a fair trial by an impartial jury "in light of the extensive *voir dire* conducted" by the trial judge).

Presently, the Court lacks sufficient grounds to conclude that such measures will be ineffective at eradicating possible prejudice to the defense. But to the extent it becomes necessary, the Court will revisit any venue-related challenges at a point closer to trial.

B. *Prosecutorial Misconduct/Due Process Analysis*

Relatedly, Defendants Hertel, Brown, and H&B submit that the charges should be dismissed based on general concerns about prosecutorial misconduct and due process. They suggest that, through its disclosures, the prosecution has violated its duty "'to refrain from improper methods calculated to produce a wrongful conviction.'" ECF No. 803 at 5 (quoting *Berger v. United States*, 295 U.S. 78, 88 (1935)). Citing *United States v. Thame*, 846 F.2d 200, 205 (3d Cir. 1988), and *Darden v. Wainwright*, 477 U.S. 168, 181 (1986), they suggest that this case warrants dismissal based on the prosecution's "egregious error." ECF No. 803 at 6.

In defending its disclosures, the Government insists that Exley's and Johnson's joint suppression motion fairly brought the substance of their challenged statements into play. The Government further posits that the content of their statements is relevant to the Court's analysis

17

of whether they were subjected to custodial interrogations. This is not manifestly obvious, as it is possible the Court may be able to resolve the disputed *Miranda* issues without either side weighing in on the substance of what was actually said during the alleged interrogations.[6] Moreover, to the extent that consideration of the statements themselves is necessary, the Government could have exercised greater caution by seeking to place that information under seal in the first instance. But even if the prosecution can be faulted for its disclosures, it does not follow that dismissal of the Superseding Indictment is warranted.

The United States Court of Appeals for the Third Circuit has been "extremely hesitant to find law enforcement conduct so offensive that it violates the Due Process Clause." *United States v. Grinnage*, 486 F. App'x 325, 328 (3d Cir. 2012) (citing *United States v. Lakhani*, 480 F.3d 171, 180 (3d Cir. 2007)) (quotation marks omitted). "Thus, Government conduct violates due process only where it is shocking, outrageous, and clearly intolerable." *Id.* (citing *United States v. Nolan–Cooper*, 155 F.3d 221, 231 (3d Cir.1998)) (quotation marks omitted).

In *United States v. Twigg*, 588 F.2d 373 (3d Cir. 1978), for example, the court overturned the convictions of two individuals -- Henry Neville and William Twigg -- charged with illegal drug manufacturing, because "the nature and extent of police involvement in [the] crime was so overreaching as to bar prosecution of the defendants as a matter of due process of law." 588 F.2d at 377. Specifically,

> [a]t the behest of the Drug Enforcement Agency, Kubica, a convicted felon striving to reduce the severity of his sentence, communicated with Neville and suggested the establishment of a speed laboratory. The Government gratuitously supplied about 20 percent of the glassware and the indispensable ingredient, phenyl-2-propanone. It is unclear whether the parties had the means or the money to obtain

---

[6] The Court views the decisions of Defendant Hertel and Defendant Brown to exit the premises on February 23, 2021 without giving statements in a somewhat different light. On this point, the undersigned agrees that the information is potentially relevant to (though clearly not dispositive of) the Court's determination whether or not the overall circumstances gave rise to a "custodial" setting when Exley and Johnson were questioned.

the chemical on their own. The DEA made arrangements with chemical supply houses to facilitate the purchase of the rest of the materials. Kubica, operating under the business name "Chem Kleen" supplied by the DEA, actually purchased all of the supplies with the exception of a separatory funnel. (The funnel was secured by Twigg at the direction of Kubica who was engaged in operating the laboratory.) When problems were encountered in locating an adequate production site, the Government found the solution by providing an isolated farmhouse well-suited for the location of an illegally operated laboratory. Again, there was no cost to the defendants. At all times during the production process, Kubica was completely in charge and furnished all of the laboratory expertise. Neither defendant had the know-how with which to actually manufacture methamphetamine. The assistance they provided was minimal and then at the specific direction of Kubica.

*Id.* at 380-81. In essence, *Twigg* involved a "crime . . . conceived and contrived by government agents." *Id.* at 378. Based on these facts, the court had "no trouble in concluding that the governmental involvement in the criminal activities . . . [had] reached 'a demonstrable level of outrageousness.'" *Id.* at 380.

By contrast, in *Grinnage*, *supra*, the court rejected the defendant's argument that the Government's conduct was so outrageous as to justify the dismissal of his case. The criminal charges in *Grinnage* were filed after the defendant's living partner was murdered in their shared home. A search of the residence following the murder revealed the presence of a handgun and drug paraphernalia, which eventually resulted in criminal charges against the defendant, Sharron Grinnage, for being a felon in possession of a firearm. The community was subjected to "heavy publicity" surrounding the murder of Grinnage's living partner and the subsequent trial of six accused individuals (which did not include Grinnage himself). 486 F. App'x at 328. One particular newspaper article reported on Grinnage being indicted as a felon in possession of a firearm. In that same article, a prosecutor in Grinnage's criminal case was quoted as stating that Grinnage was one of the "most dangerous individuals" on the street and was an "armed career criminal" who "possessed this firearm in connection with his drug dealing activities." *Id.* at 327

(citing to the record). The prosecutor made additional comments which insinuated that Grinnage was to blame for the murder of his living partner.

On appeal from Grinnage's subsequent conviction, the court of appeals ruled that the prosecution's statements to the press did not rise to the level at which the Court would presume Grinnage's due process rights were violated. Quoting *Skilling,* the court noted that "[p]retrial publicity has been found to prejudice a defendant where the conviction was 'obtained in a trial atmosphere that was utterly corrupted by press coverage.'" 486 F. App'x at 328 (citation omitted). The court ruled that the offending article did not meet that standard and the prosecutor's statements "did not rise to the level that would have required a change of venue, even if Grinnage had moved for such a change." *Id. Accord United States v. Lakhani*, 480 F.3d 171, 180-83 (3d Cir. 2007) (holding that Government's involvement as both buyer and seller in supposed illegal arms transaction did not render the prosecution of defendant fundamentally unfair on five charges for his role in attempted importation of shoulder-fired, surface-to-air missiles, as required to succeed on due process clause defense).

In this case, the Court has determined that the relevant pretrial publicity, particularly the July 19, 2023 Erie Times-News article, does not provide grounds for a presumption of prejudice. The Court also finds that the prosecution's disclosures do not rise to the level of outrageous conduct as would necessitate the dismissal of the instant criminal charges as a matter of due process.[7] The moving Defendants have suggested that the prosecutor's disclosures in this case

---

[7]   Neither *Darden v. Wainwright*, 477 U.S. 168, 181 (1986), nor *United States v. Thame*, 846 F.2d 200, 205 (3d Cir. 1988), dictate otherwise. Both decisions involved unsuccessful challenges by defendants who claimed that the prosecution's conduct during trial rendered their convictions fundamentally unfair. In *Thame,* the court determined that an agent's incidental mention of administering *Miranda* rights to the defendant did not amount to the prosecution using the defendant's post-arrest silence against him in a prejudicial manner, as the matter was not pursued through testimony or argument. 846 F.2d at 205, 208.  In *Darden,* the Supreme Court held that the prosecution's closing argument, though deserving of criticism, did not render the trial fundamentally unfair; in

violated both the Local Criminal Rule 83 and the Rule 3.6 of the Pennsylvania Rules of

Professional Conduct.  Inasmuch as those rules pertain to extrajudicial statements, the Court is

not convinced that they were violated by the Government's July 17, 2023 filings.  But even if a

technical violation occurred, the Court does not deem the prosecution's conduct so "shocking,

outrageous, and clearly intolerable" in the overall context of this case as to constitute a violation

of the Defendants' due process rights.

## III.    CONCLUSION

Based on the foregoing reasons, the Defendants' motions to dismiss the Superseding

Indictment will be denied.  The Court will revisit any concerns about pretrial publicity, to the

extent necessary, at a later stage of these proceedings.  In an abundance of caution, however, the

Court will direct the clerk to place the Government's filings at ECF Nos. 792 and 793 under seal,

and the Government will be directed to file a redacted version of those filings which omit any

reference to the content of Exley's or Johnson's alleged confessions.

An appropriate order follows.

---

passing, the Court noted that the prosecutors' argument "did not manipulate or misstate the evidence, nor did it implicate other specific rights of the accused such as the right to counsel or the right to remain silent." *Id.* at 181-82.
   Both cases are consistent with the general principle that a prosecutor's reference during trial to a *Mirandized* defendant's post-arrest silence violates the defendant's due process rights. *See generally Doyle v. Ohio,* 426 U.S. 610 (1976) (stating it is "fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial"). But the due process violation in these situations "stems from the government's breach of its implicit assurance that the defendant's 'silence will carry no penalty.'" *Gov't of the Virgin Islands v. Davis,* 561 F.3d 159, 164 (3d Cir. 2009) (quoting *Wainwright v. Greenfield,* 474 U.S. 284, 290-91 (1986)). "Thus, in defining some of the boundaries of what due process permits, the Court has held that *Doyle* is not violated where the prosecutor impeaches a defendant with his pre-arrest silence[.]" *Id.* (citing *Jenkins v. Anderson,* 447 U.S. 231, 240 (1980)). "In addition, there may be no *Doyle* violation where the trial court sustains an objection to the improper question and provides a curative instruction to the jury, thereby barring the prosecutor from using the silence for impeachment." *Id.* (citing *Greer v. Miller,* 483 U.S. 756, 764–65 (1987)).
   Here, the instant motions concern statements that were made not during trial, but in pretrial filings. In addition, there is no allegation that Defendant Hertel or Defendant Brown were subjected to *Miranda* warnings on February 23, 2021, and it remains to be seen whether the circumstances on that date gave rise to a custodial setting for Fifth Amendment purposes. Because *Darden* and *Thame* involve materially distinguishable circumstances, they are not instructive at the present juncture.

Susan Paradise Baxter
United States District Judge