IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No. 1:21-cr-39 |
| HERTEL & BROWN PHYSICAL | ) | |
| AND AQUATIC THERAPY and | ) | |
| AARON HERTEL, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION**

**Susan Paradise Baxter, United States District Judge**

Pending before the Court in this criminal action are motions to compel discovery filed by

Defendants Hertel & Brown Physical and Aquatic Therapy and Aaron Hertel.[1]  For the reasons

that follow, these motion will be granted in part and denied in part.

## I.      BACKGROUND

Hertel & Brown Physical and Aquatic Therapy (hereafter, "H&B") is a physical therapy

practice founded by Aaron Hertel and Michael Brown, both of whom are licensed physical

therapists.  Over time, the practice grew to include four offices in Erie, Pennsylvania, and one

office in Warren, Pennsylvania.

On February 23, 2021, agents from the Federal Bureau of Investigations ("FBI") and

Health and Human Services ("HHS") executed a search warrant at H&B's various offices.  In

---

[1] To the extent other Defendants have joined in the pretrial motion of movants Hertel and/or
H&B, the within ruling applies to them as well.

1

connection with the search, law enforcement office seized both electronic and non-electronic information and interviewed numerous employees.

In November of 2021, a grand jury returned an indictment against H&B and twenty individuals affiliated with H&B, including owners Aaron Hertel (hereafter, "Hertel") and Michael Brown ("Brown"). The indictment charged all Defendants with health care fraud and conspiracy to commit wire and health care fraud. ECF No. 1.

On May 10, 2022, a superseding indictment was returned, charging the same Defendants with the same crimes, but with some amended averments. ECF No. 425. In essence, the Government alleges that, between January 2007 and October 2021, the Defendants participated in a scheme whereby false or inflated billing statements were submitted to various public and private health insurance entities in order to obtain payment for services that were not authorized or were not actually rendered to H&B's patients in the manner described. According to the Superseding Indictment, the conspiracy resulted in losses of at least $22 million to the insurance entities that were allegedly defrauded.

In January 2022, following this Court's entry of a protective order, the Government began its production of discovery materials, which has occurred on a rolling basis. Among other things, the prosecution has turned over: (i) the search warrants and affidavits relating to the underlying investigation, (ii) records obtained from Medicaid, Medicare, and various private health insurance companies, (iii) evidence seized from H&B's five facilities pursuant to search warrant(s), (iv) consensual videos recorded at the Peach Street H&B facility, (v) an external hard drive containing imaging of the computers at H&B's facilities; (vi) a USB-C flash drive containing emails of certain H&B employees, (vii) H&B YouTube videos, (viii) H&B website information, (ix) Highmark and Medicare claims comparison data, (x) and WebPT records from

H&B's Peach Street facility for the period February 23, 2021 to October 6, 2021. Certain statements which the Government intends to introduce at trial have been provided to all defense counsel. Each Defendant who was interviewed by law enforcement and/or by a professional conduct investigator received a copy of the report(s) and any existing rough notes pertaining to his or her interview. Other individualized disclosures have included college transcripts, continuing education records, criminal histories, bank and tax records, personal email account records, and credit bureau reports. In letters dated February 7, 2022, April 28, 2022, and March 29, 2023, the Government disclosed information from various witnesses that it considered potentially exculpatory under *Brady v. Maryland.* [2]

Hertel and H&B contend that the prosecution should make certain additional disclosures now or, at least, well in advance of trial. H&B primarily seeks production of all documents containing a record of its employees' statements, insofar as those statements are exculpatory or relate to the offenses charged in the Superseding Indictment. ECF No. 618. Alternatively, H&B contends that this Court should use its inherent powers to structure discovery in a manner that compels disclosure of the statements "in the interests of justice and judicial economy." ECF No. 618 at 2. In subsequent briefing, H&B also requested that the Government be required to identify those documents, within the electronic data produced to date, which it considers relevant to the prosecution's case. ECF No. 743.

Hertel requests numerous categories of additional information, including the following:

- Complete copies of any statements from: (i) the witnesses identified in the Government's various disclosure letters; (ii) any fact witnesses who otherwise provided exculpatory or impeachment information; (iii) the confidential witnesses identified in the government's search warrant applications; and (iv) any fact witnesses the government may call at trial;

---

[2] *See* 373 U.S. 83 (1963).

- Documents related to the 2018 Medicare audit that have not previously been provided to the defense, including materials possessed by HHS;

- Any description of and any documents describing or governing the prosecution's methods for reviewing electronically stored information;

- ██████████████████████████████████ and

- Any prosecution team communication containing discoverable material, including witness statements, evaluations of the evidence, or observations about the strength of the case helpful to the defense.

Lastly, Hertel also asks that the Court direct the Government to identify, by a reasonable deadline, which materials form its initial document productions it plans to use at trial.

The Government has responded to the pending motions and, following oral argument, the parties filed supplemental briefs. The Court now addresses the requests made by Hertel and H&B in their respective motions and related briefing.

## II.    GOVERNING LEGAL PRINCIPLES

The United States Court of Appeals for the Third Circuit has recognized that discovery in criminal cases is limited to those areas delineated in Rule 16, "with some additional material being discoverable in accordance with statutory pronouncements and the due process clause of the Constitution." *United States v. Ramos*, 27 F.3d 65, 67-68 (3d Cir. 1994). As a general matter these other areas are limited to the Jencks Act[3] and materials available pursuant to the "*Brady* doctrine.*" *Id.* at 68. In *United States v. Coles*, the district court aptly summarized the interplay of Rule 16, the Jencks Act, and the *Brady* doctrine, as follows:

---

[3] *See* 18 U.S.C. §3500.

Most of the government's pretrial disclosure obligations stem from Rule 16(a). *See* FED. R. CRIM. P. 16(a). The rule establishes six categories of information that the government must produce to an individual defendant "[u]pon ... request." *See id.* Rules 16(a)(1)(A) and (B) task the government to disclose a defendant's oral, written, and recorded statements, and Rule 16(a)(1)(D) requires disclosure of a defendant's prior record. . . . Rule 16(a)(1)(E) is the broadest provision, requiring the government to allow a defendant "to inspect and to copy or photograph books, papers, documents, data, photographs, tangible objects, buildings[,] or places," if the item is in the possession, custody, or control of the government and is "material to preparing the defense," is intended to be used in the government's case-in-chief at trial, or "was obtained from or belongs to the defendant." . . . . Rule 16(a)(1)(F) requires the same for the results or reports of any physical or mental examinations or scientific tests or experiments that are in the possession, custody, or control of the government; are known to exist (or reasonably should be known to exist) by the attorney for the government; and either are material to preparing the defense or intended to be used in the government's case-in-chief. . . . Under Rule 16(a)(1)(G), the government must provide defendants with a written summary of any expert testimony it intends to use in its case-in-chief. . . .

Rule 16 includes important caveats. Except as authorized under Rule 16(a)(1)(A) through (D), (F), and (G), the rule exempts government work product from discovery and inspection. *See* FED. R. CRIM. P. 16(a)(2). Government work product includes "reports, memoranda, or other internal government documents made by an attorney for the government or other government agent in connection with investigating or prosecuting the case." *See id.* The rule also exempts from discovery and inspection the statements of prospective government witnesses, except as provided in the Jencks Act. *See id.* (citing 18 U.S.C. § 3500).

The Jencks Act protects from disclosure statements or reports made by prospective government witnesses until after they testify on direct examination at trial. *See* 18 U.S.C. § 3500(a). After the witness testifies, the Act entitles the defendant to a copy of "any statement ... of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified." *Id.* § 3500(b) . . . . The Act is intended to ensure that a defendant has "an opportunity to review the witness's statements for any possible inconsistencies that he might use to impeach the witness." . . .

*** 

Finally, under *Brady v. Maryland*, . . . the government is obligated to disclose to a criminal defendant any evidence in the government's possession that is "favorable to an accused" and "material either to guilt or to punishment." . . . . The government must also disclose any "evidence that goes to the credibility of crucial prosecution witnesses." . . . Known as *Giglio* material, *see Giglio v. United States*, 405 U.S. 150 . . . (1972), "this evidence is a subset of *Brady* material insofar as it addresses

5

situations in which certain evidence about a witness's credibility or motivation to testify exists." . . . Failure to disclose either type of material violates the defendant's due-process rights. . . . Admissibility is relevant but not a prerequisite to disclosure under *Brady*, since "inadmissible evidence may be material if it could ... [lead] to the discovery of admissible evidence." . . . .

511 F. Supp. 3d 566, 574-76 (M.D. Pa. 2021) (cleaned up). With these general principles in mind, the Court turns to the parties' specific requests for information.

## III.   DISCUSSION

### A.   *H&B's Request for the Statements of Officers and Employees Pursuant to Rule 16(a)(1)(C)*

H&B's motion is primarily focused on obtaining all statements concerning the offense conduct that were provided by its employees or officers to agents in connection with the investigation of this case. To date, the Government has disclosed inculpatory statements allegedly made by three former employees of H&B. The Government represents that it intends to use these alleged admissions its case in chief at trial. Additionally, pursuant to *Brady*, the Government has disclosed summaries of statements from more than two dozen employees that it considered to be potentially exculpatory. The Government insists it need do no more. The parties' dispute requires the Court to determine the disclosure mandates imposed by Rule 16 of the Federal Rules of Criminal Procedure.

### 1.   The Provisions of Rule 16(a)

As it relates to individual defendants, Rule 16 requires disclosure of the defendant's own statements in accordance with the following parameters:

**(A) Defendant's Oral Statement.** Upon a defendant's request, the government must disclose to the defendant the substance of any relevant oral statement made by the defendant, before or after arrest, in response to interrogation by a person the defendant knew was a government agent if the government intends to use the statement at trial.

6

**(B) Defendant's Written or Recorded Statement**. Upon a defendant's request, the government must disclose to the defendant, and make available for inspection, copying, or photographing, all of the following:

(i)    any relevant written or recorded statement by the defendant if:

•  the statement is within the government's possession, custody, or control; and

•  the attorney for the government knows--or through due diligence could know --that the statement exists;

(ii)   the portion of any written record containing the substance of any relevant oral statement made before or after arrest if the defendant made the statement in response to interrogation by a person the defendant knew was a government agent; and

(iii)  the defendant's recorded testimony before a grand jury relating to the charged offense.

Fed. R. Crim. P. 16(a)(1)(A) and (B).

With respect to "Organizational Defendants" such as H&B, the Rule provides that:

Upon a defendant's request, if the defendant is an organization, the government must disclose to the defendant any statement described in Rule 16(a)(1)(A) and (B) if the government contends that the person making the statement:

**(i)** was legally able to bind the defendant regarding the subject of the statement because of that person's position as the defendant's director, officer, employee, or agent; or

**(ii)** was personally involved in the alleged conduct constituting the offense and was legally able to bind the defendant regarding that conduct because of that person's position as the defendant's director, officer, employee, or agent.

Fed. R. Crim. P. 16(a)(1)(C).

2.  The *Maury* Decision

The U.S. Court of Appeals for the Third Circuit had an opportunity to address Rule

16(a)(1)(C)'s disclosure requirements in *United States v. Maury*, 695 F.3d 227 (3d Cir. 2012), a

case which is relied on heavily by both H&B and the Government.  In *Maury*, the United States prosecuted a corporate defendant and several of its managerial employees for alleged violations of the Clean Water Act and Clean Air Act.  Based on its concerns about the safety of certain prospective employee witnesses, the trial court allowed the Government to delay its disclosure of statements that were deemed to be discoverable under Rule 16(a)(1)(C).  When the prosecution ultimately made its Rule 16(a)(1)(C) disclosures, it produced redacted documents for 24 witnesses who fell into two categories:

> For individuals who could bind the Company by virtue of their position alone, the Government produced all oral statements that it intended to use at trial, and all written statements discussing issues on which the employee had the authority to bind the Company. *See* Rule 16(a)(1)(C)(i). For all employees who were capable of binding the Company by virtue of their participation in the charged events, *i.e.* employees who had participated directly in the charged conduct, the Government produced all oral and written statements discussing that specific conduct. *See* Rule 16(a)(1)(C)(ii). All other statements from these individuals, such as statements unrelated to the charged conduct or observations of the conduct of others, were redacted.

695 F.3d at 250.

    After the defendants were convicted on various charges, they appealed, arguing -- in relevant part -- that the district court had erred in its application of Rule 16(a)(1)(C)(ii).  695 F.3d at 251.  Whereas the prosecution had disclosed only the statements of corporate employees that concerned the offense conduct, the defense maintained that, "[o]nce an employee participated in the misconduct, all statements given by that employee should have been disclosed, even if unrelated to the misconduct."  *Id.* (citations and internal quotation marks omitted).

In reviewing the district court's discovery ruling for plain error, the Court of Appeals found none. It began by considering the language of Rule 16(a)(1) and the relevant comments of the Advisory Committee:

> Under Rule 16, an individual is entitled to essentially (1) any oral statement made in response to interrogation by a government agent, provided that the government intends to use that statement at trial; (2) copies of any written or recorded statement by the defendant—or any record containing the substance of that statement—provided it is within the control of the government; and (3) the defendant's grand jury testimony relating to the offense. Fed.R.Crim.P. 16(a)(1)(A), (B). Such statements are often admissions and can be used to bind the defendant at trial. Pre-trial discovery allows an individual defendant the opportunity to seek suppression of these statements before they are introduced into evidence at trial, *see* Fed.R.Crim.P. 16(a)(1)(C) Advisory Committee Notes to 1994 Amendments, and to evaluate the weight of such direct evidence against him in deciding whether to take a plea or face trial.
>
> Rule 16(a)(1)(C) imports the individual-defendant discovery rules in subsections (a)(1)(A) and (B) to the context of organizational defendants, such as the Company in this case. The Advisory Committee Notes pertaining to this portion of Rule 16 make it clear that the disclosure requirements "apply equally to individual and organizational defendants." Fed.R.Crim.P. 16(a)(1)(C) Advisory Committee Notes to 1994 Amendments (emphasis added). This, in our view, indicates that the same limitations and driving principles which control in the individual context transfer, through incorporation, to the discovery rights afforded to organizational defendants under Rule 16(a)(1)(C).

695 F.3d at 252-53.

The court recognized in *Maury* that organizations can act or speak only through their agents, and the "statements of agents can bind the corporation." 695 F.3d at 253 (citing Fed. R. Evid. 801(d)(2)(C), (D)). "And, '[b]ecause an organizational defendant may not know what its officers or agents have said or done in regard to a charged offense, it is important that it have access to statements made by persons whose statements or actions could be binding on the defendant.'" *Id.* (quoting Fed.R.Crim.P. 16 Advisory Committee Notes to 1994 Amendments)

(alteration in the original).  The court concluded that "Rule 16(a)(1)(C) . . . entitles an

organizational defendant to those very statements."  *Id.*

The court then considered the ways in which a corporate defendant can be bound by the

words of its agent under Federal Rule of Evidence 801(d)(2). *See* 695 F.3d at 253.  Using Rule

801(d)(2) as a guide, the court concluded that "two classes of individuals can make statements

that are sufficient to constitute admissions against the corporation, which are thus discoverable

under Rule 16(a)(1)(C): (1) representatives, or individuals who have the power to bind an

organization by virtue of their authority to make statements on the subject on behalf of the

organization, *see* Fed.R.Crim.P. 16(a)(1)(C)(i); and (2) employees who engage in illegal conduct

within the scope of their jobs and then make some statement about having done so, *see*

Fed.R.Crim.P. 16(a)(1)(C)(ii)." *Id.*

As it relates to the second category, the court in *Maury* concluded that discoverable

statements must be "tethered to the [offense] conduct itself." 695 F.3d at 253.  Thus, "[i]n

keeping with traditional notions of agency and vicarious liability, it is only in this context that

the employee "speaks" on the behalf of the Company as concerns the charged conduct against

which the organizational defendant must defend itself." *Id.*  The court reasoned that

> any broader reading begins to afford organizational defendants greater rights than
> those afforded to individual defendants. Rule 16 recognizes the dueling identities
> of an organization's average employee: first, as a situational agent of the Company
> and second, as an average, run-of-the-mill fact witness. The further a general
> employee's statements diverge from admissions about having engaged in a form of
> conduct on behalf of the Company, the more they begin to resemble general, fact-
> based, witness statements. Such statements are not discoverable to individual
> defendants prior to the witness's trial testimony and until the Government's Jencks
> obligations kick in. *See* Fed.R.Crim.P. 16(a)(2); 18 U.S.C. § 3500. To make such
> statements discoverable under Rule 16(a)(1)(C) would grant organizational
> defendants a windfall, by allowing such defendants to use Rule 16 as a means of
> gaining early access to witness's inculpatory statements when non-organizational
> defendants have no such right. *See United States v. Dessange*, No. 99–Cr.–1182,

2000 U.S. Dist. LEXIS 2557, at *8–9 (S.D.N.Y. Mar. 7, 2000); *United States v. Lin Lyn Trading, Ltd.*, 911 F.Supp. 494, 497 (D.Utah 1996); *United States v. Bhutani*, No. 93–585, 1995 WL 632069 (N.D.Ill. Sept. 1, 1995) (explaining that Rule 16 reaches only those statements that are in the nature of admissions). To the extent a defendant wishes to use those statements to contradict the witness, or to draw the witness's credibility into question at trial, that is the stuff of Jencks disclosures and is adequately accounted for by that requirement.

695 F.3d at 253-54. The court thus declined to interpret Rule 16(a)(1)(C)(ii) in a way that would operate as "a tool for general evidence-gathering prior to trial" and thereby "give organizational defendants a substantial advantage in criminal proceedings." *Id.* at 254. Instead, the court concluded:

> where a statement itself is being used to bind the Company, Rule 16 affords an organizational defendant the opportunity to access that statement—and only that binding statement—prior to trial so that the defendant can seek to have it suppressed and can attempt to estimate the damage that might be inflicted by it at trial. This is consistent with and equal to the discovery allowed to individual defendants under Rule 16(a).

*Id.*

### 3. Application of Rule 16(a)(1)(C) in this Case

In this case, the Government interprets *Maury* to mean that it is obliged to produce *only* those employee statements which the prosecution intends to utilize as evidence in its case in chief at trial. To that end, the Government has disclosed inculpatory statements that three individual Defendants allegedly gave to law enforcement agents in connection with the Government's investigation of this case, each of which the prosecution intends to introduce as evidence at trial. The Government denies that it has any obligation to produce the statements of other officers or employees who will testify at trial, since the Government intends to introduce those witnesses' *testimony,* and not their *prior statements,* as evidence. Similarly, for employees

whom the Government does *not* intend to call at trial, the Government insists that no disclosure is required under Rule 16.

H&B strongly disagrees with the Government's interpretation of Rule 16(a)(1)(C). According to H&B, the United States is seeking to hold it liable for the acts of *all* employees and officers, whether indicted and unindicted, who participated in the alleged conspiracy. H&B thus posits that it is entitled to *any* statement made by its employees or officers relative to the conduct charged in the Superseding Indictment.

As an initial point, the Court agrees with H&B that the Government's construction of Rule 16(a)(1)(C) is too narrow. As noted, the Government insists that it need produce only those prior statements that it intends to use as substantive evidence at trial. The Government insists this is the only reasonable interpretation of the *Maury* Court's conclusion that, "where a statement itself is being used to bind the Company, Rule 16 affords an organizational defendant the opportunity to access that statement—and only that binding statement—prior to trial so that the defendant can seek to have it suppressed and can attempt to estimate the damage that might be inflicted by it at trial." 695 F.3d at 254. Yet this interpretation is problematic.

To begin, the Government's position in this case is at odds with the broader interpretation of Rule 16 that the prosecution adopted, and the court of appeals ultimately approved, in *Maury*. To review, the prosecutors in *Maury* produced two groups of statements in discovery. "For individuals who could bind the Company by virtue of their position alone, the Government produced all oral statements that it intended to use at trial, *and all written statements discussing issues on which the employee had the authority to bind the Company.*" 695 F.3d at 250 (citing Rule 16(a)(1)(C)(i)) (emphasis added). The Government has not addressed subsection (a)(1)(C)(i) at length in its briefing, other than to clarify that neither Aaron Hertel nor Michael

Brown gave statements to investigators; but H&B contends that its various facility directors would also seemingly fall into the category of individuals whose statements could bind the company by virtue of their position and, therefore, any statements these individuals made concerning the offense conduct must be disclosed. The Court finds that, at the very least, the Government should clarify its position concerning the applicability of Rule 16(a)(1)(C)(i) as it relates to H&B's facility directors. Accordingly, the Government will be directed to file a report, within fourteen days, indicating whether it contends that H&B's various facility directors are persons who are able to legally bind H&B in this case regarding the subject of any statements they may have made, because of their position with the company.

The second group of disclosures in *Maury* concerned statements that the prosecution deemed discoverable under Rule 16(a)(1)(C)(ii). That is, "[f]or all employees who were capable of binding the Company by virtue of their participation in the charged events, *i.e.* employees who had participated directly in the charged conduct, the Government produced all oral and written statements discussing that specific conduct." 695 F.3d at 250 (citing Rule 16(a)(1)(C)(ii)). All other statements from these individuals, such as statements unrelated to the charged conduct or observations of the conduct of others, were redacted. *Id.* Notably, full, unredacted versions of these documents were ultimately produced under the Jencks Act "at least 3 days prior to the testimony of each witness[,]" but "for those individuals who did not testify, no such Jencks disclosure occurred." *Id.* at 250-51. Thus, the Government's production in *Maury* clearly encompassed more than just the statements that the prosecution intended to offer as substantive trial evidence. Rather, the Government's disclosures included the prior statements of employees who were expected to later *testify* on behalf of the Government at trial.

More fundamentally, the Government's interpretation of Rule 16(a)(1)(C) in this case is at odds with the language of the Rule itself and the relevant Advisory Committee notes. As the *Maury* Court observed, "Rule 16(a)(1)(C) imports the individual-defendant discovery rules in subsections (a)(1)(A) and (B) to the context of organizational defendants[.]" 695 F.3d at 252-53. Both *Maury* and the Advisory Committee Notes make clear that subsection (a)(1)(C) is intended to put organizational defendants on equal footing with individual defendants. Fed.R.Crim.P. 16(a)(1)(C) Advisory Committee Notes to 1994 Amendments (noting that Rule 16's disclosure requirements "apply equally to individual and organizational defendants"); *Maury*, 695 F.3d at 253 ("[T]he same limitations and driving principles which control in the individual context transfer, through incorporation, to the discovery rights afforded to organizational defendants under Rule 16(a)(1)(C)."). But in the case of individual defendants, only Rule 16(a)(1)(A) -- pertaining to oral statements -- conditions the government's disclosure obligation on its intent to use the statement at trial. No such requirement is written into subsection (a)(1)(B) pertaining to written or recorded statements of the defendant. To put a finer point on it, Rule 16(a)(1)(B)(ii) requires the disclosure of law enforcement reports of a defendant's interview without regard to whether the defendant's alleged statement will be used at trial.[4] Thus, an accused person who is interrogated by law enforcement agents is permitted to receive the agent's written report of the interrogation, irrespective of whether the defendant's statements will be introduced at trial.

In short, the Government's proposed interpretation of Rule 16(a)(1)(C) imposes a limitation [*i.e.*, intent to use the statement at trial] that is *not* present in subsection (a)(1)(B). As

---

[4] The Government seems to recognize as much, because it represents that "each Defendant who was interviewed by law enforcement received a copy of the law enforcement agent's report of their respective interview(s). ECF No. 644 at 2-3.

the defense points out, the fact that this "use at trial" limitation was expressly included in subsection (a)(1)(A) but omitted from subsection (a)(1)(B) indicates that the latter exclusion was intentional.  *See Loughrin v. United States*, 573 U.S. 351, 358 (2014) (discussing the "general cannon[ ] of statutory interpretation" that "when Congress includes particular in one section of a statute but omits it in another -- let alone in the very next provision -- [courts] presume that Congress intended a different meaning") (internal quotation marks and citation omitted).  This is confirmed by the Advisory Committee Notes stating that

> The rule now requires the prosecution, upon request, to disclose any written record which contains reference to a relevant oral statement by the defendant which was in response to interrogation, without regard to whether the prosecution intends to use the statement at trial. *The change recognizes that the defendant has some proprietary interest in statements made during interrogation regardless of the prosecution's intent to make any use of the statements.*

Fed. R. Crim. P. 16, Advisory Committee Notes to 1991 Amendment (emphasis added).  If adopted, the prosecution's position would create disparate disclosure obligations concerning the statements of individual defendants and corporate defendants.  The prosecution's preferred interpretation would also allow the Government to unilaterally determine, through its own preemptive trial strategy, which corporate admissions to disclose.  No such license is granted to the Government with respect to the recorded statements of individual defendants.

The Government insists, however, that the court's concluding statement in *Maury* can *only* be read as restricting the disclosure requirements to those prior statements of an employee that will be introduced as part of the Government's trial evidence.  Otherwise, the Government insists, there is nothing for the defense to try and suppress.  But the *Maury* court was concerned with more than just the corporate defendant's ability to suppress prior employee statements:  the court also expressed concern that a corporate defendant, like an individual defendant, have

access to its prior statements so that it can assess the state of the evidence against it and determine its potential liability and the risks of proceeding with litigation. 695 F.3d at 252 (noting that pretrial discovery allows an individual defendant the opportunity "to seek suppression of [his] statements before they are introduced into evidence at trial . . . *and to evaluate the weight of such direct evidence against him in deciding whether to take a plea or face trial*") (emphasis added); *id.* at 253 ("[B]ecause an organizational defendant may not know what its officers or agents have said or done in regard to a charged offense, it is important that it have access to statements made by persons whose statements or actions *could be binding* on the defendant.") (quoting Fed. R. Crim. P. 16 Advisory Committee notes to 1994 Amendments) (emphasis added); *id.* at 254 (noting that Rule 16 affords organizational defendants the opportunity to access any binding statement "so that the defendant can seek to have it suppressed and can attempt to estimate the damage that might be inflicted by it at trial").

Furthermore, Rule 16 contemplates the prompt disclosure of a defendant's statements early in the case. For this reason, it is most sensible to read *Maury's* rule broadly, without regard to the Government's future trial strategy. Finally, the Court recognizes that a corporate defendant, unlike an individual, may not assert the Fifth Amendment privilege against self-incrimination. *See United States v. Bhimani*, 492 F. Supp. 3d 376, 390 (M.D. Pa. 2020) (citing *Braswell v. United States*, 487 U.S. 99, 102 (1988)). This consideration, too, weighs in favor of a more liberal reading of Rule 16(a)(1)(C). Because a corporate defendant cannot necessarily preclude its agents from making binding corporate admissions, it makes sense that the corporation should be able to obtain full discovery of those admissions. *See Maury*, 695 F.3d at 253 ("'(B)ecause an organizational defendant may not know what its officers or agents have said or done in regard to a charged offense, it is important that it have access to statements made by

16

persons whose statements or actions could be binding on the defendant.'") (quoting Fed. R. Crim. P. 16 Advisory Committee Notes to 1994 Amendments). Based on all the foregoing considerations, the Court disagrees with the Government's position that it need only produce those employee statements that will be offered into evidence at trial.

At the same time, however, the Court also finds H&B's construction of Rule 16(a)(1)(C) to be overly broad. H&B generally seeks disclosure of any employee statement related to the offense under the theory that the Government is essentially trying to hold H&B liable for the conduct of *all* its employees over a multiyear period. But this view ignores *Maury's* nuanced distinction between employee statements that are in the nature of true admissions versus those that are more appropriately categorized as witness statements. Notably, both the district and appellate courts in *Maury* approved the prosecution's determination that it was not required under Rule 16 to produce employee statements "unrelated to the charged conduct" or those that concerned "observations of the conduct of others." 695 F.3d at 250. In fact, the court of appeals recognized the "dueling identities" of average employees, who serve both as "situational agent[s]" of the company and as "run-of-the-mill fact witness[es]." *Id.* at 254. The court drew a clear distinction between (a) an employee's discoverable "admissions about having engaged in a form of conduct on behalf of the Company" and (b) an employee's "general, fact-based, witness statements[,]" which are "not-discoverable." *Id.* The court expressly rejected any interpretation of Rule 16(a)(1)(C) that "would grant organizational defendants a windfall by allowing such defendants to use Rule 16 as a means of gaining early access to witness's inculpatory statements, when non-organizational defendants have no such right." *Id.*

Accordingly, consistent with the ruling of *Maury* and Rule 16(a)(1)(C)(ii), H&B may discover employee statements which concern the speaker's own participation in the alleged

offense conduct. This includes statements given in the context of a proffer session where a government agent was involved in questioning the witness. *See United States v. Stein,* 424 F. Supp. 2d 720, 728 (S.D.N.Y. 2006) (ordering production of notes made by government agents of interviews and proffer sessions pursuant to Rule 16(a)(1)(B)(ii)); *accord United States v. Ferguson,* Crim. No. 3:06CR137, 2007 WL 196668 (D. Conn. Jan. 24, 2007). On the other hand, H&B is *not* entitled to obtain employee statements that do not concern the charged conduct or that are in the nature of inculpatory fact witness observations concerning the conduct of others.[5]

### B. Hertel's Request for Witness Statements

1. Hertel's Request Pursuant to Rule 16

Like H&B, Hertel requests that the Government be compelled to produce employee or confidential witness statements in its possession. Unlike H&B, however, Hertel is not an organizational defendant and therefore cannot benefit from the more expansive disclosure requirements of Rule 16(a)(1)(C). Instead, Hertel seeks to obtain employee and confidential witness statements pursuant to the "materiality" provision of Rule 16(a)(1)(E), which permits a

---

[5] H&B argues that, as part of its *Brady* disclosure obligations, the Government must produce any witness statements in the government's possession that might contain potentially exculpatory information, including information that might support a motion to suppress. ECF 618 at 9. In support of this argument, H&B cites *Biles v. United States*, 101 A.3d 1012 (D.C. 2015) (holding that failure to provide information relevant to a motion to suppress was a *Brady* violation). As discussed further herein, whether *Brady* applies in the context of suppression proceedings remains an open question within this circuit and elsewhere. *See infra* at Section III(E).

Regardless, H&B acknowledges that its *Brady* request is mooted by the Court's determination that it is entitled to employee statements pursuant to Rule 16(a)(1)(C). Beyond this, the Government has already made substantial, adequate *Brady* disclosures relative to dozens of interviewees. The Court accepts the Government's representation that it understands and will continue to comply with its *Brady* obligations. Accordingly, H&B's discovery request relative to additional *Brady* disclosures is dismissed as moot.

defendant to inspect and copy or photograph "books, papers, documents, data, photographs,

tangible objects, buildings or places," *etc*., if "the item is material to preparing the defense."

Fed. R. Crim. P. 16(a)(1)(E)(i).  Hertel contends that complete witness statements are material to

his defense because he "cannot present witnesses he does not know about," he "cannot assess the

strength of those witnesses' testimony without knowing what they may have told the

government," and he "cannot judge the strength of the government's witnesses without knowing

what they have said." ECF No. 624 at 14.

      Hertel's argument for obtaining witness statements under Rule 16 lacks merit.  The rule

is clear that it does not authorize "the discovery or inspection of statements made by prospective

government witnesses except as provided in 18 U.S.C. §3500," commonly known as the Jencks

Act.  Fed. R. Crim. P. 16(a)(2).  The Jencks Act is equally clear that "no statement or report in

the possession of the United States which was made by a Government witness or prospective

Government witness (other than the defendant) shall be the subject of subpoena, discovery, or

inspection until said witness has testified on direct examination in the trial of the case." 18

U.S.C. §3500.  Thus, "Rule 16 does not authorize the pretrial discovery or inspection of

statements made by prospective government witnesses, even if they arguably are 'material to

preparing the defense' under Rule 16(a)(1)(E), unless, of course, they constitute *Brady* material."

*U.S. v. Hanner*, No. 02:05cr385-02, 2007 WL 587462 at *1 (W.D. Pa. Feb. 20, 2007); *see also*

*United States v. Fenstermaker*, No. 1:21CR41, 2023 WL 4950499, at *3 n. 2 (W.D. Pa. Aug. 3,

2023) ("It is well-settled that the plain language of the Jencks Act precludes a court from

compelling the disclosure of Jencks Act material prior to the completion of a government

witness' testimony on direct examination.") (citing authority); *Coles*, 511 F. Supp. 3d at 575

("The Jencks Act is the sole means of acquiring the statements that it covers; that is, 'statements

of a government witness made to an agent of the [g]overnment which cannot be produced under the terms of [the Jencks Act] cannot be produced at all.") (quoting *Palermo v. United States*, 360 U.S. 343, 351 (1959)) (alterations in the original).[6]

Recognizing this limitation, Hertel insists that he nevertheless is entitled to obtain the statements of any employee or other individuals whom the Government does not plan to call as a witness in its case. He reasons that such information falls outside of the Jencks Act and is therefore discoverable. To the extent the Government resists disclosure, Hertel posits that the prosecution should have to establish each interviewee's status as a prospective witness or co-conspirator. In support of his discovery request, Hertel has cited a few out-of-circuit decisions where the pretrial disclosure of statements given by non-testifying co-defendants or co-conspirators was permitted. *See United States v. McMillen*, 489 F.2d 229, 231 (7th Cir. 1972) (stating that defendants were entitled to obtain the statements of non-testifying co-defendants); *United States v. Madeoy*, 652 F. Supp. 371, 375 (D.D.C. 1987) (allowing for pretrial discovery of co-conspirator statements whom the government does not intend to call as witnesses); *United States v. Bell*, Case No. 17-cr-20183, 2019 WL 3451223 at *7 (E.D. Mich. July 31, 2019) (recognizing district court's discretion to order the Government to produce a co-defendant's statement before trial to the extent the co-defendant is not a prospective government witness).

This, however, does not appear to be the prevailing view, and Hertel cites no binding authority from this judicial circuit that would support the disclosures he seeks. Here, many of

---

[6] As discussed in more detail below, the Government has offered to provide Jencks Act material at least two weeks prior to the commencement of trial in this case. The Third Circuit has endorsed and encouraged the government's prevailing practice of committing to disclose Jencks material prior to trial. *Fenstermaker*, 2023 WL 4950499 at *3 n. 2 (citing *United States v. Murphy*, 569 F.2d 771, 773 (3d Cir. 1978); *United States v. Hill*, 976 F.2d 132, 140 (3d Cir. 1992)).

the interviewees identified by Hertel are co-Defendants in this case. ECF No. 624 at 15-16. But under Third Circuit law, an "individual defendant is not entitled to discovery of the statements of his codefendants." *Maury*, 695 F.3d at 251 n.21 (citing *United States v. Randolph*, 456 F.2d 132, 135-36 (3d Cir. 1972)); *Coles*, 511 F. Supp. 3d at 579 (noting that the defendants' request for discovery of their codefendants' statements was "foreclosed by binding precedent"). Similarly, with respect to unindicted co-conspirators, "the robust and longstanding consensus of district courts within this circuit is that statements of coconspirators are not discoverable under Rule 16." *Coles*, 511 F. Supp. 3d at 579 and n. 6 (citing authority). Several courts have adhered to this rule even as it relates to the statements of non-testifying coconspirators. *See Coles,* 511 F. Supp. 3d at 580 n. 7 (rejecting defendants' argument that, pursuant to *United States v. Jackson*, 757 F.2d 1486 (4th Cir. 1985), the statements of a coconspirator are discoverable under Rule 16 if the coconspirator will not be testifying as a government witness at trial; court noted that "the Fourth Circuit Court of Appeals reversed [*Jackson*] *en banc* two years later in *United States v. Roberts*, 811 F.2d 257 (4th Cir. 1987) (*per curiam*)); *see also United States v. Johnson*, 218 F. Supp. 3d 454, 458 (W.D. Pa. 2016) ("Every circuit court to address the issue has held that [co-conspirator] statements are not discoverable under Rule 16 and that disclosure of such statements is governed by the Jencks Act, regardless of whether the co-conspirator will be called as a witness.") (citing authority); *United States v. Thomas*, 66 F. Supp. 372, 375 (W.D. Pa. 1991) ("[T]o the extent that the defendant seeks disclosure of statements that are not either *Jencks* or *Brady* material, the Court finds that the defendant is not entitled to any other statements, including statements of witnesses whom the Government does not plan to call at the trial of this case.") (citing cases). *Accord United States v. Tarantino*, 846 F.2d 1384, 1418 (D.C. Cir. 1988) (court concluding that it lacked authority to order the disclosure of a co-conspirator statements where the prosecution

21

"does not propose to put the co-conspirator on the stand"); *United States v. Taylor*, 707 F. Supp. 696, 701 (S.D.N.Y. 1989) ("The statements of co-conspirators are not subject to discovery if the government does not intend to introduce such statements at trial, unless such material must be provided as exculpatory under the *Brady* doctrine.").

In any event, to the extent this Court possesses the discretion to order the production of any non-testifying witness's statement in this case, it declines to do so at this time.[7]  Given the likelihood of future motions practice and the possibility of plea agreements, it is doubtful the Government has definitively determined which of its prospective witnesses will eventually testify at trial.  Hertel cites no authority for his suggestion that the Government must affirmatively justify its characterization of witness statements as Jencks Act material; and requiring the prosecution to do so at this point would violate the "firmly established" rule in this circuit that the Government is under no obligation "to divulge the identity of its witnesses in a noncapital case." *United States v. Addonizio*, 451 F.2d 49, 62 (3d Cir. 1971); *see Coles*, 511 F. Supp. 3d at 580 (government was not required to justify withholding its witness list or to identify with particularity a known threat to its witnesses).  Finally, Hertel has made no prima facie showing that the "non-Jencks" statements he seeks are material to his defense.  "For evidence to be 'material' under Rule 16(a)(1)(E)(i), the defendant must show 'some indication that the pretrial disclosure of the disputed evidence would ... enable the defendant significantly to alter the quantum of proof in his favor.'" *United States v. Duncan*, No. 4:19-CR-00086, 2020 WL

---

[7] As discussed above, the Court has ordered that the Government disclose certain employee statements to H&B. The Court recognizes that, as a practical matter, Hertel may ultimately obtain access to that same information in his capacity as H&B's principal or through an agreement among defense counsel.

4934757, at *2 (M.D. Pa. Aug. 24, 2020) (citing *United States v. Young*, No. CR.A.05 56, 2007 WL 756729, at *2 (E.D. Pa. Mar. 7, 2007)).  Hertel has not articulated any specific need for the Government's witness statements other than a generalized desire to know more about the prosecution's case.[8]  Accordingly, his request under Rule 16 will be denied.

###    2.  Hertel's Request Pursuant to the *Brady* Doctrine

We next consider Hertel's request for witness statements as it relates to *Brady v. Maryland.*  Pursuant to *Brady*, the prosecution must disclose evidence that is favorable to the accused and material to either guilt or punishment.  373 U.S. at 87.  To that end, the prosecution issued letters dated February 7 and April 28, 2022, in which it disclosed favorable information received from more than two dozen witnesses.  On March 29, 2023, as part of its ongoing disclosure obligations, the prosecution issued another letter summarizing potential *Brady* information received from thirty-three (33) individuals.  Some of the statements identified in the March 29 letter concerned individuals who had been mentioned in the Government's prior *Brady* disclosures; however, the March 29 letter also included information received from fourteen (14) additional sources.

####      a.  Objections to the Format of the Government's *Brady* Disclosures

Hertel has objected to the format of the Government's *Brady* disclosures, arguing that the Government should provide the original law enforcement reports of these witness interviews rather than mere summaries or bullet points identifying potentially favorable information.  H&B has lodged a similar challenge to the format of the prosecution's disclosures.

---

[8] To the extent Hertel is requesting the statements of individuals identified in the Government's *Brady* disclosures, we address that discovery request in more detail below.

The Government insists that its disclosure letters are sufficient to satisfy its obligations under *Brady*.  It cites numerous decisions from other jurisdictions wherein the prosecution's *Brady* disclosures were found to be adequate, even though they occurred in the form of letters or summaries of pertinent information rather than the production of original source material.  *See, e.g., United States v. Henderson,* 250 F. App'x 34, 38-39 (5th Cir. 2007) (finding no *Brady* violation where "[a]ll the relevant information" from an email between a DEA agent and AUSA was disclosed by the government in a letter to defense counsel one month prior to trial); *United States v. Grunewald,* 987 F.2d 531, 535 (8th Cir. 1993) (finding no *Brady* violation where the prosecution provided typewritten summaries of IRS agent's notes to the defense, rather than the notes themselves); *United States v. Van Brandy,* 726 F.2d 548 (9th Cir. 1984) (no *Brady* violation arose from the court's failure to compel production of an informant's FBI file, where the prosecution provided summaries of information from the informant's file that was favorable to the defense, the informant was vigorously cross-examined on credibility issues at trial, and the value of any additional non-disclosed information was "marginal"); *United States v. Parnas*, Case No. 19-CR-725, 2021 WL 2981567, at *6 (S.D.N.Y. July 14, 2021) ("The Government represents that it has provided multiple letters disclosing the essential facts that would enable Defendants to call witnesses and take advantage of any exculpatory testimony. Assuming this to be true, the Court concludes that the Government has met its *Brady* obligations."); *United States v. Flynn*, 411 F. Supp. 3d 15, 37 (D.D.C. 2019) (court noting that "persuasive authority holds that the government's production of summaries of notes and other documents does not constitute a *Brady* violation") (citing *Grunewald* and *Van Brandy, supra*).

24

Although not binding on this Court, the cases relied on by the Government are persuasive authority in support of its position.  Further, no authority has been cited from within this judicial circuit that would require the production of primary source material under the facts of this case.

Still, in arguing for additional discovery, Hertel insists there are reasons in this case to doubt the accuracy and completeness of the Government's summaries.  He notes, for example, that "several academic sources" have described "the distortions that often slip into summaries of witness statements." ECF No. 700 at 10.  But in this case, the Government has represented that the information in its disclosure letters was taken verbatim from the original law enforcement interview reports.  In that respect, the Government's *Brady* "summaries" are not summaries at all, and there is no reason to infer that the prosecutor's own biases somehow distorted the content of his disclosures.

Hertel has also raised more targeted concerns about the accuracy of the Government's disclosures as they relate to Defendant Dudenhoefer.  Consistent with its Rule 16 obligations, the Government released to Dudenhoefer's counsel the entirety of Dudenhoefer's alleged statements to law enforcement officers, as set forth in certain reports.  Subsequently, the Government produced to Hertel and all other Defendants a portion of Dudenhoefer's alleged statements -- *i.e.*, the inculpatory portion -- which the Government intends to introduce at trial as part of its case in chief.  The Government did not include in that disclosure the non-inculpatory statements attributed to Dudenhoefer because those statements would form no part of the Government's case and, in any event, Dudenhoefer could not be compelled to testify.  In this Court's view, the Government's conduct was consistent with its discovery obligations and provides no substantial grounds for questioning the accuracy of the Government's *Brady* disclosures relative to other witnesses.

More generally, Hertel insists that the Government has repeatedly resisted its discovery obligations in this case. He points to the Government's March 29, 2023 letter as an example of a belated *Brady* disclosure that supports his requests for complete witness statements. He argues that, notwithstanding the Government's repeated insistence that it understands and has complied with its discovery obligations, the March 29 letter contains additional *Brady* information that should have been disclosed earlier. According to Hertel, the letter proves that the Government's witness interview records contain additional discoverable information beyond that which has been disclosed to date.

Unlike Hertel, the Court does not view the Government's March 29, 2023 disclosure as evidence that it cannot be trusted to fulfill its discovery obligations. Although the prosecution has indeed represented that it is aware of, and is abiding by, its obligations under *Brady*, the prosecution has also been forthright about the fact that it continues to review the material in its files and that it will continue to promptly produce any additional *Brady* material that is uncovered in the process. "'The obligation to disclose such Brady material is not based on any general constitutional right to discovery in criminal cases, but rather on a defendant's due process right to a fair trial.'" *Thompson v. City of Williamsport*, No. 4:22-CV-01159, 2024 WL 1747645, at *7 (M.D. Pa. Apr. 23, 2024) (quoting *United States v. Bashir*, 738 F. App'x 743, 748 (3d Cir. 2018)). Ultimately, "'[n]o denial of due process occurs if Brady material is disclosed to [defendant] in time for its effective use at trial.'" *Id.* (quoting *United States v. Higgs*, 713 F.2d 39, 44 (3d Cir. 1983) (alteration in the original)). Here, the Government's ongoing review of evidence and publication of its March 29, 2023 letter is in keeping with these principles. Accordingly, the Court does not agree that the circumstances of this case cast doubt on the accuracy and completeness of the Government's *Brady* disclosures.

Finally, Hertel argues that the prosecution's disclosures are insufficient for contextual purposes. He maintains that he cannot assess the exculpatory value of the information provided without the benefit of the original source material. He professes a need for complete witness statements to understand, *e.g.*, when or to whom the statements were made, whether they are verbatim accounts, from what source they are derived, where the witness worked, what they were able to observe, and the like. Ultimately, however, *Brady* and its progeny "establish a prosecutorial obligation rather than a general rule of pretrial discovery." *United States v. Beech,* 307 F.R.D. 437, 441 (W.D. Pa. 2015); *Coles*, 511 F. Supp. 3d at 576. Consequently, the Government's disclosure obligations under *Brady* may not be used "to obtain wholesale discovery of the government's principal case." *Id.*

Unlike Hertel, the Court finds that the exculpatory nature of the information contained in the Government's disclosure letters is generally straightforward and self-evident. As discussed, the information was reportedly taken verbatim from the agents' interview reports, which resolves at least some of Hertel's contextual queries.

The Court recognizes that, under the law of this circuit, Defendants have no affirmative obligations to exercise "due diligence" relative to their acquisition of *Brady* information. *See Dennis v. Sec'y, Pennsylvania Dep't of Corr.*, 834 F.3d 263, 290 (3d Cir. 2016) ("[T]he United States Supreme Court has never recognized an affirmative due diligence duty of defense counsel as part of *Brady*, let alone an exception to the mandate of *Brady* as this would clearly be."); *see also Bracey v. Superintendent Rockview SCI*, 986 F.3d 274, 279 (3d Cir. 2021) (noting that "*Dennis* effected a material change in Circuit law with respect to the reasonable expectations of a *Brady* claimant: While we had previously suggested that defendants had to search for exculpatory evidence themselves, *Dennis* made clear that a defendant can reasonably expect—

and is entitled to presume—that the government fulfilled its *Brady* obligations because the

prosecution's duty to disclose is absolute and in no way hinges on efforts by the defense.").

Therefore, the Court has doubts about whether the Government could satisfy its *Brady* obligation

merely by providing the names of favorable witnesses, as some caselaw suggests. *See, e.g.,*

*United States v. Abdallah,* 840 F. Supp. 2d 584, 615 (E.D.N.Y. 2012).

 Nevertheless, the Court concludes that the Government may fulfill its *Brady* obligations

so long as it provides the defense a fair and accurate summary of all relevant exculpatory or

impeachment information in its possession. Provided that threshold is met, the Government may

satisfy its disclosure responsibilities by publishing potentially favorable information in the form

it has used to date.  Based on the present record, the Court is satisfied that the Government's

disclosure letters comply with the mandates of due process as articulated in *Brady v. Maryland*

and its progeny.  Accordingly, Hertel's motion for production of complete witness statements

will be denied without prejudice.  The Court will revisit this issue at a later point in the

proceedings, should circumstances so warrant.

  b.   SUBSTANTIVE OBJECTIONS TO THE GOVERNMENT'S *BRADY* DISCLOSURES

 In addition to challenging the format of the Government's *Brady* disclosures, Hertel

raises a substantive challenge, claiming that the prosecution has construed its constitutional

obligations too narrowly.  At oral argument and again in post-argument briefing, Hertel asserted

that the Government must anticipate possible defense theories when considering what constitutes

potential *Brady* information.  *See* ECF No. 745 at 1-2 ("[T]he government logically 'cannot

prepare a case without thinking about how to counteract, *i.e.*, explain away, evidence

inconsistent with proving the elements of the charged crime.'") (quoting *United States v. Salyer,*

No. S-10-61, 2010 WL 3036444, at *5 (E.D. Cal. Aug. 2, 2010)).  To that end, Hertel has

identified categories of evidence that he believes constitutes *Brady* information in the context of

this case.  These include, *e.g.*:

> • Witness statements or evidence discussing compliance training at [H&B], which tends to undermine claims that the company or its owners intended to falsely report claims;
>
> • Witness statements or evidence discussing continuing education at [H&B], which tends to undermine claims that the company or its owners intended to falsely report claims;
>
> • Witness statements or evidence regarding billing instructions at [H&B], including discussions with Mr. Hertel about billing, which tend to undermine claims that the company or its owners intended to falsely report claims;
>
> • Witness statements or evidence regarding the roles of physical therapists, physical therapy assistants, and unlicensed aides or students, which may tend to undermine claims that the company or its owners improperly or regularly used unlicensed aides to provide care;
>
> • Witness statements or evidence discussing scheduling at [H&B], which would tend to undercut claims that [H&B] and its owners double-booked patients or billed for more hours than were possible in a given day;
>
> • Witness statements or other evidence discussing the organizational structure and job responsibilities of personnel at the various [H&B] locations, including what individuals were responsible for providing services, submitting bills, etc.;
>
> • Witness statements from lengthy interviews that did not reveal any incriminating information or which contain only a few incriminating statements, which would tend to suggest an overall culture of compliance at [H&B]; and
>
> • Evidence that tends to show that government agents misrecorded what a witness said in their interview reports, exaggerated supposed admissions of wrongdoing, or otherwise distorted a witness's statements—such as the interview notes and other evidence provided to Mr. Dudenhoefer, Ms. Exley, and Ms. Johnson in response to their recent motions— because that evidence casts doubt on the agents' reliability, ability to correctly recall events, and so on.

ECF No. 745 at 2-3.

Hertel also argues that the Government must disclose any statements that it might deem

"self-serving" denials.  According to Hertel, these are "straightforward and essentially

paradigmatic *Brady* materials," and may include "statements in which alleged co-conspirators

deny any wrongdoing; deny being instructed to incorrectly bill insurers, Medicare, or Medicaid; describe a robust training program or bulletins designed to prevent incorrect billing; and so on." ECF No. 745 at 3.

This Court has previously declined to enter an order that purports to definitively define *Brady* content as requested by Defendants Exley and Johnson, since "what constitutes favorable and material evidence under *Brady* is highly dependent on the particular item in question and necessarily involves a measure of discretion on the part of the prosecution." ECF No. 830 at 10. The *Brady* doctrine is generally understood as imposing a duty of minimum fairness on prosecutors, based on a defendant's due process rights to a fair trial. *United States v. Higgs*, 713 F.2d 39, 42 (3d Cir. 1983). But "[e]ven though [the Government's] duty of disclosure is tightly tethered to constitutional guarantees of due process, 'the Constitution is not violated every time the government fails or chooses not to disclose evidence that might prove helpful to the defense.'" *Smith v. Holtz*, 210 F.3d 186, 196 (3d Cir. 2000) (quoting *Kyles v. Whitley*, 514 U.S. 419, 434 (1995)); *see also United States v. Ruiz*, 536 U.S. 622, 629 (2002) ("[T]he Constitution does not require the prosecutor to share all useful information with the defendant"). That is because Brady and its progeny "establish a prosecutorial obligation rather than a general rule of pretrial discovery." *United States v. Beech*, 307 F.R.D. 437, 441 (W.D. Pa. 2015). Thus, the Government must "make judgment calls about what would count as favorable evidence" because "the very fact that the character of a piece of evidence as favorable will often turn on the context of the existing or potential evidentiary record." *Kyles*, 514 U.S. at 439.

Here, it is conceivable that certain information falling within the categories Hertel identifies could constitute *Brady* material. In addressing other discovery motions, the Court previously instructed the Government to "be especially vigilant for probative information that

contradicts the Government's theory of the case or that undermines or negates any element of the offenses charged, such as the Defendants' alleged intent to engage in fraudulent billing practices." ECF No. 830 at 15 (citing cases). In adhering to this instruction, the Government should bear in mind that any information shedding favorable light on H&B's office policies, including billing instructions and compliance training, will likely have special importance for Hertel, given his status as a principal owner and presumptive policy-maker at H&B. But the Court also recognizes that the exculpatory value of particular evidence will likely depend on how directly it supports the defense and/or undermines the Government's case. *See United States v. Salyer*, No. CR. S-10-0061, 2010 WL 3036444, at *5 (E.D. Cal. Aug. 2, 2010) (describing *Brady* information as evidence which "evidence, on its face, significantly tends to controvert what [the prosecution] is attempting to prove"). Similarly, a patent discrepancy between an agent's FBI 302 report and handwritten notes may be fodder for disclosure under *Giglio*, whereas a minor or very indirect discrepancy may not be. See Salyer, supra, at *5 (describing *Giglio* material as "information [that] is significantly inconsistent with the testimony it expects *its* potential witnesses to present or with their credibility generally"). In any case, it is up to the prosecution to make these subjective assessments in the first instance. *See Pennsylvania v. Ritchie*, 480 U.S. 39, 59 (1987) (noting that, in a typical case, "it is the State that decides which information must be disclosed" under *Brady*).

Here, the Government has disclosed a considerable amount of information involving witnesses who have made statements that are potentially exculpatory or otherwise favorable to the defense. In fact, many of the prosecution's disclosures appear to involve so-called "self-serving denials" of wrongdoing. The Government has consistently represented throughout these proceedings that it is aware of its *Brady* obligations and will continue to disclose any additional

*Brady* material that is uncovered in the course of its trial preparation.  As discussed previously

elsewhere in this Memorandum Opinion, the prosecution has satisfied its *Brady* obligations thus

far, and the Court accepts its representations that it will continue to do so as the case progresses.

The Court again cautions the Government to err on the side of disclosure when faced with close

calls, as this will help forestall any possible due process concerns and help ensure the fair

administration of justice.  *See Kyles*, 514 U.S. at 439 (noting that "a prosecutor anxious about

tacking too close to the wind will disclose a favorable piece of evidence[,] and "[t]his is as it

should be"); *Agurs*, 427 U.S. at 108 ("[T]he prudent prosecutor will resolve doubtful questions in

favor of disclosure.").

      Finally, to the extent the Government has already disclosed evidentiary material that may

contain potential *Brady* or *Giglio* information, its constitutional duty is satisfied as to the

evidence produced.  "As a general rule, the government is under no duty to direct a defendant to

exculpatory evidence within a larger mass of disclosed evidence."  *United States v. Skilling*, 554

F.3d 529, 576 (5th Cir. 2009), *aff'd in part, rev'd in non-relevant part*, --- U.S. --- (2010).  Some

courts have recognized an exception to this rule where there is evidence of bad faith or deliberate

concealment on the part of the prosecution.  *See, e.g., Skilling,* 554 F.3d at 577 (suggesting that

the production of a voluminous open file may violate *Brady* if there is evidence the government

"padded" the file with pointless or superfluous information, made the file "unduly onerous to

access," or deliberately hid *Brady* material in a huge open file); *United States v. Farese*, Crim.

No. 21-877, 2023 WL 6795083, at *2 (D.N.J. Oct. 12, 2023) ("The Court can envision an

extreme case in which the exculpatory discovery was deliberately concealed or unfairly

manipulated so as to present the defense with a needle-in-a-haystack.  But absent such bad faith

or concealment, there is no duty to help the defense identify and analyze which items may be

considered exculpatory."); *United States v. Hsia*, 24 F. Supp. 2d 14, 29-30 (D.D.C. 1998), *rev'd in part on other grounds*, 176 F.3d 517 (D.C. Cir. 1999) ("the government cannot meet its Brady obligation by providing [the defendant] with access to 600,000 documents and then claiming that she should have been able to find the exculpatory information in the haystack.").

Such circumstances are not present here. The defense has objected to many aspects of the Government's disclosures, but most of those objections have not been well-taken. And while the Court has expressed its disagreement with the prosecution's interpretation of Rule 16(a)(1)(C) and ordered broader disclosures to H&B, the Court finds no evidence of deliberate bad faith on the part of the prosecution. Rather, in this case, the prosecution has made significant, ongoing *Brady* disclosures as they relate to witness interviews. In addition, the Government took pains to organize its electronic discovery into distinct folders, in a format that allows the discovery to be downloaded and electronically searched. Much of the production to date has involved company records and/or Hertel's own business or personal emails, with which he should have some familiarity. It also bears noting that Hertel is an educated professional and business owner and, as a principal founder of H&B, he presumably has access to company resources, which may assist in his review of relevant documentation. Hertel is also one of multiple Defendants in this case and, like the others, he is not subject to pretrial incarceration. Under these circumstances, there is no basis for imposing upon the Government an additional obligation to identify *Brady* or *Giglio* material among the items already produced. *See Farese*, 2023 WL 6795083, at *2 (government had no duty to identify *Brady* material from within discovery previously produced where evidence indicated cooperation rather than bad faith or concealment on the part of the Government); *United States v. Ellis*, Crim. No. 19-693, 2020 WL 3962288, at *2 (D.N.J. July 13, 2020) ("If the government produced the discovery in a

reasonable fashion and provided the defendant sufficient access to the materials, then the defendant bears the onus of reviewing the discovery for exculpatory information, even when a significant volume of discovery has been produced."); *Skilling*, 554 F.3d at 577 ("[C]onsidering the additional steps the government took beyond merely providing Skilling with the open file, the equal access that Skilling and the government had to the open file, the complexity of Skilling's case, and the absence of evidence that the government used the open file to hide potentially exculpatory evidence or otherwise acted in bad faith, we hold that the government's use of the open file did not violate *Brady*."); *United States v. W.R. Grace*, 401 F.Supp.2d 1069, 1080 (D. Mont. 2005) (Government was not required to conduct a *Brady/Giglio* identification review of massive amounts of information acquired where much of the information was text searchable, the individual defendants had access to corporate assistance in the search for exculpatory evidence, the vast majority of documents at issue were corporate documents, and there had been ongoing, related civil litigation). *Cf. United States v. Salyer*, No. CR. S-10-0061 LKK (G, 2010 WL 3036444, at *7 (E.D. Cal. Aug. 2, 2010) (requiring the Government to identify *Brady* and *Giglio* material within previously disclosed documentation where the case involved a singular individual defendant who was detained in jail pending trial, who was represented by a relatively small defense team, and who had no access to voluntary corporate assistance in searching for necessary documents).

To the extent Hertel is requesting an order that directs the Government to identify *Brady* or *Giglio* material within the information previously produced to the defense, that request is denied. His remaining requests for additional "*Brady* information" will be denied without prejudice and may be revisited, if necessary, at a later point in these proceedings.

*C.  Hertel's Request for Agent Rough Interview Notes*

Hertel contends that the prosecution should be compelled to produce any notes that agents generated in connection with witness interviews.  As discussed, he draws upon social science research which, he claims, "has shown that interview summaries often distort what is actually said during interviews, applying structure, drawing inferences, and omitting key distinctions or qualifiers."  ECF No. 624 at 18-19 (citing sources).  Hertel contends that reviewing interview notes is critical to ferreting out such distortions, particularly in this case, as he believes there is reason to doubt the accuracy of the agents' written summaries.  As evidence, he cites Exley and Johnsons' assertions that the Government has wrongly attributed certain statements to them.  Hertel also points to the Government's disclosures regarding Dudenhoefer's alleged statements, which Hertel describes as "contradictory."

The rule within this judicial circuit is that investigating agents must preserve their rough interview notes so that the trial court can determine, if necessary, whether they should be produced as *Brady* or Jencks Act material.  *See United States v. Ammar*, 714 F.2d 238, 259 (3d Cir. 1983); *United States v. Vella*, 562 F.2d 275, 276 (3d Cir. 1977). Further, under Rule 16(a), a defendant may obtain interview notes that contain his own statements.  *See United States v. Kofsky*, Crim. No. 06-392, 2007 WL 1825183 (E.D. Pa. June 22, 2007).

Here, the Government represents that it has produced agent rough notes to other Defendants who were interviewed by law enforcement agents; however, Hertel was not among those who provided statements to investigators.  Accordingly, the Government states there are no notes or reports to produce relative to an interview of Hertel himself.

Hertel's motion will be denied as premature to the extent he seeks production of rough notes from other witness interviews at this time.  Hertel is "entitled to the production of such

material only to the extent that it falls within the purview of *Brady*, *Giglio v. United States*, 405 U.S. 150 (1972), or the Jencks Act." *United States v. Shaner*, No. 19-CR-135-9, 2020 WL 4915339, at *2 (W.D. Pa. Aug. 21, 2020); *see also United States v. Armes*, No. 2:20-CR-0377, 2021 WL 1737459, at *6 (W.D. Pa. May 3, 2021). To date, it appears the Government has satisfied its due process obligations of providing ongoing disclosures of *Brady* material, albeit in a format that Hertel does not prefer. The Government states that it will continue to disclose any additional *Brady* information of which it becomes aware. Further, the Government represents that, in the event the defense raises an issue necessitating the Court's review of rough notes, such material will be provided for *in camera* review. At the present time, the Court finds no basis for conducting an *in camera* review. Although Defendants Exley and Johnson dispute the inculpatory statements that have been attributed to them, that is not unusual in a criminal case. Defendants Exley and Johnson have already received the agent notes that relate to their own interviews and may use those notes in connection with any future cross-examination of the interviewing agents, but there is no basis for compelling the production of those notes to Hertel at the present time.

Hertel also grounds his request for rough notes on concerns about prosecutorial misconduct. To the extent Hertel's argument concerns the Government's disclosures of Defendant Dudenhoefer's statements, the Court finds no substantial basis for inferring that the Government has violated its *Brady* obligations. But Hertel also posits that members of the prosecution team destroyed their interview notes. On that point, the record shows that Professional Conduct Investigators from the Pennsylvania Department of State's Bureau of Enforcement and Investigation ("BEI") conducted interviews of several Defendants in this case. AUSA Trabold has been forthcoming in reporting that those investigators destroyed their

interview notes in accordance with BEI policy.  Accordingly, while AUSA Trabold provided

Defendants Exley, Johnson, and Dudenhoefer the interview notes taken by federal investigators,

AUSA Trabold was unable to produce the notes taken by BEI agents.  This raised questions as to

whether the BEI agents can fairly be considered part of the "prosecution team."

In the context of *Brady* discovery, the U.S. Court of Appeals for the Third Circuit has

identified three relevant inquiries which inform the extent of the prosecution's constructive

knowledge and cross-jurisdictional disclosure obligations, namely: "(1) whether the party with

knowledge of the information is acting on the government's 'behalf' or is under its 'control'; (2)

the extent to which state and federal governments are part of a 'team,' are participating in a 'joint

investigation' or are sharing resources; and (3) whether the entity charged with constructive

possession has 'ready access' to the evidence." *United States v. Risha*, 445 F.3d 298, 304 (3d

Cir. 2006); *see also Coles*, 511 F. Supp. 3d at 583.  In addressing Defendant Dudenhoefer's

discovery motion, this Court previously directed the United States to advise whether it considers

the BEI to be part of the prosecution team in this case and its reasons for so concluding.  The

Court specifically sought clarification as to whether the BEI agents undertook Dudenhoefer's

interview at the behest of federal prosecutors and/or investigators and, if so, what instructions, if

any, were given to the state agents concerning the retention of their interview notes. ECF No.

832 at 7.

The Government responded that it did not consider the BEI to be part of the prosecution

team in this case.  *See* ECF No. 838.  The Government explained that the BEI was generally

informed of this criminal investigation several days after the search warrants had been executed

at the five H&B locations in February 2021 and after that fact had been reported by the media.

The Government further advised that neither AUSA Trabold nor any criminal investigators

involved in this case ever provided instructions to the BEI agents, nor did they conduct any joint investigation with the BEI or receive advanced notice of any BEI activities relative to this matter. The Government states that it did not seek any input from the BEI during the process of preparing and presenting the indictments in this case and did not give the BEI advanced notice of the indictments. *Id.* Based on these representations, there is no basis for the Court to infer that the BEI was part of the "prosecution team" in this case or that the destruction of the BEI agents' notes constituted a discovery violation by the United States.

Hertel insists that "[b]oth this Court and other Third Circuit courts have held that agents' rough notes and interview reports must be produced where they contain discoverable witness statements." ECF No. 624 at 17. However, he cites no persuasive authority to support his request for disclosure at the present time. In *United States v. Godson*, No. CRIM. 06-206, 2006 WL 3373174 (W.D. Pa. November 20, 2006), the court ordered the Government to retain rough notes and encouraged the prosecution to turn over Jencks material at least one week prior to trial. *Id.* at *4. Nothing about the court's ruling in *Godson* supports Hertel's request for immediate production of interview notes. In *United States v. Blatt*, No. 06–CR–0268, 2007 WL 1795685 (E.D. Pa. June 18, 2007), the court ordered production of agent rough notes pursuant to Rule 16(a)(1)(C), finding that the notes constituted a "written record" of an organizational defendant's statements. Because Hertel is not an organizational defendant and did not personally give a statement to law enforcement officers, *Blatt* does not support his request for agent interview notes.

In sum, Hertel cites no basis for compelling production of agent interview notes at this procedural juncture. Accordingly, this aspect of his motion will be denied.

### D. Hertel's Requests for Information Concerning a 2018 Medicare Investigation

Hertel originally moved for an order compelling the production of any materials in the Government's possession (or in the possession of HHS or its contractors) related to a 2018 Medicare audit that was conducted at H&B's various practice locations. Hertel argued that, because the audit did not result in any findings of misconduct relative to H&B's billing practices, the evidence would likely to be material to his defense.

In its response, the Government stated that it had previously provided the documents in its possession regarding the 2018 Medicare review, which involved a small sample of patient records. The Government represented that there was nothing else for it to provide and no requirement that it seek out additional material from a non-prosecution entity.

Hertel's attorney conceded at oral argument that there appears to be nothing more for the Government to produce as it relates to the 2018 Medicare audit. Accordingly, this aspect of Hertel's motion will be denied as moot.

### E. Hertel's Request for Information Related to the Government's Search of Digital Evidence

Hertel also seeks information relating to the Government's search of digital evidence that was seized pursuant to various search warrants. He contends that such information constitutes *Brady* material because it will likely support a future motion to suppress evidence. Specifically, he believes that the search protocols (or lack thereof) will likely establish that the Government engaged in an "overly aggressive and overbroad review of digital files." ECF No. 624 at 26. He also points to perceived deficiencies in the process used by the prosecution to filter out material protected by the attorney-client privilege and suggests that privileged materials may have been widely disseminated or improperly reviewed by the prosecution.

As an initial point, it appears that Hertel's concerns about the Government's privilege filter process are overstated. The Government represents that, pursuant to a search warrant, it obtained the emails of six H&B employees, as well as emails from the personal/business accounts of Defendant Hertel and Defendant Brown. Prior to reviewing these emails, the prosecution employed an independent filter agent from HHS OIG to review the emails and remove any that potentially contained privileged attorney-client communications. To that end, the filter agent employed numerous search terms, which the Government has disclosed in its brief. *See* ECF No. 646 at 27 n.7. If items responsive to the search terms were discovered by the filter agent, those items were removed from the emails that were made available to investigating agents.

Following completion of this process, the remaining emails were provided to the prosecution. The investigating agents and prosecutors then took the additional step of not reviewing any emails dated on or after February 23, 2021, which was the day the search warrants were executed at H&B's various facilities. Although the prosecution has only viewed post-filter emails dated prior to February 23, 2021, the emails were provided in their entirety to the Defendants, as they were originally received from the email service providers. The Government represents that it advised Hertel's attorney in June 2022 of the filter procedures that were utilized during the filter review.

Subsequently, while reviewing the six employee emails, the prosecution came across an email to an attorney on a matter unrelated to the alleged criminal activity at issue in this case. That same day, October 25, 2022, AUSA Trabold notified defense counsel via letter that a review of investigative materials had revealed an email that likely contained attorney-client privileged material. The prosecution's notification indicated that this email had been segregated

from the investigative file and would not be relied upon by the prosecution.  In response to the discovery of this email, the prosecution's filter agent utilized additional search terms to again search the seized emails for the purpose of segregating any privileged material.  All defense counsel were also invited to provide additional search terms for use by the prosecution to avoid encountering additional privileged material.  According to the Government, only Defendant Berchtold provided additional search terms.

The Government represents that it has not viewed any other privileged emails other than the single email discovered on October 25, 2022.  And notably, Hertel has not identified any other privileged communications that he believes were improperly accessed or reviewed by the prosecution team.  Thus, the record suggests that the Government employed substantial measures to avoid encountering privileged material.  On the one occasion where the Government *did* inadvertently encounter a privileged, albeit non-relevant, communication, the prosecutor promptly notified defense counsel with the assurance that the privileged communication would not be utilized in this case.  The Government then employed additional filter searches based on the newly identified attorney's name and credentials.   Finally, the Government disputes Hertel's suggestion that it shared the contents of Hertel's email account with other defense counsel.  On the contrary, it states that "Hertel and only Hertel was provided with the seized contents of his private email account, just as only counsel for Michael Brown received the contents of Brown's private emails."  ECF No. 646 at 29.  In sum, the record does not presently support any inference that significant discovery violations occurred with respect to privileged communications.

The Court also finds that Hertel's request for digital search information is predicated on a questionable legal premise.  His theory is that the Government's search protocols constitute *Brady* information because that information will likely support a future motion to suppress; but

the extent to which *Brady* applies in the context of a suppression motion is an unsettled point of law.  On one hand, Hertel cites four cases where courts have applied *Brady* principles to suppression proceedings.  *See* ECF No. 624 at 26 and n.3 (citing *United States v. White*, 489 F. Supp. 3d 274, 280 (S.D.N.Y. 2020) (concluding that the *Brady* doctrine required the prosecution to disclose any evidence it intended to offer at trial that had been obtained based on tainted evidence, so that the defendant could move to suppress such evidence as "fruit of the poisonous tree"); *Biles v. United States*, 101 A.3d 1012, 1025 (D.C. 2014) (reversing defendant's conviction where the government's failure to timely disclose favorable information had "prevent[ed] [the defendant] from litigating a winning motion to suppress the government's most damning evidence against him," thereby "undermin[ing] confidence in the outcome of the trial"); *United States v. Gamez–Orduno*, 235 F.3d 453, 461 (9th Cir. 2000) ("The suppression of material evidence helpful to the accused, whether at trial or on a motion to suppress, violates due process if there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different."); *Smith v. Black,* 904 F.2d 950, 965–66 (5th Cir.1990), *vacated on other grounds*, 503 U.S. 930 (1992) ("[O]bjections may be made under *Brady* to the state's failure to disclose material evidence prior to a suppression hearing.")).

On the other hand, as Hertel acknowledges, "the authorities are not unanimous on this point," ECF No. 624 at 26 n.3, and several courts have expressed doubt concerning the applicability of the *Brady* doctrine to suppression proceedings.  *See, e.g., United States v. Bowie*, 198 F.3d 905, 912 (D.C. Cir. 1999) ("[I]t is hardly clear that the *Brady* line of cases applies to suppression hearings. Suppression hearings do not determine a defendant's guilt or punishment, yet *Brady* rests on the idea that due process is violated when the withheld evidence is 'material either to guilt or punishment ....'"); *United States v. Bullock*, 130 F. App'x 706, 723 (6th Cir.

2005) (same); *United States v. Stott*, 245 F.3d 890, 902 (7th Cir.), *amended on reh'g in part*, 15 F. App'x 355 (7th Cir. 2001)("[W]e cannot say that the law is clear on the question of whether Brady should apply to suppression hearings. There is no clear statement on the issue from either the Supreme Court or this court, and there is no prevailing national standard."); *Martin v. United States*, No. 2:18-CR-00124-JDL, 2021 WL 4846877, at *4 (D. Me. Oct. 18, 2021) (noting there is "little authority" for the petitioner's argument that the "*Brady* right attached at the suppression hearing"), *report and recommendation adopted*, 2022 WL 204640 (D. Me. Jan. 24, 2022); *United States v. Luna*, 439 F. Supp. 3d 1243, 1246 (D.N.M. 2020) ("As to this motion, the Court finds that Defendant is not entitled to disclosure of impeachment evidence before a suppression hearing because due process requires only that defendant receive evidence that is material to either guilt or punishment, and suppression hearings do not relate to guilt or punishment.").

The question becomes even more muddied when considering the Supreme Court's decision in *United States v. Ruiz*, 536 U.S. 622 (2002). There, the Supreme Court held that neither the Constitution nor *Brady* requires disclosure of impeachment evidence before a guilty plea because, among other reasons, "impeachment information is special in relation to the *fairness of a trial*, not in respect to whether a plea is *voluntary*." 536 U.S. 622, 629 (2002) (emphasis in original).  At least one district court has concluded that the holding of *Ruiz* logically extends to the suppression hearing context.  *See United States v. Harmon,* 871 F. Supp. 2d 1125, 1169 (D.N.M. 2012), *aff'd*, 742 F.3d 451 (10th Cir. 2014) ("It would not be consistent with the holding in *United States v. Ruiz* to extend the obligation to disclose impeachment evidence to suppression hearings when the prosecution would have no obligation to make the disclosure at a later stage in many criminal proceedings—before the defendant enters a guilty plea."). Notably,

43

neither *White* nor *Biles* discuss the holding of *Ruiz* as it may relate to *Brady* obligations in the pretrial motions context, and both *Gamez–Orduno* and *Black* predate the *Ruiz* decision.

In sum, there is no prevailing national standard -- much less any binding authority -- establishing that *Brady* principles apply in the context of suppression proceedings. But even if *Brady* does have some application in that context, the Court does not believe that due process presently mandates the disclosures Hertel is seeking. As the Supreme Court has noted, there is no general constitutional right to discovery in a criminal case. *Weatherford v. Bursey*, 429 U.S. 545, 559 (1977). Nor does the Constitution "require the prosecutor to share all useful information with the defendant." *Ruiz*, 536 U.S. at 629. Instead, the *Brady* doctrine is generally understood as imposing a duty of minimum fairness on the prosecution, based on a defendant's due process right to a fair trial. *United States v. Higgs*, 713 F.2d 39, 42 (3d Cir. 1983). Accordingly, *Brady* and its progeny require the disclosure of "all exculpatory evidence, which includes both [m]aterials...that go to the heart of the defendant's guilt or innocence and materials that might affect the jury's judgment of the credibility of a crucial prosecution witness." *United States v. Ramos*, 27 F.3d 65, 68 (3d Cir. 1994) (internal quotation marks and citation omitted; alteration and ellipsis in the original). Typically, suppression motions concern perceived procedural violations arising under the Fourth, Fifth, or Sixth Amendments. And because a defendant is typically aware of the circumstances under which a search and seizure occurred, the defendant is also possessed of sufficient information to assert a motion to suppress the evidence that was seized, based on the perceived constitutional defect.

That is the situation here. Hertel's request for electronic search information concerns a perceived Fourth Amendment process violation, and he is already aware of the putative basis for asserting his Fourth Amendment challenge. Like the Government, this Court is of the view that

Hertel should proceed with filing his intended suppression motion if he so desires, and the Government will then be permitted to respond.  To the extent any future suppression motion requires further record development, the defense will have an opportunity to pursue relevant information, and the Government will be better positioned to assess its *Brady* obligations, if any, as they relate to Hertel's suppression arguments.

Hertel's request for information relating to the Government's search of digital evidence is presently denied, without prejudice, as premature.  Should Hertel file a motion to suppress evidence, the Court will revisit the applicability of additional disclosures in the context of those proceedings.

### F.  *Hertel's Request for Prosecution Team Communications*

Hertel has also requested the Government be compelled to produce communications among members of the prosecution team that are material to the defense or otherwise discoverable as *Brady* material.  He believes that, given the scope of this investigation, there may be internal communications that reflect the perceived strengths or weaknesses of a witness's story, the merits of certain evidence, preliminary findings, or communications with potential witnesses.  More specifically, Hertel posits that there are likely to be communications addressing information that is unfavorable to two confidential witnesses and/or communications addressing the error that occurred in the prosecution's privilege filtering process.

Under Rule 16(a)(1)(E)(i), the Government must permit the defense, upon request, to inspect and copy documents and tangible objects that are within the Government's custody and control and "material to preparing the defense."  But "[e]xcept as authorized under Rule 16(a)(1)(A) through (D), (F), and (G), the rule exempts government work product from

discovery and inspection." *Coles*, 511 F. Supp. 3d at 574 (citing Fed. R. Crim. P. 16(a)(2)). Notably, documents and tangible objects that are material to the defense, as set forth in Rule 16(a)(1)(E)(i), are not among the categories of discoverable information that can override the work product exemption.  Fed. R. Crim. P. 16(a)(2). *See United States v. Lacerda*, Crim. No. 12-303, 2013 WL 3146835, at *18 (D.N.J June 19, 2013) (noting that Federal Rule 16(a)(1)(E) is subject to a "'carveout' for attorney or agent work product made in connection with investigating and prosecuting the case").  Thus, under Rule 16(a)(2), the Government has no obligation to produce "reports, memoranda, or other internal government documents made by an attorney for the government or other government agent in connection with investigating or prosecuting the case."  Communications wherein members of the prosecution team discuss the perceived strengths or weaknesses of a witness's story, the relative merits of certain evidence, the process of screening evidence, or potential flaws in the Government's case fall squarely within the protections of the work product privilege.  Such information is therefore not discoverable under Rule 16(a)(1)(E).

Perhaps recognizing these limitations, Hertel primarily argues for disclosure of certain communications as part of the Government's *Brady* obligations.  Boiled to its essence, Hertel's *Brady* request is twofold.  First, he seeks an explanation as to whom, in the Government's view, is a member of the prosecution team.  Second, he seeks "assurances" that the Government "has systematically reviewed prosecution team documents and communications for potentially discoverable material."  ECF No. 700 at 15-16.

This aspect of Hertel's motion, like others, is founded on alleged concerns about the prosecution team's conduct in this case.  Originally, he questioned whether the Government was withholding information about a 2018 Medicare audit of H&B's patient records.  He has also

alleged that the Government "botched" its process for screening out materials protected by the attorney-client privilege.  Further, he has expressed concern about the destruction of the BEI agents' rough notes ████████████████████████████████████████████████ ████████████████████████████.

 None of the matters cited by Hertel have involved evidence of bad faith or any substantial discovery violation by the Government. Hertel's initial concerns about the 2018 Medicare audit records has since been resolved.  The Government's screening process for privileged material did result in one non-relevant communication being missed by the filter agent, but for the reasons previously discussed, Hertel's concerns about that process appear to be overstated.  Regarding the destruction of the BEI agents' notes, AUSA Trabold has provided a report to this Court explaining why those agents should not be considered part of the prosecution team in this case.

████████████████████████████████████████████████
████████████████████████████.

 Beyond this, Hertel's request for prosecution team communications rests on speculation that there might be discoverable *Brady* or *Giglio* information contained in the electronic communications among prosecution team members.  But this is insufficient to justify the disclosures Hertel is seeking.  *See United States v. Ramos*, 27 F.3d 65, 71 (3d Cir. 1994) (stating that "it unwise to infer the existence of *Brady* material based upon speculation alone"); *United States v. Houdersheldt*, 2020 WL 7210993, *2 (S.D.W.V. Dec. 3, 2020) (denying request for internal prosecution team communications where defendant's request was based on speculation that the communications would contain material exculpatory information).

 Finding no basis to direct the production of prosecution team communications, the Court will deny this aspect of Hertel's motion.







███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████

### H. *Defendants' Requests Regarding the Timing of the Government's Disclosures*

Both H&B and Hertel take issue generally with the timing of the Government's disclosures. Hertel asserts that the Government's intention to produce witness statements two weeks in advance of trial is unworkable in a complex case such as this. He argues for early disclosure of Jencks material at least 30 days -- and preferably six weeks -- before trial in order to address issues *Bruton* challenges or other evidentiary concerns. He points out that the constitutional imperative to produce *Brady* or *Giglio* material in time for its effective use at trial trumps the more lenient requirements of the Jencks Act. In fact, he argues for the immediate release of *Brady* or *Giglio* material, including (as previously discussed) statements or information that may support a suppression motion. He asks for an order compelling the Government to provide some indication of which evidence it believes is relevant and/or which evidence it intends to use at trial.

The Court has previously indicated its appreciation for the complexity of this case and the Defendants' concerns about identifying relevant evidence among the troves of data that have been produced in discovery. Nevertheless, given the current posture of this case, Hertel's motion to compel identification of the Government's trial exhibits is premature. *See, e.g., United States*

*v. Chatman*, No. CRIM. 3:10-30, 2011 WL 7037129, at *5 (W.D. Pa. Nov. 23, 2011) (rejecting defendant's request to compel the Government to identify its trial evidence based on the "voluminous nature of the evidence expected to be offered" against defendant at trial); *United States v. Bledsoe*, No. 2:05CR370, 2006 WL 3098770, at *1 (W.D. Pa. Oct. 30, 2006) ("Rule 16 was not designed to provide a defendant with a vehicle to discover the government's case in detail or the strategy it intends to pursue at trial."); *United States v. Litman*, 547 F. Supp. 645, 652 (W.D. Pa. 1982) (denying defendants' request to compel designation of prosecution's trial exhibits from among those produced in discovery because the court found "no case or statutory law supporting the defendants' request for such a list"); *accord United States v. Prince*, 618 F.3d 551, 561–62 (6th Cir. 2010) ("Rule 16 does not entitle a defendant to pretrial disclosure of the government's exhibit list. The district court did not abuse its discretion by refusing to require the government to provide one in this case.").

Nor is Hertel entitled to an order compelling identification of prosecution witnesses or their proposed testimony. On the contrary, it is "'firmly established'" under the law of this circuit that "the government is under no obligation 'to divulge the identity of its witnesses in a noncapital case.'" *Coles*, 511 F. Supp. 3d at 580 (quoting *United States v. Addonizio*, 451 F.2d 49, 62 (3d Cir. 1971); *also citing Gov't of Virgin Islands v. Martinez*, 847 F.2d 125, 128 (3d Cir. 1988), and *United States v. DiPasquale*, 740 F.2d 1282, 1294 (3d Cir. 1984)). "Similarly, there is no authority to support a defendant's request for the specifics of each government witness' proposed testimony." *Johnson*, 218 F. Supp. 3d at 458 (citing *Fioravanti*, 412 F.2d at 410).

Here, the Government has expressed a willingness to make disclosures of Jencks materials two weeks in advance of trial. While the Court will encourage the Government to consider an even more advanced period of disclosure, the Court has no authority to compel it.

*See, e.g., Murphy*, 569 F.2d 771, 773 (3d Cir. 1978) (recognizing an "unbroken precedent in the Courts of Appeals denying to district courts the power to compel production of the statements of government witnesses until conclusion of direct examination at the trial."); *United States v. Nickas*, No. 3:21-CR-143, 2022 WL 2657114, at *8 (M.D. Pa. July 8, 2022) ("[T]here is no authority by which th(e) court can compel the government to provide Jencks Act statements prior to the time any government witness has testified on direct examination at trial.")(quoting *United States v. Yawson*, No. CRIM. 13-271, 2014 WL 3401663, at *3 (W.D. Pa. July 10, 2014)); *United States v. Taylor*, 2018 WL 1960669, *5 (M.D. Pa. April 26, 2018) (denying defendants' requests for early disclosure of Jencks material because the court lacked authority to compel the government to disclose such material, except as specified in the Act). To the extent Hertel is requesting an order compelling advanced disclosure of Jencks material, that request is denied.

As far as *Brady* and *Giglio* information is concerned, "[d]ecisional law guides the timing of the required disclosures." *Coles*, 511 F. Supp. 3d at 576. Actual exculpatory material that "go[es] to the heart of the defendant's guilt or innocence," *see Higgs*, 713 F.2d at 42, must be disclosed on a rolling basis without undue delay. *See United States v. Collier*, No. 2:21CR375, 2023 WL 3932537, at *2 (W.D. Pa. June 9, 2023); *Coles*, 511 F. Supp. 3d at 576-77. Impeachment material that concerns "a witness's credibility or motivation to testify," *see Maury*, 695 F.3d at 249, may be disclosed at a later time, so long as it is provided "in time for its effective use at trial." *Higgs*, 713 F.2d at 44; *Collier, supra*, at *2; *Coles*, 511 F. Supp. 3d at 577. Nevertheless, district courts have the general discretionary authority to order the pretrial disclosure of *Brady* impeachment material in a manner that will ensure "the effective administration of the criminal justice system." *Starusko*, 729 F.2d 256, 261 (3d Cir. 1984); *Collier*, 2023 WL 3932537, at *2; *Coles*, 511 F. Supp. 3d at 577. And in this circuit, there is a

"longstanding policy of encouraging early production." *Starusko*, 729 F.2d at 261; *Coles*, 511 F. Supp. 3d at 577.

Presently, no trial date has yet been scheduled, and it is likely to be months away. Once a definitive trial date is established, the Court will enter a pretrial order that provides for early disclosure of impeachment information in a timeframe that will ensure its effective use at trial. To that end, the Court will entertain the possibility of requiring *Giglio* disclosures more than two weeks in advance of trial. To the extent Hertel requests immediate disclosure of *Giglio* impeachment information, that request is denied without prejudice to be reasserted, if warranted, at a later stage of these proceedings.

IV.     **CONCLUSION**

For the reasons set forth herein, H&B's motion for disclosure of employee statements will be granted in part and denied in part.  Hertel's Omnibus Motion to Compel Responses to Pending Discovery Requests will be granted in limited part and otherwise denied as stated more fully herein.

Susan Paradise Baxter
United States District Judge