IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No. 1:21-cr-39 |
| HERTEL & BROWN PHYSICAL AND | ) | |
| AQUATIC THERAPY, et al., | ) | |

**MEMORANDUM OPINION RE: DEFENDANTS' MOTIONS**
**FILED at ECF Nos. 903, 906, 909, 910 and 911**

**Susan Paradise Baxter, United States District Judge**

Previously pending in this criminal matter were numerous motions to suppress evidence, filed at ECF Nos. 903, 906, 909, 910, and 911. After reviewing extensive briefing on the motions and holding oral argument, the Court entered an order denying the motions. The Court's reasoning is set forth below.

### *Defendants' Motion at ECF No. 911 Pertaining to Third Party Insurance Records*

Between November 2020 and January 2021, during the initial investigative stages of this case, the FBI sent Requests for Investigative Assistance ("RFIAs") to various third-party health insurance entities, including Highmark, UPMC, Medicare, Medicaid, and Aetna. The requests sought:

> 1. All claims/billings submitted for Medicaid members having procedures performed at Hertel and Brown Physical and Aquatic Therapy for the period January 1, 2014 to November 1, 2020. Specifically, ... patient name, Social Security Account Number, patient contact information, CPT code, diagnosis code, date of service, amount billed, amount paid, and TIN.
>
> 2. Any correspondence to the listed parties relating to billing procedures.

1

3. All audit and/or investigative materials, to include, but not limited to, patient complaints, reports of independent medical examinations, investigative interview reports, related literature and coding terminology, and any appeals letters.

4. Enrollment agreement(s), as applicable.

5. Peer review and/or peer comparison reports, as applicable.

6. Copies of checks paid to the provider.

The FBI issued the RFIAs in its capacity as a health oversight agency and represented that the disclosures were permitted under certain Health Insurance Portability and Accountability Act ("HIPAA") regulations, including 45 C.F.R. §164.512.

The recipient health insurance entities complied with the FBI's requests without objection and, ultimately, the Government obtained billing and claims records related to thousands of patients.  The Government's analysis of this data eventually formed a basis for various search warrants that allowed agents to access HB's practice locations and obtain electronic records from the practice locations as well as from WebPT.

In their motion filed at ECF No. 911, the Defendants sought to suppress all evidence the Government obtained through its seizure of insurance data from third-party insurers, as well as any fruits thereof (including evidence seized or searched based on warrants that relied on that data). The underlying premise of Defendants' motion was that the Government could not have lawfully obtained this information without a search warrant.  Defendants further posited that, even if a warrant was not required, the Government's execution of the search was unreasonable because it violated HIPAA.

The Government denied that a search warrant was required.  It disputed that the Defendants had any reasonable expectation of privacy in the seized information for purposes of asserting a Fourth Amendment violation.  The Government further denied that it violated HIPAA

or that suppression is an available remedy for an alleged HIPAA violation.  In any event, the Government maintained that suppression was not warranted because the agents had seized the records in good faith.

A.

The Fourth Amendment protects against unreasonable searches and seizures, U.S. Const. amend. IV, and "[e]vidence will be suppressed under the exclusionary rule when suppression would further the exclusionary rule's primary objective: to deter Fourth Amendment violations." *United States v. Goldstein*, 914 F.3d 200, 203 (3d Cir. 2019).  However, "[d]efendants 'must have standing to invoke the Fourth Amendment's exclusionary rule.'"  *United States v. Brooks*, 841 F. App'x 346, 350 (3d Cir. 2020) (quoting *United States v. Correa*, 653 F.3d 187, 190 (3d Cir. 2011)).  "Whether defendants have standing depends on whether they had a reasonable expectation of privacy in the information the Government sought to use.  *Id.* (citing *United States v. Cortez-Dutrieville*, 743 F.3d 881, 885 (3d Cir. 2014)).

In the instant case, the United States obtained the challenged material through Requests for Investigative Assistance (RFIAs), which are akin to administrative subpoenas.  *Cf. Consumer Fin. Prot. Bureau v. Heartland Campus Sols., ECSI*, 747 F. App'x 44, 47 (3d Cir. 2018) (analyzing the enforceability of a Civil Investigating Demand under the standards applicable to administrative subpoenas); *see also Matter of Plavin*, 2016 WL 11775142, *3 (N.D. Ga. Feb. 4, 2016) (observing that a CID issued under the False Claims Act is, in essence, a subpoena issued by an administrative agency); *RSM, Inc. v. Buckles*, 254 F.3d 61, 63, 69 (4th Cir. 2001) ("demand letters" from ATF requiring the disclosure of firearms purchase and sales information were analogous to administrative subpoenas).

Here, the RFIAs were issued not to the Defendants but to third-party health insurance providers. As such, Defendants lack standing to challenge the RFIAs on Fourth Amendment grounds unless they can establish a legitimate expectation of privacy in the information the FBI obtained. *United States v. Brooks*, 841 F. App'x 346, 350 (3d Cir. 2020); *see also United States v. Phibbs*, 999 F.2d 1053, 1077 (6th Cir. 1993).

A central issue is the applicability (or not) of the third-party doctrine, which holds that "the Fourth Amendment does not prohibit the obtaining of information revealed to a third party and conveyed by him to Government authorities, even if the information is revealed on the assumption that it will be used only for a limited purpose and the confidence placed in the third party will not be betrayed." *United States v. Miller,* 425 U.S. 435, 443 (1976) (citing authority). In *Miller*, the Supreme Court ruled that a criminal defendant lacked any protected privacy interest in records the Government had subpoenaed from two banks, which included microfilms of checks, deposit slips and other records relating to the defendant's bank accounts. The Court found that the defendant could assert "neither ownership nor possession" of the documents, which were business records of the banks. *Id.* at 440. Even the defendant's original checks were "not confidential communications but negotiable instruments to be used in commercial transactions." *Id.* at 442. And "[a]ll of the documents obtained, including financial statements and deposit slips, contain[ed] only information voluntarily conveyed to the banks and exposed to their employees in the ordinary course of business." *Id.* The Court explained that "[t]he depositor takes the risk, in revealing his affairs to another, that the information will be conveyed by that person to the Government." *Id.* at 443. Because no protected Fourth Amendment interests of the defendant were implicated, the Court concluded that the case was "governed by the general rule that the issuance of a subpoena to a third party to obtain the records of that party

4

does not violate the rights of a defendant, even if a criminal prosecution is contemplated at the time of the subpoena is issued." *Id.* at 444.

Several years later, the Supreme Court again applied the third-party doctrine in *Smith v. Maryland*, 442 U.S. 735 (1979). In that case, the Court ruled that no "search" occurred, for Fourth Amendment purposes, when a telephone company, at the request of law enforcement, installed a pen register at its offices for the purpose or recording numbers dialed from the petitioner's home phone. *Id.* at 745-46. The Court initially observed that, because the pen register was installed on the telephone company's property, the defendant/petitioner Smith "obviously cannot claim that his 'property' was invaded or that police intruded into a 'constitutionally protected area.'" *Id.* at 741. As for Smith's claim that he had a privacy interest in the phone numbers he dialed, the Court concluded that any subjective interest Smith held in that regard was not entitled to Fourth Amendment protection. *Id.* at 743-46. Citing *Miller* and other cases, the Court noted that it had "consistently has held that a person has no legitimate expectation of privacy in information he voluntarily turns over to third parties." *Id.* at 743-44. The Court then applied that rule and concluded that Smith could have no "legitimate expectation of privacy" in the pen register evidence because Smith had "voluntarily conveyed numerical information to the telephone company and 'exposed' that information to its equipment in the ordinary course of business." *Id.* at 744. "In so doing," the Court explained, Smith "assumed the risk that the company would reveal to police the numbers he dialed." *Id.*

The United States Court of Appeals for the Third Circuit has applied the third-party doctrine by upholding the Government's use of administrative summons or subpoenas to obtain information from third parties in furtherance of criminal and civil investigations. *See, e.g., Brooks*, 841 F. Appx at 350 (denying motion to suppress the defendant's travel information and

5

transaction history, which government agents had subpoenaed from Delta Airlines; also upholding the government's use of a subpoena to obtain subscriber and call information maintained by Sprint); *Masciantonio v. United States*, 528 F. App'x 120, 122 (3d Cir. June 12, 2013) (affirming the enforcement of an administrative summons which the IRS served on a taxpayer's bank for the purpose of furthering an administrative tax audit).

Defendants assert that the third-party doctrine has no applicability in the context of this case, based on the Supreme Court's reasoning in *Carpenter v. United States*, 528 U.S. 296, 319 (2018). In *Carpenter*, the Supreme Court held that the third-party doctrine did not apply to cell-site location information ("CSLI") that prosecutors had obtained from the defendant's wireless carriers. The information in question involved some 12,898 location points which catalogued the defendant's movement over 127 days, averaging 101 data points per day. The Court ruled that, notwithstanding the fact that the data was held by third-party wireless carriers, the defendant maintained a protected Fourth Amendment privacy interest in that information.

In analyzing the asserted privacy interest, the Court noted that CSLI lay "at the intersection of two lines of cases." 585 U.S. at 306. The first, exemplified by cases such as *United States v. Jones*, addressed an individual's expectation of privacy in his physical location and movements. *See* 565 U.S. 400, 415 (2012) (Opinion of Sotomayor, J.); *id.* at 430 (Opinion of Alito, J.) (concurring Justices concluding that "longer term GPS monitoring in investigations of most offenses impinges on expectations of privacy"). The second line of cases concerned the third-party doctrine, as set forth in *Smith* and *Miller*. *See Carpenter*, 585 U.S. at 307-09 (discussing two lines of precedent). Thus, the Court in *Carpenter* was confronted with "how to apply the Fourth Amendment to a new phenomenon" -- namely, "the ability to chronicle a person's past movements through the record of his cell phone signals." 585 U.S. at 309.

Ultimately, the Court declined to extend the holdings of *Smith* and *Miller* to the prosecution's acquisition of CSLI and instead recognized Carpenter's legitimate expectation of privacy in the record of his own physical movements. 585 U.S. at 310. Citing *Jones*, the Court noted that a majority of Justices had already recognized an individual's reasonable expectation of privacy "in the whole of their physical movements." *Id.* at 310 (citing 565 U.S. at 430 and 415). The Court then observed that "[m]apping a cell phone's location over the course of 127 days provides an all-encompassing record of the holder's whereabouts." *Id.* at 311. The technology therefore presented "even greater privacy concerns than the GPS monitoring of a vehicle" that was considered in *Jones, id.,* because it allowed the Government to achieve "near perfect surveillance." *Id.* at 312. Moreover, the "retrospective quality" of the data allowed access to "a category of information otherwise unknowable." *Id.* Accordingly, "when the Government accessed CSLI from the wireless carriers, it invaded Carpenter's reasonable expectation of privacy in the whole of his physical movements." *Id.* at 313. It followed that the location information at issue was the product of a "search" and was therefore subject to the Fourth Amendment's general warrant requirement. *Id.* at 310, 316, 320.

The *Carpenter* Court distinguished *Smith* and *Miller* by explaining that those decisions rested not just on the defendant's act of sharing information, but on the "nature of the particular documents" at issue and the "voluntary exposure" of those documents by the defendants in those cases. 585 U.S. at 314-15. Through CSLI, the Court explained, the Government could obtain "a detailed chronicle of a person's physical presence compiled every day, every moment, over several years[,]" which implicated "privacy concerns far beyond those considered in *Smith* and *Miller. Id.* at 315. In addition, a cell phone user cannot be said to "voluntarily 'assume[ ] the risk' of turning over a comprehensive dossier of his physical movements," because cell phones

7

are "indispensable to participation in modern society," and "a cell phone logs a cell-site record by dint of its operation, without any affirmative act on the part of the user beyond powering up." *Id.* In sum, "[g]iven the unique nature of cell phone location information, the fact that the Government obtained the information from a third party [did] not overcome Carpenter's claim to Fourth Amendment protection." *Id.* at 315-16.

Defendants argued that this Court should apply the reasoning in *Carpenter* to this case and find that the third-party doctrine is inapplicable to the health insurance records that the FBI recovered through their RFIAs. They maintain that healthcare data possesses the same characteristics as the CSLI at issue in *Carpenter* because it exists for nearly all individuals and because it "'implicates privacy concerns far beyond those considered in *Smith* and *Miller*.'" ECF No. 911 at 18 (quoting *Carpenter*, 585 U.S. at 315; 138 S. Ct. at 2220). Defendants posit that the sharing of health information is not truly voluntary, given the nature of our healthcare system and the fact that individuals are technically required by to maintain health insurance. Id. (citing 26 U.S.C. 5000A).

This line of argument is unavailing. In *Carpenter*, the Supreme Court took pains to explain that its holding was a "narrow one" and that it was not expressing a view on matters not before the Court. 585 U.S. at 316. The Court was also clear that it was not disturbing the application of *Smith* and *Miller, id.,* and that, "[t]he Government will be able to use subpoenas to acquire [third-party] records in the overwhelming majority of investigations." 585 U.S. at 318. Indeed, the Court took pains to repeatedly emphasized the unique circumstances of that case. *See* 585 at 309 (court recognizing that it was confronting a "new phenomenon: the ability to chronicle a person's past movements through the record of his cell phone signals"); *id.* (recognizing "qualitatively different category of cell-site records"); *id.* (declining to extend *Smith*

8

and *Miller* to cover "these novel circumstances"); *id.* (given the "unique nature of cell phone location records, the fact that the information is held by a third party does not by itself overcome the user's claim to Fourth Amendment protection"); *id* at 314 (characterizing CSLI as "a distinct category of information"); *id.* at 318 (describing CSLI as "an entirely different species of business record").

This case does not involve any similar "new" or "unique" phenomenon regarding the acquisition of health insurance provider data. In fact, the Supreme Court long ago recognized that "disclosures of private medical information to . . . insurance companies," among others, "are often an essential part of modern medical practice even when the disclosure may reflect unfavorably on the character of the patient." *Whalen v. Roe*, 429 U.S. 589, 602 (1977). Simply stated, the facts in this case are unlike those at issue in *Carpenter*. Thus, this is not the "rare case where the suspect has a legitimate privacy interest in records held by a third party." *Carpenter*, 585 U.S. at 319.

Defendants also argued that the third-party doctrine is foreclosed by the property-based approach to Fourth Amendment protection, as discussed by Justice Gorsuch in *Carpenter*. In his dissenting opinion, Justice Gorsuch advocated for a Fourth Amendment analysis predicated on concepts of property ownership and bailment. *See* 585 U.S. at 399 (observing that, under the common law, "the fact that a third party has access to or possession of your papers and effects does not necessarily eliminate your interest in them"). Defendants insisted that they maintained a property interest in their medical records under Pennsylvania law and that this property interest by itself gives practitioners and their practices standing to assert a Fourth Amendment challenge to the data in question here. *See* ECF No. 911 at 13 (citing 28 Pa. Code §115.28 and *Mitan v. United States Postal Insp. Serv.*, 656 F. App'x 610, 615 (3d Cir. 2016)).

This line of argument is also unpersuasive. The regulation cited by Defendants states that "Medical records are the property of the hospital, and they shall not be removed from the hospital premises, except for court purposes"; however, "copies may be made available for authorized purposes such as insurance claims . . . "). There is no allegation here that agents removed HB medical records from the HB facilities without a warrant.  On the contrary, the Government represented that the information supplied by the health insurance providers was largely in the form of spreadsheets and consisted of the requested HB billing information rather than the patients' medical records, which the insurers did not possess.  Thus, this case is distinguishable from *Zadeh v. Robinson*, which Defendants cited in support of their asserted Fourth Amendment privacy interest. *See* 928 F.3d 457 (5th Cir. 2019) (medical board investigators' execution of an administrative subpoena upon defendant's medical office violated the Fourth Amendment where agents were on site in the office, demanded immediate production of medical records for sixteen patients, and threatened disciplinary action if the records were not produced).  *Mitan* is also inapposite, as that case involved the wrongful retention of personal property that had been seized by postal agents.  *See* 656 F. App'x 610.

Nor was the Court persuaded by Defendants' argument that requiring a warrant for third-party health insurance records is necessary to preserve the degree of privacy that existed when the Fourth Amendment was adopted. Unlike *Carpenter*, which implicated the historic expectation of privacy individuals have in their own physical location and movements, the health insurance data at issue in this case is of more modern origin.

For all of these reasons, the Court has concluded that *Carpenter* provides no grounds for avoiding application of the Third-Party Doctrine in this case. As in *Miller*, the records at issue were voluntarily conveyed to the health insurance providers and exposed to their employees in

the ordinary course of business. Significantly, the contracts that HB entered into with these providers expressly stated that the information could be shared with law enforcement. HB and its practitioners therefore took the risk that, in conveying the billing information to the insurance entities, that information might be conveyed to the Government.

Defendants have offered no persuasive legal authority that alters the Court's conclusion on this point. The decisions they cite as recognizing a protected privacy interest in medical data generally concern an individual's privacy interest in his own medical data, which is not at issue here. *See, e.g., Ferguson v. City of Charleston*, 532 U.S. 67, 70-76, 78 (2001) ("[t]he reasonable expectation of privacy enjoyed by the typical patient undergoing diagnostic tests in a hospital is that the results of those tests will not be shared with nonmedical personnel without her consent."); *Skinner v. Railway Labor Execs. Ass'n*, 489 U.S. 602, 617 (1989) (holding that railway employees had reasonable expectation of privacy in mandated drug test results while upholding the policy at issue under the specific circumstances); *Nat'l. Treas. Emps. Union v. Von Raab*, 489 U.S. 656, 665 (1989) (recognizing that Customs employees have a reasonable expectation of privacy in their drug test results but upholding the warrantless testing program explicitly because the results could not be used in criminal prosecutions). Defendants' reliance on to *Zadeh*, *supra*, and *Tuscon Woman's Clinic v. Eden*, 379 F.3d 531 (9th Cir. 2004), is also unhelpful, as those decisions involved government agents searching and/or seizing medical records directly from a medical facility without a warrant. *Compare, e.g., Barry v. Freshour*, 905 F.3d 912, 914-15 (5th Cir. 2018) (physician lacked standing to raise Fourth Amendment challenge to subpoenaed medical records where his asserted interest in the information was tied to his patients' privacy interests in their own medical records.); *United States v. Gayden*, 977 F.3d 1146 (11th Cir. 2020) (physician had no privacy interest in prescription records that law

11

enforcement obtained without a search warrant from Florida's Prescription Drug Monitoring Program); *United States v. Evers*, Crim. No. 3:19-CR-250, 2021 WL 4846241, *8-9 (M.D. Pa. October 18, 2021) (physician lacked a reasonable expectation of privacy in medical records that were not within his control).

In sum, the Court has concluded that the Third-Party Doctrine governs the agents' acquisition of health insurance billing information in this case. Because no protected Fourth Amendment interests of the Defendants were implicated by this conduct, there was no "search" within the meaning of the Fourth Amendment such that a warrant would have been required. Accordingly, the Government's warrantless acquisition of the records did not violate the Defendants' Fourth Amendment rights, despite the fact that the records were sought in connection with a criminal investigation.

B.

Defendants have also asserted that, even if a search warrant was not required in order to obtain the records in question, the evidence should still be suppressed because the Government violated the provisions of 45 C.F.R. §164.512, making the search and seizure "unreasonable" within the meaning of the Fourth Amendment. This argument is also meritless.

The regulation provides, in relevant part, as follows:

(f) Standard: Disclosures for law enforcement purposes. A covered entity may disclose protected health information for a law enforcement purpose to a law enforcement official if the conditions in paragraphs (f)(1) through (f)(6) of this section are met, as applicable.

(1) Permitted disclosures: Pursuant to process and as otherwise required by law. A covered entity may disclose protected health information:

(i) As required by law including laws that require the reporting of certain types of wounds or other physical injuries, except for laws subject to paragraph (b)(1)(ii) or (c)(1)(i) of this section; or

(ii) In compliance with and as limited by the relevant requirements of:

*** 

(C) An administrative request for which response is required by law, including an administrative subpoena or summons, a civil or an authorized investigative demand, or similar process authorized under law, provided that:

(1) The information sought is relevant and material to a legitimate law enforcement inquiry;

(2) The request is specific and limited in scope to the extent reasonably practicable in light of the purpose for which the information is sought; and

(3) De-identified information could not reasonably be used.

45 C.F.R. §164.512(f).

Here, Defendants contend that the Government's request for information did not abide by the provisions of 45 C.F.R. §165.512(f)(ii)(C), because the request was not sufficiently specific and limited in scope and because "de-identified" information was not used. They maintain that this regulatory violation renders the Government's actions unreasonable, requiring suppression of the information and all fruits thereof. This argument fails for numerous reasons.

First, Defendants have not demonstrated that they have standing to challenge the Government's authority to issue the RFIAs. *See United States v. Brooks*, 841 F. App'x 346, 351 3d Cir. (2020) (to challenge an administrative subpoena, defendants "must assert their own legal interests and show that their interests are within the zone of interests the statute is intended to protect.") (citing *Davis ex rel. Davis v. Phila. Hous. Auth.*, 121 F.3d 92, 96 (3d Cir. 1997)). Accordingly, courts look to whether the authorizing statute provides an "'express right to challenge the subpoenas issued under it.'" *Id.* (quoting *United States v. Moffett*, 84 F.3d 1291, 1293 (10th Cir. 1996)); *see also United States v. Plunk*, 153 F.3d 1011, 1020 (9th Cir. 1998)

13

(concluding that the defendant could not attack the subpoena because he was not in the zone of interest and the statute did not provide an express right to challenge subpoenas issued under it), *overruled on other grounds by United States v. Hankey*, 203 F.3d 1160, 1169 n. 7 (9th Cir. 2000). Although agents did not issue a formal subpoena in this case, 18 U.S.C. §3486 gives the Attorney General or his designee broad authority to subpoena "any records or other things relevant to the investigation" of a federal health care offense. *Id.* §3486(a)(1)(B)(i). There is no express right under the statute to challenge subpoenas issued thereunder, nor have Defendants shown that HIPAA or the HIPAA regulation at issue provide such a right. Accordingly, Defendants lack standing to assert the HIPAA violation. *Brooks*, 841 F. App'x at 351 (court noting that its "supervisory power does not authorize [it] to order suppression of otherwise admissible evidence on the ground that it was seized unlawfully from a third party not before the court") (cleaned up).

Second, even if the Defendants had standing to challenge the RFIA's under 45 C.F.R. §164.512, the Court would find no regulatory violation. As the U.S. Court of Appeals for the Fourth Circuit recognized in *Doe v. United States*,

> it appears clear, both from the language of the statute and from Congress's intent in enacting HIPAA, that the DOJ's subpoena power in investigating federal health care offenses is meant to be broad. Section 3486 authorizes the Attorney General or her designee to subpoena any records "which may be relevant" to an authorized investigation, thus illustrating the substantial scope of the subpoena power Congress intended to give to the Attorney General. 18 U.S.C. §3486(a)(1)(A) (emphasis added).

253 F.3d 156, 267 (4th Cir. 2001) (affirming the denial of a motion to quash administrative subpoena, which sought seven years' worth of records relative to the government's investigation of a podiatrist for suspected health care fraud). Here, the Government's administrative requests entailed specific, enumerated categories of information that would be relevant to its investigation

14

into HB's billing practices.  Given the complexity of the issues involved, the FBI's

administrative requests were sufficiently specific and limited in their scope to meet the

requirements of the HIPAA regulation.

Defendants also assert that the Government failed to satisfy the regulatory requirements

for disclosure because the FBI did not request "de-identified" information.  In their view, this

was not a situation where "[d]e-identified information could not reasonably be used."  45 C.F.R.

§164.512(f)(1)(C)(3).  But as the Government points out, that argument is misplaced because

agents were attempting to corroborate data received from other sources and required identifying

information in order to do so.  Additionally, the FBI was authorized to request information in

connection with its health oversight activities pursuant to §164.512(d), which does not reference

"de-identified" information.

However, even if Defendants had standing to challenge the RFIAs and could show a

regulatory violation, suppression would not be an appropriate remedy.  Neither the HIPAA

authorizing statute nor the HIPAA regulation provide for suppression of evidence as a remedy,

as numerous courts have recognized.  *See, e.g., Givens v. St. Louis Cty.,* No. 4:18-CV-1732 SPM,

2020 WL 4334942, *5 (E.D. Mo. July 28, 2020) (noting that "courts have declined to exclude

records because HIPAA regulations do not provide for suppression of evidence as a remedy for a

HIPAA violation); *United States v. Yazzie*, 998 F. Supp. 2d 1044, 1115-16 (D.N.M. 2014)

(noting that HIPAA prohibits a "covered entity" from using or disclosing protected health

information, and the FBI is not a "covered entity"; thus, "suppressing medical records does not

appear to be an appropriate remedy for a HIPAA violation."); *Elder-Evins v. Casey*, No. C 09–

05775 SBA, 2012 WL 2577589, at *8 (N.D. Cal. July 3, 2012) ("As other courts have noted,

HIPAA does not have a suppression remedy. And where this is the case, it is inappropriate for

the court to exclude evidence on this basis."). *See also Brooks*, 841 F. App'x at 351 n. 5 ("Even if Brooks could challenge the subpoenas, suppression is not an available remedy because both statutes are silent as to whether exclusion is appropriate."); *United States v. Moalin*, 973 F.3d 977, 996 (9th Cir. 2020) ("Because suppression is a disfavored remedy, we impose it to remedy a statutory violation only where it is clearly contemplated by the relevant statute.").

C.

Finally, even if the Defendants had a protected Fourth Amendment interest in the subject records and could establish a violation of their rights, the Court would be disinclined to suppress the evidence because, in this Court's view, the agents' requests were undertaken in good faith. *See United States v. Davis*, 564 U.S. 229, 232 (2011) (holding that "searches conducted in objectively reasonable reliance on binding appellate precedent are not subject to the exclusionary rule"). Here, the Court has ruled that the RFIAs did not violation the Defendants' Fourth Amendment rights because the Defendants had no constitutionally protected privacy interests in the acquired documentation under the Third-Party Doctrine, as set forth in *Miller*, *Smith*, and their progeny. To the extent this Court is wrong in that regard, the agents' reliance on that doctrine was nevertheless objectively reasonable, warranting application of the good faith exception to the exclusionary rule.

For all of the above reasons, the Defendants' motion at ECF No. 911 has been denied.

### ***Defendants' Motions at ECF Nos. 903, 906 and 910 Pertaining to the Search Warrants for HB's Five Offices, Michael Brown's Cell Phone, and WebPT's Records***

On February 21, 2020, SA Michael Thoreson applied for two Search and Seizure Warrants -- one pertaining to the five HB facilities, including personal computers and cell

phones on site, and a second one pertaining to the HB-related records of WebPT. *See* Case Nos. 1:21-mj-16 and 1:21-mj-17. In support of the applications, Special Agent Thoreson submitted lengthy affidavits describing aspects of the Government's investigation to that point and the reasons why Thoreson felt there was probable cause to believe that further evidence of criminal activity would be found at the places to be searched. The facts contained in the two affidavits are generally consistent in material respects. For present purposes, the Court will refer only to the affidavit at Case No. 1:21-mj-16 (ECF No. 4), pertaining to the five HB facilities.

The affidavit indicated at the outset that HB is owned by co-founders Aaron Hertel and Michael Brown and has five facilities, four of which were located in Erie County, Pennsylvania (at the West Erie Plaza, on Peach Street in Summit Township, on Avonia Road in Fairview Township, and on Buffalo Road in Harborcreek Township), and one of which was located on Farm Colony Drive in Warren, Pennsylvania. *See* HB Facilities Affidavit, Case No. 1:21-mj-16-CRE (Doc. 4) ("Affidavit") at ¶¶5, 8-9. The public website for HB identified Aaron Hertel and Michael Brown as licensed physical therapists who had each obtained their Master of Physical Therapy degrees from Gannon University. *Id.* at ¶¶ 8-9. The website listed approximately 25 physical therapists and physical therapist assistants, each of whom were identified as working at one of the five HB facilities. *Id.* at ¶ 10. The website also identified front office personnel and billing specialists, but it did not identify technicians/aides or student interns. *Id.*

Sometime in 2020, Thoreson received a tip that HB was utilizing supportive personnel and not licensed physical therapists during pool rehabilitation therapy sessions. The FBI did not open an investigation into the matter at that time due to a lack of corroboration and other evidence; however, according to Thoreson, the tip provided an initial indication that HB may be engaged in criminal activity. Affidavit at ¶34.

17

The FBI later learned of a similar complaint that had been raised in 2016. Specifically, the United States Department of Health and Human Services Office of Inspector General (OIG) received a complaint in April of 2016 from an individual that claimed to be a current or former employee of HB. The complainant reported that, for years, HB had been using unlicensed aides and students to provide services, such as ultrasounds and electric stimulation, and billing health insurance entities for the services provided. However, OIG closed the matter due to a lack of evidence. ¶33.

In November 2020, the FBI opened a health care fraud investigation of HB, Aaron Hertel, Michael Brown, and others working at HB after an individual, identified in the affidavit as "CW1," alleged that HB, Aaron Hertel and Michael Brown had engaged in a pattern and practice of filing false claims for payment to the United States related to HB's physical therapy practice. Affidavit at ¶35. Though the search warrant affidavit did not say so, the information provided by CW1 initially came to light when CW1 filed a sealed *Qui Tam* action against HB. CW1 disclosed that s/he had worked for HB as a non-licensed aide until approximately September or October of 2020. Affidavit at ¶13, 36. While employed at HB, CW1 was also employed as an aide at a different physical therapy practice. CW1 was instructed at the other practice that, s/he was not allowed to provide physical therapy treatment to patients as an unlicensed aide. *Id.* ¶36. CW1 claimed that this was the opposite of the training and guidance provided by HB, where CW1 was authorized to provide physical therapy treatments to patients, and the treatments were then billed as if CW1 was a licensed physical therapist. *Id.* According to CW1, other aides at HB similarly performed physical therapy treatments on patients on a regular basis and as a way of doing business. *Id.* CW1 also alleged that, in addition to regular physical therapy, technicians/aides regularly provided aquatic therapy, and HB's physical therapists and

physical therapist assistants were almost never in the pool or pool area during aquatic therapy. *Id.* ¶ 55. CW1 maintained that HB schedules numerous patients each day and would not be able to treat them within the course of the workday without unlicensed aides performing some of the physical therapy treatment that is required to be performed by licensed physical therapists. ¶36.

In support of these allegations, CW1 provided photographs s/he took of a computer monitor at HB's Summit office, displaying the electronic morning schedules for three separate days – March 9, 2020; July 6, 2020; and July 30, 2020. Affidavit at ¶ 48. Thoreson described these photographs in his affidavit, noting they bore indicia of an HB office setting. He observed that:

> two physical therapists and one physical therapy assistant, are listed on the schedule photographs provided by CW1. Each patient on the schedule is then listed under a physical therapist or physical therapist assistant's name. The schedule provided by CW1 showed the first patient was to be seen at 8:00 a.m. While the Summit HB office was open for longer than just in the morning, the photographs only include the morning portion of the schedule. Numerous patient appointments are on the schedule provided by CW1. No open time, breaks, or off time is labeled or observed on the schedules for each employee.

*Id.*

CW1 had also provided photographs of the morning patients' corresponding "flowsheets."[1] The affidavit described these flowsheets as a "WebPT[2] produced document that

---

[1] Thoreson apparently used the term "Flowsheet" throughout his affidavit to refer to CW1's photographs of both "Daily Sheets/Billing Sheets" and "Flowsheets." The former documents the type of treatment performed and the duration of the treatment. The latter is a separate document that identifies specific exercises when a patient's visit includes exercise therapy. For the sake of consistency, the Court's reference to "Flowsheets" encompasses both types of documents, unless otherwise indicated.

[2] Web PT is a software program that provides (among other things) scheduling and electronic medical records (EMR) functions. Web PT was utilized through computers at each HB facility. Affidavit ¶¶45, 48.

includes the name of patient, health insurance provider, reasons for visit, treatment of patient,

minutes spent with patient, and the CPT billing code[3] for each patient.  In general, the

'flowsheet' is a complete detailed description of what took place during the patient's visit."

Affidavit at ¶48.

Thoreson examined each "flowsheet" provided by CW1, the CPT codes billed for each

patient as indicated on the "flowsheets," and the total time the physical therapist spent one-on-

one with each patient (as indicated on the "flowsheet"). Affidavit at ¶49. Investigators then

totaled and separated the recorded total minutes of treatment according to the PT/PTA who was

listed as administering the treatment. *Id.*  Based on this analysis, Thoreson concluded that HB's

PTs and PTAs had billed for more treatment time than was possible in the morning work hours

of March 9, 2020; July 6, 2020; and July 30, 2020.  According to his affidavit,

> [t]he results were as follows for the July 6, 2020 schedule from approximately 8:00 am. to 12:00 p.m.:
>
> a. July 6, 2020: Physical Therapist A.D. – Total time billed 10.4 hours
>
> b. July 6, 2020: Physical Therapist Assistant L.G. – Total time billed 6.1 hours
>
> c. July 6, 2020: Physical Therapist J.M. – Total time billed 6.75 hours[.]
>
> . . . Therefore, as observed in the data provided by CW1, on July 6, 2020, the three employees working the morning shift at HB, A.D., L.G. and J.M., recorded and billed health insurance providers a combined total of over 23 hours of one-on-one services during the morning time frame of 8:00 a.m. through around 12:00 p.m. The three licensed HB employees claimed they had been in direct one-on-one contact with their patients for over 23 hours during the four-hour window (12 total hours of possible billable time – 3 employees multiplied by 4 hours) for the morning of July 6, 2020.

Affidavit ¶¶49-50.

Thoreson further determined that, on July 6, 2020, A.D. billed Medicare for 48 minutes

of one-on-one aquatic therapy for a particular patient whose appointment was at 10:30 a.m.  Yet

---

[3] CPT [Current Procedural Terminology] codes are five-digit, uniform, numeric language maintained by the American Medical Association and used to identify medical services and procedures.

that same day, A.D. also had a 9:30 a.m. appointment that was billed for 47 minutes and a 10:00 a.m. appointment that was billed for 42 minutes. Each of these overlapping time spans were billed as involving direct 1-on-1 therapy. Thoreson interpreted these billings as illustrating that "A.D. claimed to be in the pool administering one-on-one aquatic treatment to a patient while . . . also administering one-on-one treatment to another patient at the same time." Affidavit at ¶ 55.

A similar review of the scheduling documentation and flowsheets was conducted for each patient treated at HB's Summit office on the morning of March 9 and July 30, 2020. The morning schedule (8:00 a.m. to 12 p.m.) for March 9, 2020 showed two physical therapists (A.D. and J.M.) and one physical therapist assistant (L.G.) listed on the schedule. Affidavit at ¶ 57. Based on his analysis of the corresponding flowsheet photographs, Thoreson calculated that, for this four-hour work morning, A.D. billed a total of 7.6 hours, J.M. billed a total of 5.75 hours, and L.G. billed a total of 8.4 hours. *Id.*

The schedule for the morning of July 30, 2020 showed that J.M. and L.G. were listed as having patients scheduled between the hours of 8 a.m. and noon. Affidavit at ¶57. Thoreson reviewed the corresponding flowsheets and calculated that J.M. billed a total of 5.4 hours for that time and L.G. billed a total of 5.2 hours. *Id.* Thoreson concluded that, as with his July 6 analysis, the data for March 9 and July 30, 2020 revealed billed hours in excess of a four-hour billable window.

In furtherance of the investigation, agents obtained patient billing records for HB from Medicare, Medicaid, Highmark, and UPMC pursuant to requests under the Health Insurance Portability and Accountability Act (HIPAA). Affidavit at ¶ 63. Thoreson then examined more than 30 patient flowsheets provided by CW1 and compared them with the insurance provider billing data. ¶64. After comparing the patient names, CPT codes, units billed, insurance

21

provider, and treatment dates for the documents, he found that each patient's flowsheet listed the exact data that was billed to the insurance provider. *Id.* He concluded that the data provided by CW1 was not only authentic, but also an accurate representation of HB's billing practices. Id.

A review of the health insurance billing records also revealed that in 2014, HB only billed for group therapy (CPT Code 97150) three times and, from 2015 through mid-2020, HB did not bill for group therapy even one time. Yet according to an article on WebPT's website, CPT Code 97150 was one of the top twenty CPT codes billed by WebPT clients between September 2019 and February 2020. Affidavit at ¶ 69.

Conversely, Thoreson learned from Highmark that, based on Highmark's own data spanning January 1, 2014 through November 1, 2020, HB was near the very top of all physical therapy practices relative to 1-on-1 CPT billing. For CPT Code 97110 (which requires direct 1-to-1 patient contact), HB was the 12th highest out of 3,810 other practices. For CPT 97140 (which also requires 1-to-1 treatment), HB was 4th out of 3,299 other practices. And for CPT 97113 (aquatic therapy), HB was 1st out of some 450 providers. Affidavit ¶¶ 71, 84.

Thoreson's investigation revealed that CPT Code 97150 for group therapy is an "untimed" code, meaning that when a PT performs treatment to a group of patients, each patient can only be charged one instance regardless of the time spent with the therapist. Affidavit ¶70. In 2014, Highmark reimbursed PTs $18.00 for each billing of CPT Code 97150. *Id.* By contrast, Highmark reimbursed PTs for individual therapy Code 97110 at a rate of $27.00 for every 15 minutes spent with a patient. Affidavit ¶72. CPT 97140 (also involving 1-on-1 treatment) was reimbursed at $28.98 for every 15 minutes spent with a patient. *Id.* Therefore, as Thoreson observed in his affidavit, "[b]illing exclusively CPT Codes 97110 or 97140 throughout the day would make a drastic difference in profitability." *Id.* ¶74. And because a PT's pay is

significantly higher than that of an unlicensed aide or technician, "there is a significant profit motive for a physical therapy practice to utilize unlicensed physical therapy aides or technicians to perform the work legally reserved for only physical therapists and then bill that work as if a physical therapist performed it.  In doing so, a physical therapy practice illegally reaps the higher bills of a physical therapist while saving money paying an aide or technician."  *Id.* ¶74.

As part of the investigation, Thoreson and his team researched guidelines and rules for billing one-on-one treatment by a PT or PTA. Id. at ¶¶ 60-62, 77-78.  To that end, Thoreson reviewed online publications, articles, Medicare guidelines, the American Physical Therapy Association's website, and the WebPT website.  Thoreson's research confirmed that:  one-on-one physical therapy is defined as direct, one-on-one patient contact; this type of physical therapy must be performed by a licensed physical therapist or physical therapist assistant; and treatment by unlicensed individuals cannot be billed to Medicare or insurance providers. *Id.*  On the American Physical Therapy Association' (APTA) website, www.apta.org, Thoreson found billing descriptions and examples of appropriate methods for billing one-on-one physical therapy services. *Id.* at ¶ 61. He learned that it is possible for PTs to bill for one-on-one services when the PT is moving between multiple different patients scheduled at the same time; however, the PT must record only the time spent with each patient, meaning that when the PT moves their treatment to a different patient, the PT's billable time for the first patient stops until the PT returns to the first patient and re-starts treatment. Simultaneously one-on-one billing for more than one patient at the same time is not allowed nor lawful. *Id.*  From the Medicare Benefit Policy Manual, Thoreson learned that "Aquatic Therapy with therapeutic exercise (97113) should not be billed when there is not one-on-one contact between therapist and patient." *Id.* at ¶ 56.  And in researching Pennsylvania law, Thoreson learned that "[t]he Commonwealth of

Pennsylvania is also clear in its language, support personnel cannot perform treatment on a patient and certainly cannot then bill that treatment as if it was performed b a physical therapist or physical therapist assistant." *Id.* at ¶ 62.

Thoreson also sought guidance from an independent PT ("CW2"), who agreed to provide information about the physical therapy profession. According to Thoreson's affidavit, CW2 has been involved in the physical therapy profession for many years and has practiced as a licensed physical therapist in Pennsylvania. CW2 has experience in both providing treatment to patients and billing private medical insurance and Medicare for those services. Affidavit, ¶¶13, 37. CW2 is also familiar with the curriculum taught to physical therapy students at Gannon University, where both Aaron Hertel and Michael Brown earned their Masters Degrees in Physical Therapy. *Id.* ¶¶8-9, 38. According to CW2, graduates of Gannon are provided with instruction on Pennsylvania physical therapy rules and guidelines. *Id.* at ¶ 38. Further, physical therapists and physical therapist assistants are professionally licensed and are expected to know the parameters of allowable treatment and how to properly bill for services rendered. Therefore, PTs and PTAs cannot use the excuse that they were never informed/educated about the differences in allowed treatment and proper billing. *Id.*

CW2 confirmed that Per Medicare rules and guidelines, a PT or PTA can treat multiple patients at the same time, but if one-on-one services are being billed for each, then the physical therapist or physical therapist assistant must be with each patient for the time they documented, because 1-on-1 service is defined as continuous direct contact with the patient. PTs or PTAs who are engaged in one-on-one treatment are permitted to go back and forth between patients, but when moving among multiple patients, they must stop the billable clock for the current patient and then begin a new billing clock for the next patient. A technician/aide may not

continue the PT/PTA's clock by being present after the PT/PTA has moved to a different patient. Technicians may be with the patient to help count exercise reps, for example, but they cannot provide skilled (i.e., billable) instruction. Affidavit ¶51.

CW2 explained that the CPT codes used by HB PTs and PTAs are billed in 15-minute increments of one-on-one treatment time, but PTs and PTAs may round time to the nearest 15 minutes if they meet the "8-minute rule." This means that, if a physical therapist treats a patient for 12 minutes, they may round the time up to 15 minutes and bill for 15 minutes. However, if a physical therapist sees a patient for 18 minutes, they must round down to 15 minutes. If a physical therapist engaged in one-on-one treatment with a patient for 23 minutes, they could then bill that time as 30 minutes. However, if the time spent by the physical therapist is only 22 minutes, that time should be billed only as 15 minutes because 8 additional minutes of treatment time did not occur. Affidavit ¶51.

CW2 advised that there is a legitimate way for physical therapists to treat multiple patients simultaneously. This is performed through group therapy, where a physical therapist treats more than one patient at a time and provides instruction to each or all at the same time. According to CW2, group therapy can be beneficial in that more revenue can be collected versus treating one patient at a time. Therefore, it would be unusual for a physical therapy practice not to bill group therapy. Affidavit ¶53. Although a single PT simultaneously seeing multiple patients and billing for each as one-on-one services would bring in more revenue than billing it as group therapy, this would be illegal. *Id.* at ¶ 54.

CW2 was presented with the facts for all three morning schedules (March 9, July 6, and July 30, 2020) that were provided by CW1, and advised that after doing the math, s/he could not see how a PT or PTA could legitimately bill the therapy as one-on-one services. Affidavit at ¶

59.  With respect to Thoreson's analysis of the July 6 records, CW2 opined that billing for a combined total of 23 hours of one-on-one therapy in a four-hour window was not possible.  *Id.* ¶¶52, 54.  CW2 advised that in his/her experience, the only way the three HB employees could have billed a combined total of 23 hours in a four-hour window is by not performing services as documented or if their time was not actually spent with each patient as documented.  *Id.* ¶54.  As another example, on July 6, 2020, the therapists billed 137 minutes in a 90-minute time slot. Id. at ¶59. CW2 advised that not only are the billable times suspect, but there is no open schedule to allow for documentation, restroom breaks, and food breaks. Id.  CW2 concluded that the data provided by CW1 demonstrates that HB's billable time is not realistic. Id.

CW2 advised Thoreson that technicians are not allowed to be the sole provider of services for aquatic therapy patients. While the technician could watch over the patients for safety, they cannot provide skilled billable instruction or treatment.  Thus, no matter what a technician did in a therapy pool, their time is not billable under CPT codes pertaining to aquatic therapy.  CW2 informed Thoreson that it would be fraudulent to document that a physical therapist or physical therapist assistant performed the aquatic therapy (billable time) when in fact the technician performed the instruction/therapy.  Affidavit ¶56.

As part of his investigation, Thoreson twice interviewed CW3, a licensed physical therapist who was then still employed at HB.  Affidavit ¶12.  CW3 gave the second interview pursuant to a proffer agreement that required the witness's full, complete, and truthful information concerning HB, Aaron Hertel, Michael Brown, and others.  *Id.*

During the interviews, CW3 revealed that HB utilizes aides (unlicensed personnel) to perform duties that only a licensed physical therapist or physical therapist assistant can lawfully perform.  CW3 also revealed that it was a pattern and practice at HB for physical therapists to

record billable time for patients that were treated by unlicensed personnel. CW3 indicated that

treatment performed by unlicensed aides was regularly recorded as one-on-one treatment time

with a physical therapist and billed under a one-on-one physical therapist treatment code such as

CPT 97110 (therapeutic exercise). CW3 also revealed that the physical therapists would

regularly instruct the unlicensed aides about the treatment the unlicensed aides were to perform,

and that treatment would then be performed by the unlicensed aide without the oversight of the

physical therapist. This unlicensed activity undertaken by the aide would then be recorded as

time spent by a licensed physical therapist or physical therapist assistant. CW3 indicated that not

every HB patient is treated by an unlicensed aide, but it was common for unlicensed aides to be

providing treatment.  Further, CW3 was trained at HB that it is acceptable for aides to engage in

treatment activity. CW3 also indicated that Aaron Hertel and Michael Brown were fully aware

that unlicensed aides are engaged in treating patients at HB.  Affidavit ¶87.

       CW3 also confirmed that technicians and support personnel administer aquatic therapy in

the pool area while PT/PTAs are with other patients within the building. Affidavit ¶ 55.  Once

the aide's work is done, the patient's insurance is billed as if a PT or PTA performed the pool

therapy.  *Id.*

       CW3 revealed his/her knowledge that each HB facility operated in the same manner;

namely, each location utilizes aides or technicians with patients and bills that time as if it was

performed by PTs or PTAs.  Affidavit ¶ 55.  And each HB facility uses WebPT and accesses the

online software through the website at www.webpt.com. *Id.* at ¶¶ 48, 95.

       CW3 stated that HB's physical therapists work on average less than 40 hours per week.

Affidavit at ¶ 82. S/he advised that physical therapist assistants are paid an hourly rate, as

opposed to a salary, and may occasionally earn overtime if they work more than 40 hours per

week. *Id.* While it is possible that HB employees may move between different facilities, CW3 stated that the employee list on HB's website is an accurate representation of which employees worked at each facility. *Id.* at ¶ 66. CW3 stated that technicians/aides are not depicted nor listed anywhere on HB's website. *Id.* at ¶ 90.

As another element of the investigation, agents analyzed multiple days within the universe of medical insurance billings they had secured from UPMC, Highmark, Medicare and Medicaid. After sorting the data by office location, agents used HB's website to factor in the number of physical therapists and physical therapist assistants at each location and were able to calculate an approximation of hours worked by each PT or PTA. The results revealed many instances where physical therapists or physical therapist assistants billed more than eight hours per day, sometimes billing ten-hour days. Affidavit ¶¶67, 80.

Investigators then examined billing information for March 9, 2020, July 6, 2020 and July 30, 2020 and found that, for July 6, 2020, twenty-five percent (25%) of HB's patients had insurance other than UPMC, Highmark, Medicare, or Medicaid. For July 30, 2020, it was over 50%, and on March 9, 2020, it was 38%. Thoreson deduced that HB bills more medical insurance providers than just UPMC, Highmark, Medicare, and Medicaid, and he estimated that the FBI was missing approximately 25-50% of the health insurance records that HB has ever billed. Affidavit ¶81. Thoreson explained that,

[b]ased on the above analysis, investigators do not have a complete picture of HB billings for each and every day. What the above analysis does show is that the numerous eight-hour billable days found in the analysis of the information from the four reviewed medical insurance providers is just the tip of the iceberg. Applying this missing 25-50% to the known eight-hour plus workdays, as described above, investigators believe HB employees are billing upwards of ten or twelve hours per day (eight hours multiplied by 25% and 50%, respectively). Furthermore, by adding non-billable time, like bathroom breaks, lunch, and patient documentation time, a ten or eleven billable day now turns into a twelve or thirteen-hour workday. HB is not open for twelve to thirteen hours each day. CW3 has revealed to

> your affiant that HB physical therapists work on average less than 40 hours per week. CW3 further revealed that physical therapist assistants are paid hourly and may occasionally earn overtime after working 40 hours in a week. Less than forty-hour work weeks don't match physical therapist billings at HB of ten to twelve hours each day. While the analysis did not show that every day was an eight/ten/twelve-hour billable day, the sheer number of them, combined with the amount of time needed for physical therapist or physical therapist assistant documentation or lunch breaks and other non-billable time, reveals the high likelihood that HB's billing is significantly inflated and willfully and illegally erroneous.

Affidavit ¶82. Thoreson concluded that this "data analysis did not reveal anything different than what CW1 and CW3 reported and in every regard revealed that the statements, factual assertions and documentation provided by CW1 and CW3 are accurate." *Id.*

The investigation also included information received from CW4, a former patient of HB who had received treatment at HB's Harborcreek facility in 2018. Affidavit ¶¶12, 88. CW4 advised that his/her treatment at HB involved two different "teams," which CW4 labeled as the "A" team and "B" team. *Id.* ¶88. CW4 used these labels in reference to the level of care and expertise each had, with the "A" team being the better of the two. *Id.* At each visit, a "B" team employee would greet CW4 and walk him/her back to a treatment room or piece of equipment. The "B" team employee would typically place an electronic stimulation (stim) device on CW4's person, followed by a hot or cold pack. The "B" team employee would then begin CW4's exercise treatment. *Id.* The "B" team employee would typically have a sheet of paper that listed the exercise program that CW4 needed to perform. *Id.* CW4 heard at least one employee say these were the exercises that "Phil" wanted CW4 to perform. *Id.* After examining a photograph of P.S. (a licensed physical therapist) on HB's website, CW4 identified that individual as "Phil." CW4 examined the rest of the photographs and advised none of them were the "B" team employees. *Id.*

CW4 reported that s/he only saw "Phil" for around 10 minutes each visit.  Affidavit ¶89.
Prior to seeing "Phil," CW4 would receive approximately 10 minutes of stim/pack treatment and
another 15 minutes of exercise treatment.  *Id.*  Sometimes the "B" team employee would stay
with CW4, other times they would leave CW4 unattended.  *Id.*  When CW4 was left without
supervision, s/he would see these other "B" team employees treat other patients.  During any
typical appointment, CW4 would observe approximately 10 other patients receiving treatment.
CW4 described the HB Harborcreek location as very busy, pushing through patients, with an
emphasis on making money through volume.  *Id.* CW4 advised that no employee ever offered up
their position at HB (stating whether they were an unlicensed support employee), although one
"B" team employee advised she was a student when CW4 engaged her in small talk.  CW4
assumed each was a licensed employee able to provide physical therapy treatment.  *Id.*

CW4 reported that s/he used Highmark insurance for treatment at HB.  Affidavit at ¶ 89.
Accordingly, Thoreson examined the records obtained from Highmark and identified more than
15 visits' worth of billing records relating to CW4's treatment at HB.  Id. at ¶90.  On every
occasion except one, HB billed a total of 45 minutes of one-on-one treatment under CPT Codes
97110 and 97140.  *Id.*  Thoreson concluded that CW4's estimated treatment times were about
half of what was billed, because CW4 estimated s/he spent around 25 minutes receiving
treatment (not including stim pack/hot cold pack treatment), only 10 minutes of which involved
direct contact with "Phil."  Thoreson inferred that the other treatment time was performed by
unlicensed HB employees, including a "student," because CW4 had indicated that none of the
"B" team employees were listed on HB's website, and Thoreson had been advised by CW3 and
aides and technicians are not listed or displayed on the website.  *Id.*

On February 11, 2021, FBI Special Agent Valentino Cuba, working in an undercover capacity, visited the West Erie Plaza HB location during normal working hours. After entering the office, SA Cuba asked an employee if he could get a tour of the facility to see what treatment options were available. An HB employee offered to give him a tour and walked him around showing him the different areas and treatment options HB provided. While walking around, SA Cuba noticed upwards of 20 patients. Several patients were using various pieces of equipment, many of them doing their "own" treatment/exercise program without supervision. SA Cuba was not allowed into the private patient rooms and could not see if they were occupied. Several additional patients were either checking out or sitting in the waiting area chairs near the front entrance. SA Cuba witnessed several young females, who all wore the same black shirts, working with patients. SA Cuba also noted four different HB employees working with patients. SA Cuba did not receive treatment and only walked around the facility, leaving a few minutes later. Affidavit ¶91.

SA Cuba subsequently examined the HB website and each photograph displayed. Although each employee wore a mask when SA Cuba visited the West Erie Plaza HB location, SA Cuba was able to determine that none of the HB female employees wearing black shirts had their photograph displayed on the website. Affidavit ¶92.

Thoreson concluded that "SA Cuba's observations match[ed] what CW3 and CW4 describe. Numerous patients present at HB, some being seen or treated by HB employees, while many others were not being attended to by HB personnel but rather appeared to be engaging in solitary treatment activity. The HB website lists eight different licensed HB employees working at the Erie Plaza location. SA Cuba only saw four but witnessed upwards of 20 patients." Affidavit ¶93.

31

Finally, on February 17, 2021 interviewed CW1, who confirmed all the information about HB that s/he had previously provided. CW1 disclosed that s/he was currently prescribed three different medications for mental health related issues and had been hospitalized for mental health related issues within the previous year. During the interview, however, Thoreson observed that CW1 was alert and oriented and did not appear to be suffering from mental health problems at that time. CW1 had no criminal history and was then employed as a corrections officer, working approximately 120 to 140 hours every two weeks. Affidavit ¶94.

Based on the above information, Special Agent Thoreson, as the Affiant, applied for Search and Seizure Warrants for the five HB facilities and for WebPT records on February 21, 2020.

After reviewing SA Thoreson's Affidavits, then-Chief U.S. Magistrate Judge Cynthia Reed Eddy found there was probable cause to issue the warrants. The Search Warrants were executed on February 23, 2021, resulting in the seizure of numerous items of both digital and physical evidence.

### A.  Franks Challenge[4]

The moving Defendants have argued that the magistrate judge was misled by certain misstatements and omissions from SA Thoreson's probable-cause affidavit in violation of *Franks v. Delaware*, 438 U.S. 154 (1978), and they request a hearing to test the veracity of SA Thoreson's allegations. However, "[t]he right to a *Franks* hearing is not absolute." *United States v. Pavulak*, 700 F.3d 651, 665 (3d Cir. 2012). To be entitled to a hearing, the defendant "must first (1) make a 'substantial preliminary showing' that the affiant knowingly or recklessly

---

[4] To the extent Defendants' *Franks* motion asserts these challenges relative to other warrants or the fruits thereof, the Court's ruling herein applies to those challenges as well.

included a false statement in or omitted facts from the affidavit, and (2) demonstrate that the false statement or omitted facts are 'necessary to the finding of probable cause.'" *Id.* (quoting *United States v. Yusuf*, 461 F.3d 374, 383–84 (3d Cir. 2006)). *See United States v. Brown*, No. 23-2296, 2024 WL 2953127, at *2 (3d Cir. June 12, 2024).

Recklessness is measured not by the relevance of the information, but by the demonstration of willingness to distort truth affirmatively. *Wilson v. Russo*, 212 F.3d 781, 788 (3d Cir. 2000). Relevantly, the U.S. Court of Appeals for the Third Circuit has stated that:

> an assertion is made with reckless disregard for the truth when the affiant must have entertained serious doubts as to the truth of his statement or had obvious reasons to doubt the accuracy of the information he reported. Id. For an omission, we are concerned about giving neutral and detached magistrates the ability to draw reasonable inferences in order to avoid giving police the power to make unilateral decisions on the materiality of information. Id. at 787. An omission is made if an affiant withholds a fact within his knowledge that "any reasonable person would have known that this was the kind of thing the magistrate would wish to know." Id. at 788 (citation omitted).

*United States v. Rivera*, 347 F. App'x 833, 839–40 (3d Cir. 2009).

Here, Defendants asserted that the February 21, 2021 warrants were deficient because they were procured on the basis of numerous misrepresentations or omissions concerning which SA Thoreson showed at least a reckless disregard for the truth. These are discussed below.

The Affiant's Allegations of Overbilling on March 9, July 6, and July 30, 2020

Several of the alleged falsities and omissions pertain to SA Thoreson's analysis of the billing data from March 9, July 6, and July 30 of 2020. As described in the warrant application, Thoreson made his calculations by referencing the clinicians listed on CW1's photograph of the electronic schedule for each of the three mornings in question and examining the corresponding flowsheets from those same days. From the flowsheets photographed by CW1, he derived the billing codes and total number of treatment minutes that had been documented relative to the

33

clinicians' treatment of the morning patients. Thoreson assumed a four-hour time for treatment (between 8 a.m. and 12 p.m.), consistent with the timeframe displayed on the electronic schedules. He found that, in each case, the treatment times and CPT Codes reflected in the flowsheets matched the billing information obtained from the health insurance providers and were facially indicative of overbilling.

March 9, 2020

To review, the electronic schedule for the morning of March 9, 2020 showed three employees (A.D., J.M., and L.G.) seeing patients during the hours of 8:00 a.m. to 12 p.m. Affidavit at ¶ 57. The corresponding flowsheet photographed by CW1 showed that a total of 7.6 hours were billed for A.D.'s morning patients, 5.75 hours were billed for J.M.'s morning patients, and 8.4 hours were billed for L.G.'s morning patients. Id. Thoreson construed the evidence as facially indicative of overbilling based on his calculation that three clinicians cannot provide 21.75 hours of billable 1-on-1 treatment in the space of 12 collective hours (3 clinicians and 4 treatment hours for each).

July 6, 2020

For the morning of July 6, 2020, the electronic schedule again listed A.D, J.M., and L.G. as seeing patients during the hours of 8:00 a.m. to 12 p.m. Affidavit at ¶ 49. Based on the billing information from the corresponding flow sheets, Thoreson calculated that A.D. billed a total of 10.4 hours for his morning patients, J.M. billed a total of 6.75 hours, and L.G. billed a total of 6.1 hours. Id. Thoreson construed this evidence as indicative of overbilling for a 4-hour treatment window.

34

In addition, it appeared that A.D. billed Medicare for 48 minutes of one-on-one aquatic therapy for a particular patient whose appointment was at 10:30 a.m., while also billing 47 minutes of one-on-one *non-aquatic* treatment for a different patient who was scheduled at 9:30 a.m., followed by 42 minutes of one-on-one *non-aquatic* treatment for a patient who was scheduled at 10:00 a.m. Id. at ¶55. This information appeared to corroborate CW1's report that technicians/aides, rather than PTs and PTAs, were performing aquatic therapy at HB, since Physical Therapist A.D. appeared to be documenting one on-one in-pool aquatic therapy while simultaneously administering one-on-one *nonaquatic* therapy to other patients. *Id.*

<u>July 30, 2020</u>

The electronic schedule for the morning of July 30, 2020 showed that J.M. and L.G. were scheduled to see patients during the hours of 8:00 a.m. to 12 p.m. Affidavit at ¶ 57. The corresponding flowsheet photographed by CW1 suggested that J.M. billed 5.4 hours, and L.G billed a total of 5.2 hours for the morning session. *Id.* As with the other two dates, Thoreson interpreted the data as indicative of overbilling.

Defendants have argued that Thoreson misrepresented these alleged instances of overbilling and the information underlying them. Relatedly, they take issue with his statements that certain clinicians "claimed" to have provided specific treatment, over a specific period of time, to specific patients. According to Defendants, the employees in question did not "claim" what Thoreson attributed to them, and he was wrong in his underlying calculations, both in terms of the number (and identities) of clinicians who provided treatment, as well as the number of hours over which the treatment in question was provided. They contend that the source information utilized by Thoreson was incomplete and inherently unreliable.

35

With respect to the number of treatment providers on hand during the specified days, the affidavit is clear that Thoreson derived this information from CW1's photograph of the electronic schedule, which showed the PTs or PTA who were scheduled to see patients that day. Affidavit ¶48.  But Defendants claim that Thoreson's assumptions in this regard were mistaken. Pointing to the second page of the Daily Notes for July 6 and July 30, they assert that a fourth employee (N.C.) was present to treat patients on July 6 and that A.D. was actually in the office treating patients on July 30.  However, Thoreson did not have this information; he was working off the photographs that CW1 had provided, which included only the first page of the Daily Notes (referred to as "flowsheets") for the days in question.  As the Government points out, Thoreson could not have been untruthful concerning information that he did not know about.

Nor did Thoreson have reason to suspect that the information in his possession was unreliable.  He was able to glean from the first page of the Daily Notes the CPT Codes and minutes of 1-1 treatment that had been documented relative to the morning patients, and that information aligned with documentation received from the insurance providers.  Even if Thoreson could have deduced from the photographs that there were additional pages to the Daily Notes, he had no obvious reason to suspect that the information on the second page would contradict the information on the electronic schedule.  Thus, Thoreson was not reckless in describing or relying on the information in the flowsheets.

Defendants also criticize Thoreson's analysis based on his assumption that only four hours (8 a.m. to 12 p.m.) were available for morning treatment sessions.  They assert that Thoreson was untruthful when he stated, based on a photographed schedule, that "morning billable hours did not also cover or extend to times after 12:00 p.m. because HB had different patients being treated in the afternoon."  Affidavit ¶57 n.4.  Elsewhere, Thoreson stated that

"[n]o open time, breaks, or off time is labeled or observed on the schedules for each employee."
Affidavit ¶48.

Defendants point to CW1's photographs of the schedules for the days in question and note that, beginning at 12 p.m., there are 90-minute and 120-minute blocks of time where no patients are scheduled. On March 9, 2020, for example, the photo shows 90-minute blocks of time for each of the three employees, beginning at noon, with the words "LUNCH" and "NO MORE EVALS" appearing in that space. ECF No. 924-3 (Sealed). On July 6, the photo shows a 90-minute block under J.M's name and two-hour blocks under A.D.'s and L.G.'s names, each with the words "NO JESS / NICOLE HERE." Id. On July 30, the schedule shows a similar 90-minute block under the name of J.M. and a 2-hour block under the name of L.G.[5] Defendants contend that treatment times could, and did, extend past the noon hour, so it was at least recklessly dishonest for Thoreson to represent that PTs and PTAs had only four hours within which to see their patients.

Having fully considered the Defendants' arguments on this point, the Court notes the following. First, based on the photographic evidence, Thoreson's statement that patient appointments were scheduled in the afternoon was accurate. In addition, when read in context, Thoreson's reference to a lack of "open time, breaks, or off time" references the time frame

---

[5] Although A.D.'s name is on the schedule for July 30, no scheduled patients appear under his name, lending the impression that he did not see patients on that date. However, Defendants claim that A.D. was both present *and assisting with treatments that day*, as evidenced by his signature on the second page of the daily notes for July 30. As previously noted, Thoreson did not possess this information at the time he submitted his affidavit for the February 21, 2020 warrants. Accordingly, the evidence is not indicative of a reckless disregard for the truth as it relates to Thoreson's calculation of the number of clinicians who were available to treat patients at the Summit office on July 30, 2020.

between 8 a.m. and 12 p.m. when patients were scheduled to be seen by the various employees.

Defendants suggest that Thoreson should have avoided any ambiguity by simply including the

photographs of the schedules in his affidavit; but the photographs were part of a sealed *qui tam*

action, and his descriptions of the source data he possessed were detailed and generally accurate.

To the extent Thoreson inaccurately described the scheduling photos by failing to

describe the alleged "open times" between 12 p.m. and 2 p.m., the Court does not view this as

demonstrating a reckless disregard for the truth regarding his allegations of overbilling.

Defendants do not contend that these blocks of "open time" were utilized in their entirety for the

purpose of treating morning patients. Instead, at oral argument, they gave three examples where

morning patients left the practice after 12 p.m., namely: on March 9, Patient "K.C." checked out

of the office at 12:09 p.m.; on July 6, Patient "B.F." checked out at 12:18 p.m.; and on July 30,

Patient "R.B." checked out at 12:20 p.m. But Thoreson was not in possession of this information

at the time he submitted his affidavit, so that specific knowledge cannot be imputed to him.

Moreover, without knowing when these patients checked in, no conclusion can be drawn

concerning the overall accuracy of Thoreson's billing estimations for the days in question.

Indeed, even if one were to assume that morning treatment times ran from 8:00 a.m. to 12:20

p.m., it would not change the conclusion, based on what Thoreson then knew, that employees

had apparently overbilled for the time they had spent treating patients. Nor would it have been

illogical for Thoreson to assume that the "open times" cited by Defendants were not utilized for

treatment. On at least two days, the calendar photos show that the open time slots were labeled

"LUNCH" and/or "NO MORE EVALS." And based on common sense as well as his

consultation with CW2, Thoreson could infer that PTs and PTAs would require open time for

38

non-billable matters such as administrative work, meals, and restroom breaks.[6]  Thus, the Court

cannot say that "any reasonable person would have known" that the magistrate judge would want

to know about the "open times" on the calendar.  On balance, the evidence does not show that

Thoreson "lacked a sufficient grounding" for his conclusions or had "obvious reasons to doubt

the accuracy of the information he had reported" in his affidavit.  *Wilson v. Russo*, 212 F.3d at

788.

     Nor does the evidence suggest that Thoreson was recklessly untruthful in stating that the

employees in his analysis "claimed" to have provided a certain amount of 1-on-1 treatment for

specific patients on specific days over a four-hour period.  *See, e.g.*, Affidavit at ¶50 ("The three

licensed HB employees claimed they had been in direct one-on-one contact with their patients

for over 23 hours during the four-hour window (12 total hours of possible billable time - 3

employees multiplied by 4 hours) for the morning of July 6, 2020.").  Thoreson explained that

his investigation was focused on "how HB employees recorded treatment minutes and whether

those documented records were done correctly and accurately."  Id. ¶49.  Thoreson knew from

CW2 that "patient billable time is recorded by the physical therapist or physical therapist

assistant performing the treatment/therapy."  Id. ¶51.  It is clear from the context of the Affidavit

that employee "claims" about billing referred to the treatment time that the employees recorded

or documented on the patients' flow sheets (i.e. the Daily Notes/Billing Sheet).  See Affidavit

¶¶49, 50, 57.  That information matched the billing records that investigators had obtained for

---

[6] Defendants have presented evidence indicating that HB employees sometimes signed treatment notes after normal work hours, as shown by the March 9, 2020 Daily Notes signed by A.D. and J.M. at 6:45 p.m. and 6:19 p.m., respectively. See ECF No. 907-8.  It is undisputed that Thoreson was not privy to this information at the time he submitted his warrant application.  Moreover, he had been advised by CW3 that the physical therapists at HB generally worked less than 40 hours per week.

the treatment days in question. Based on the evidence that was available to him, Thoreson reasonably assumed that certain employees who were ostensibly scheduled to see particular patients on particular days had documented 1-on-1 treatment time for those patients in excess of the time that was available.

In any event, a corrected affidavit would not necessarily be exonerative on this point. Based on the source material that was available to Thoreson, a corrected affidavit would have advised the reviewing judge that: (1) there were 90-minute and 120-minute blocks of unscheduled time on the three days in question, beginning at the noon hour, as described above; (2) it was unknown to what extent any of this unscheduled time was used for continued treatment of the morning patients, as opposed to, e.g., non-billable administrative matters, restroom breaks, and meal time; but (3) giving HB the benefit of the most generous assumption -- namely, that all of this time was utilized for continued treatment of the morning patients -- there were still instances of apparent overbilling on at least two of the days in question. For example, if the three employees listed on the morning schedule for March 9 had all continued their morning treatments straight through the 90-minute period from 12 p.m. to 1:30 p.m. without breaks, the records still suggested that, for this 5.5-hour period (8 a.m. to 1:30 p.m.), A.D. billed 7.6 hours of 1-on-1 treatment, J.M. billed 5.75 hours, and L.G. billed 8.4 hours. Making similar assumptions for July 6, 2020, the documentation would suggest that A.D. billed 10.4 hours of 1-on-1 treatment over a 6-hour period, and J.M billed 6.75 hours over a 5.5 hour period.

For all of these reasons, the Court finds that Defendants have not adduced substantial evidence that Thoreson recklessly disregarded the truth when attesting to the overbilling analysis that he conducted relative to March 9, July 6, and July 30 of 2020. And as discussed in more detail below, even if Thoreson had been reckless in his representations and omissions, the

40

allegedly inaccurate information would not have materially impacted the reviewing judge's probable cause analysis.

<u>Alleged Misrepresentations and Omissions Relating to CW1</u>

Defendants also alleged four instances of untruthfulness in the Affidavit as it relates to information concerning CW1.  First, they fault Thoreson for failing to disclose that CW1's allegations had come to light as part of a qui tam action that he/she had filed against HB under the False Claims Act.  Second, Defendants fault Thoreson for failing to disclose that none of CW1's fellow employees wanted to be involved with her qui tam filing.  Third, they contend that Thoreson did not indicate the full extent of CW1's mental health history.  Finally, Defendants assert that Thoreson failed to disclose certain inaccuracies and inconsistencies in CW1's qui tam filings and falsely stated that CW1's "statements, factual assertions, and documentation" had been "accurate."

As to Defendant's first point, the Government does not dispute that Thoreson knew CW1 had filed a sealed qui tam action and that he did not include the information in his warrant application.  Nevertheless, the Government denies that the omission was done with reckless disregard for the truth.  On the contrary, the United States contends that this case presents a unique situation where the omitted information was, and still is, under seal.  As the prosecution sees it, including any reference to the sealed qui tam action in the affidavits would have been a violation of the False Claims Act and the Court's Order sealing the matter. Accordingly, the Affiant consulted with the U.S. Attorney's Office regarding whether to include the sealed qui tam, or a variant reference thereto, in the search warrant affidavit; on advice of counsel, he omitted the reference. Defendants dispute the Government's logic and insist that the prosecution could have simply sealed the warrant application or sought to obtain a limited lifting of the seal.

41

Where omissions from an affidavit are involved, courts are concerned with "giving police the power to make unilateral decisions on the materiality of information." United States v. Rivera, 347 F. App'x 833, 839–40 (3d Cir. 2009) (citation omitted). That is not what happened here. Thoreson did not omit mention of the qui tam action based on his own assessment of its materiality; rather, he based his decision on the advice of counsel and due consideration to the extant sealing order. Even if Thoreson should have pursued a different course of action, the Court does not view his failure to mention the qui tam action as indicative of a reckless disregard for the truth.

In any event, however, disclosing the qui tam information in the warrant application would have added little probative value to the overall probable cause analysis. It is true that, as a False Claims Act relator, CW1 stood to gain financially from a finding of wrongdoing on the part of HB and its principals, [7] and the Court recognizes that a witness's financial motives are always relevant to a determination of credibility. However, Thoreson did not predicate his probable cause showing merely on CW1's bare allegations, nor did he ask the reviewing magistrate judge to simply take CW1 at his/her word. Instead, the affidavit makes clear that: CW1 provided photographic evidence to support his/her allegations of fraudulent billing; Thoreson independently analyzed that evidence and found indicia of fraudulent billing; Thoreson cross-checked CW1's evidence against records that investigators had obtained from health insurance providers and verified that CW1's evidence was authentic and accurate; Thoreson

---

[7] Defendants assert in their brief that CW1 only made his/her allegations after hearing family members mention how much money could be made in a qui tam action. However, they have offered no evidence in support of this particular assertion, so it does not support Defendants' request for a hearing.

consulted with an independent PT to assess the evidentiary import of CW1's data; Thoreson interviewed CW3, who's allegations independently corroborated CW1's allegations, and investigators developed other evidence in the case (including an analysis of insurance billing records and information from a former patient) that appeared to be consistent with CW1's information. Thus, even if CW1 had a financial motive for coming forward with his/her allegations, his/her veracity was buttressed by a significant amount of evidence. Disclosure of CW1's qui tam action would likely have added little probative value to the analysis.

Defendants also fault Thoreson for not indicating in his affidavit that none of CW1's alleged corroborating witnesses "wanted to be involved" in the qui tam action. In his/her False Claims Act Disclosure Statement, CW1 indicated that, prior to filing the qui tam action, he/she discussed the matter with three co-workers who did not want to become involved in filing a claim. The Disclosure Statement further related that one of the employees was a physical therapist who had witnessed the same practices at HB as CW1 and believed them to be wrong but did not want to come forward with CW1 for fear of losing his/her job.[8] The Disclosure Statement apparently does not indicate why the other two employees declined to join in the qui tam action.

The Court does not view this omission as indicative of untruthfulness on the part of Thoreson. The information suggests that one fellow employee initially corroborated CW1's allegations. Any inferences as to why the other two employees declined to participate in the qui

---

[8] Defendants contend that this witness later refuted this point in statement that s/he gave to agents at a later point in the investigation. This is not information that Thoreson could have known at the time he swore out his Affidavit for the five HB locations. Therefore, it is not relevant for this aspect of the Court's *Franks* analysis.

tam action would be based on mere speculation. On balance, this information does not detract from probable cause.

Defendants contend that Thoreson also wrongfully omitted information about the true severity of CW1's mental health history. This assertion is belied by the affidavit itself, in which Thoreson stated:

> Your affiant interviewed CW1 on February 17, 2021. He/she confirmed all the information about HB that he/she had previously provided. CW1 also revealed that he/she is currently prescribed three different medications for mental health related issues. CW1 also stated that he/she had been hospitalized for mental health related issues within the previous year. During your affiant's discussion with CW1 he/she appeared alert and oriented and did not appear to be suffering from mental health problems. CW1 also revealed that he/she currently works as a corrections officer in Northeast Ohio and works approximately 120 to 140 hours every two weeks. CW1's mental health issues have not impacted his/her ability to maintain his/her present employment. CW1 has no prior criminal history and has revealed that he/she was the valedictorian of his/her high school graduating class.

Affidavit, ¶94. Defendants have proffered no evidence to establish that CW1 suffered from mental health issues beyond that which Thoreson described in his affidavit. Accordingly, they have failed to make a substantial showing of recklessness on this point.

Defendants also contend that Thoreson's affidavit failed to disclose that CW1's qui tam filings were "replete with falsities, misleading claims, and inconsistencies." ECF No. 984 at 8. As an example, Defendants claim that CW1 wrongly assumed and represented that the WebPT calendars documented actual patient treatment, when in fact they were merely a patient scheduling tool. As evidence, they point to the second page of a Daily Note, which was signed by Physical Therapist Assistant N.C. on a day when she was present at the Summit office but did not appear on the WebPT calendar. Defendants further allege that CW1 "lied" when he/she stated that "no PT" was available to perform therapy on July 30. Defendants make their case by pointing to the Daily Note for July 30, 2021, which was signed on the second page by Physical

Therapist A.D.  They note that CW1 would have known of A.D.'s presence because CW1 was also present in the Summit Office on July 30, 2021.  Importantly, however, there has been no showing that this information was known to Thoreson at the time he swore out his affidavit.

Defendants also fault CW1 for using partial records to estimate each day's billing and for failing to include PTAs in his/her count of the relevant treating clinicians.  But (again) Thoreson was not privy to the complete Daily Notes on which Defendants now rely as evidence and, in any event, he conducted his own independent analysis of the source material after verifying that it was authentic and accurate with respect to the billing codes and treatment times that HB employees had submitted to the insurance providers.  In addition, Thoreson consulted with an independent licensed PT (CW2) regarding his analysis of the source material.

Defendants claim that CW1 contradicted his/herself when he/she identified Physical Therapy Assistant N.C. as a PTA who worked "at all HB offices" but then later omitted N.C. from a "Chart of HB Providers" in her Exhibits.  But this is not information that any reasonable person would necessarily assume a magistrate judge would want to know.  Like Defendants' other criticisms of CW1's *qui tam* filings, the alleged inconsistency does not substantially support an inference that Thoreson was reckless about the truth of his own allegations.

Ultimately, Defendants' various *Franks* arguments relative to CW1 all concern his/her credibility as a witness to alleged wrongdoing.  But as discussed above, the investigating agents did not merely take CW1 at his/her word; instead, they examined the case from multiple angles and developed numerous sources of information that generally supported CW1's allegations.  When viewed in the context of the affidavit as a whole, Defendants' attacks on CW1's credibility add little probative value to the determination of probable cause.

45

Inaccuracies Concerning the Affiant's Insurance Records Analysis

During the course of the investigation, agents obtained hundreds of thousands of billing records from health insurance entities and proceeded to analyze multiple days of billing, sorting the records by office locations. Investigators then factored in the number of PTs and PTAs at each location based on HB's website information, which listed practitioners and the offices at which they worked. Using this data, investigators approximated the number of hours worked by each PT or PTA and found many instances where PTs or PTAs billed more than 8 hours per day, sometimes billing 10-hour days. Affidavit at ¶¶63, 66-67, 69, 80.

Upon further examination of the medical and billing records, investigators learned that HB bills other insurance providers besides just UPMC, Highmark, Medicare, and Medicaid. Affidavit at ¶81. Based on available data, Thoreson estimated that the FBI is missing approximately 25-50% of the health insurance records that HB has ever billed. Id. Thoreson explained that:

> Based on the above analysis, investigators do not have a complete picture of HB billings for each and every day. What the above analysis does show is that the numerous eight-hour billable days found in the analysis of the information from the four reviewed medical insurance providers is just the tip of the iceberg. Applying this missing 25-50% to the known eight-hour plus workdays, as described above, investigators believe HB employees are billing upwards of ten or twelve hours per day (eight hours multiplied by 25% and 50%, respectively). Furthermore, by adding non-billable time, like bathroom breaks, lunch, and patient documentation time, a ten or eleven billable day now turns into a twelve or thirteen-hour workday. HB is not open for twelve to thirteen hours each day. CW3 has revealed to your affiant that HB physical therapists work on average less than 40 hours per week. CW3 further revealed that physical therapist assistants are paid hourly and may occasionally earn overtime after working 40 hours in a week. Less than forty-hour work weeks don't match physical therapist billings at HB of ten to twelve hours each day. While the analysis did not show that every day was an eight/ten/twelve hour billable day, the sheer number of them, combined with the amount of time needed for physical therapist or physical therapist assistant documentation or lunch breaks and other non-billable time, reveals the high likelihood that HB's billing is significantly inflated and willfully and illegally erroneous. Your affiant's data

46

analysis did not reveal anything different than what CW1 and CW3 reported and in every regard revealed that the statements, factual assertions and documentation provided by CW1 and CW3 are accurate.

Affidavit at ¶82.

Defendants contend that Thoreson was untruthful concerning the investigators' analysis of these insurance billing records. At bottom, they contend that the affidavit falsely presented the employee counts as reliable and accurate when they plainly were not. More specifically, Defendants assert that it was unreasonable to rely on the 2021 website data as a method of inferring who was working at various locations in prior years because Thoreson had reason to know that some prior employees who had left the practice were not represented on the 2021 website, and other practitioners worked at multiple offices. Because of these analytical flaws, Defendants argue, Thoreson's conclusions about practitioners billing in excess of 8 hours per day was also false.

Again, the Court does not find this proffer to be indicative of a reckless disregard for the truth. While Thoreson's billing analysis was necessarily based on imperfect assumptions and approximations, those were self-evident from his description of the analysis. Thus, the reviewing judge could easily infer that personnel changes had occurred over the years and that HB's then-current website likely was not a perfect representation of which employees worked at particular locations on specific days in the past.

Nevertheless, Thoreson took steps to ensure the reliability of his information, such as it was, while at the same time acknowledging the limitation that the available data presented. While noting the possibility that HB employees might work at multiple locations, he verified with CW3 that the website was an accurate representation of which PTs and PTAs worked at a particular location on any given day. Affidavit, ¶66. And because the insurance records did not

identify whether a PTA had billed for a particular treatment under the listed PT's National

Provider Identifier (NPI) credentials, Thoreson assumed that the treatments documented in the

insurance records had been performed by the full compliment of PTs and PTAs listed at the

various locations, thus ensuring that PTAs were accounted for in the analysis. ¶66-67. Thoreson

also explained in his affidavit that additional information was needed in order to conduct a more

precise analysis, and possibly benefit HB, as a partial explanation for why he was applying for

the search warrant:

> By not including each and every licensed employee, (physical therapists and physical
> therapy assistants), the data analysis may be misleading and inaccurate. Thus, your affiant is
> requesting authorization to obtain the flowsheets from the HB locations in order to ensure
> that any data analysis of billing uses the most accurate information possible and does not
> just rely on the billings submitted to the insurance companies. By obtaining the flowsheets
> from the HB locations, your affiant can take an additional step in the analysis and determine
> the actual minutes spent with each patient without having to rely solely on the 15-minute
> increments in which insurance providers are typically billed. In this way, HB will benefit
> because any analysis of the data will include the most accurate indication of time actually
> spent with each patient.
>
> As illustrated by the "flowsheets" provided by CW1, a search of HB and WebPT records
> and procurement of the flowsheets should allow investigators to determine the "exact"
> recorded times that HB employees spent administering one-on-one services with patients.
> The current health insurance provider data gives a ballpark range, but with "exact" times,
> investigators should be able to pinpoint how long a patient was treated ("exact" is relative
> since both CW1 and CW3 have stated that physical therapists and physical therapist
> assistants are recording time spent with patients even though an aide or technician is
> sometimes administering treatment).

Affidavit, ¶¶67-68.

In sum, it was evident from the information in the affidavit that the investigators' analysis

involved approximations based on the documentation they had, and more documentation would

be needed in order to conduct a more exact analysis. Based on the current record, the Court finds

nothing in Thoreson's representations that suggests a reckless disregard for the truth.

<u>Thoreson's Representation about the Accuracy and Completeness of CW1's Information</u>

  Defendants assert that Thoreson falsely stated or implied that CW1 had provided complete and accurate information "in every regard," which was untrue because CW1 provided incomplete documentation and made inaccurate statements in his/her QT disclosure statement.

  Defendants' argument appears to be predicated, in part, on Thoreson's statement that, "[i]n general, the 'flowsheet' is a complete detailed description of what took place during the patient's visit.'" Affidavit ¶48. This statement was made in the context of Thoreson explaining what a "flowsheet" (i.e., Daily Note/Billing Sheet) entails, and the type of information it contains (*i.e.*, the patient's name, health insurance provider, reasons for visit, treatment of patient, minutes spent with patient, and the CPT billing code for each patient"). There is nothing untrue about Thoreson's statement that "[i]n general, the 'flowsheet' is a complete detailed description of what took place during the patient's visit.'" To the extent Thoreson failed to specifically disclose that he possessed only the first page of the "flowsheets" for March 9, July 6, and July 30 of 2020, the Court has already explained why it does not view that omission as indicative of bad faith or recklessness toward the truth.

  Defendants' argument also appears to be predicated on Thoreson's statement (quoted above) that his "data analysis did not reveal anything different than what CW1 and CW3 reported and in every regard revealed that the statements, factual assertions and documentation provided by CW1 and CW3 are accurate." Affidavit ¶82. Viewed in the context of the entire affidavit, this statement is not untruthful or materially misleading because the information that was then available to investigators did, in fact, appear to corroborate CW1's and CW3's allegations that HB was using unlicensed personnel to treat patients and then falsely billing that time as though a licensed clinician had provided one-on-one treatment. To the extent Thoreson's

49

language overstated his point, it is not indicative of bad faith or recklessness, nor would deleting that language materially affect the Magistrate Judge's probable cause analysis, for the reasons discussed below.

Inaccuracies Concerning the Affiant's Description of CW4

Defendants object to Thoreson's description of the evidence as it relates to CW4, a former patient at HB's Harborcreek facility. According to the Defendants, Thoreson misled the reviewing Magistrate Judge by falsely indicating that CW4 had "advised" he/she was treated by "unlicensed HB employees," when CW4 actually said that "each was a licensed employee able to provide physical therapy treatment." ECF No. 907 at 39.

The information pertaining to CW4 is laid out in Paragraphs 88 through 90 of the HB Facilities Warrant Affidavit. The Court's review of this information reveals no basis for inferring that Thoreson was reckless about what he was reporting.

First, the affidavit is clear that CW4 had merely "assumed" he/she received treatment from licensed individuals. CW4 did not definitively say this was the case because he/she did not know; according to CW4, "no employee ever offered up their position at HB (stating whether they were an unlicensed support employee), although one "B" team employee advised she was a student [which would be an unlicensed individual] . . ." Affidavit at ¶89.

Second, Thoreson did not falsely state that CW4 had "advised" he/she was treated by "unlicensed HB employees." From the context of the relevant paragraphs, it is clear that Thoreson was *inferring* CW4 had been treated by unlicensed HB employees, based on information provided by CW4 and an examination of the corresponding insurance records. Because the basis for Thoreson's inference was laid out in the affidavit, there was no misrepresentation; the reviewing Magistrate Judge could consider the information and accord the

50

inference whatever weight she thought was appropriate. No showing has been made on this matter that would warrant a *Franks* hearing.

Omission Concerning a 2018 Audit

Defendants have asserted that Thoreson was reckless in omitting any mention of a Targeted Probe and Education (TPE) review of HB which was conducted in 2018 by the Centers for Medicare and Medicaid Services (CMS) regarding a particular billing code. The code in question was 97110 relating to therapeutic exercises to develop strength and endurance, range of motion, and flexibility. The TPE entailed a review of documentation for 40 random Medicare patients of HB for whom CPT Code 97110 was billed. These claims were paid and HB passed the review with some minor corrections.

The Government states that disclosures about the audit were included in a later warrant application for records relating to HB's account at Kareo, Inc., which was approved by the reviewing judge. This included information that HB had withheld certain information from Medicare in connection with the audit, including the fact that: (a) HB had generated a flowsheet for a particular patient one month after treatment when it discovered the flowsheet was missing; (b) Aaron Hertel was actually on vacation at the time he purportedly signed medical and billing documentation for two patients included in the random sample; and (c) HB's PTAs were performing re-evaluations but signing the documentation as PTs. ECF No. 965 at 68; Kareo Affidavit, No. 1:23-mj-46, ¶¶44-46.

Because the audit involved a billing code that is at issue in this case, the Court will assume for present purposes that it should have been included in the initial warrant application. Yet, as discussed below, the Court finds that inclusion of the audit would not materially affect the probable cause determination in this case.

No Substantial Showing of Materially False Representations or Omissions Has Been Made

To carry their burden under *Franks*, Defendants cannot rest on mere conclusory allegations or a 'mere desire to cross-examine,' but rather must present an offer of proof contradicting the affidavit, including materials such as sworn affidavits or otherwise reliable statements from witnesses. *United States v. Desu*, 23 F.4th 224, 234 (3d Cir. 2022) (citation omitted). Defendants did not produce this type of material but, to the extent they submitted alternative forms of evidence, the Court finds that their proffers do not substantially demonstrate that Thoreson made false representations or omissions that were material to the reviewing judge's probable cause analysis.

Some of Defendants' challenges do not involve actual falsities, while others concern information not known to Thoreson at the time he submitted his affidavit. And to the extent Thoreson can be faulted for any of the affirmative representations or omissions discussed herein, those discrepancies are more indicative of possible negligence than willful distortion or a reckless disregard for the truth. Negligence, however, is not enough to warrant a *Franks* hearing, let alone suppression of the evidence. *See Franks*, 438 U.S. at 171 (observing that "[a]llegations of negligence or innocent mistake are insufficient" to warrant a *Franks* hearing); *United States v. Coles*, 264 F. Supp. 3d 667, 677 (M.D. Pa. 2017) ("[t]he mere fact of an inaccurate statement will not suffice under *Franks*").

Regardless, even if Defendants had made a substantial showing that Thoreson acted in reckless disregard for the truth, the inaccuracies in question are not material to the probable determination, when viewed in context of the corrected affidavit as a whole. *Desu*, 23 F.4th at 234 ("To obtain a *Franks* hearing, a defendant must establish (1) that a warrant application contained false statements made with reckless disregard for the truth and (2) that the remaining

52

truthful statements, standing alone, do not establish probable cause.") (citing *Franks*, 438 U.S. at 171–72).

For present purposes, the Court assumes that a corrected affidavit would disclose the fact that CW1's information had come to the Affiant's attention through a False Claims Act case in which CW1 was the Relator and therefore had a presumed financial interest in the outcome of the case. The affidavit would further disclose (for the sake of argument) that CW1 had conferred with three co-workers about joining in his/her qui tam filing, and none of the co-workers joined the action.

The Court assumes that the affidavit would have laid out Thoreson's initial billing analysis for March 9, July 6, and July 30, 2020, with the further disclosure that there were 90-minute and 120-minute blocks of unscheduled time at the noon hour of each day, as described herein. The Court assumes the affidavit would have disclosed that it was unclear from existing data whether any of that unscheduled time had been used for patient treatment on the days in question but that, even if clinicians had used *all* of that time for continued treatment of the morning patients, there was still evidence of overbilling on March 9 and July 6, 2020, as discussed herein. The Court assumes for present purposes that a corrected affidavit would remove Thoreson's language specifically stating that CW1's information had been "accurate" in "every regard." And the Court assumes a corrected affidavit would include a disclosure that, in 2018, CMS conducted a PTE review of 40 randomly chosen patient files relative to HB's billing of CPT Code 97110, and those services were ultimately processed as billed without any particular finding of wrongdoing.

Notwithstanding all of these assumptions, a corrected affidavit would have included the following information. CW1, a former HB employee, alleged on the based on first-hand

knowledge that: (1) unlicensed personnel at HB (including CW1) performed physical therapy treatments on a regular basis; (2) CW1's own treatments had been billed as if CW1 was a licensed therapist; (3) these unlicensed staff also regularly provided aquatic therapy, and HB's PTs and PTAs were almost never in the pool/pool area at those times; (4) HB schedules numerous patients each day and would not be able to treat them within the course of the workday without unlicensed aides performing some of the physical therapy treatment that is required to be performed by licensed physical therapists.

Further, as part of the qui tam file, CW1 had produced photographs of electronic schedules and flow sheets, as described in the affidavit. Thoreson cross-checked this information against third-party insurance records and found it to be authentic and accurate. Assuming that patients were treated during a 4-hour period from 8:00 AM to noon as displayed on the schedule, the source materials submitted by CW1 facially confirmed the allegations of overbilling on March 9, July 6, and July 30, 2020, as set forth in detail in the Affidavit. Thoreson consulted an independent physical therapist, CW2, regarding his calculations and CW2 confirmed that the data indicated unrealistic and/or impossible billing. As discussed, the electronic schedules also show periods of unscheduled time beginning at the noon hour on each of the three days. Even assuming that treatment of morning patients continued throughout the entirety of this time without breaks for documentation, meals, and the like, the source material facially indicated that overbilling occurred on at least two of the three days in question, substantially corroborating CW1's allegations.

The documentation also appeared to show that, on July 6, 2020, A.D. billed for simultaneous aquatic and non-aquatic treatments, corroborating CW1 allegation that non-licensed employees were used to conduct aquatic therapy.

As noted, the government interviewed CW3, a physical therapist who was then still employed at HB and had direct knowledge of its practices. CW3 corroborated CW1's allegations by revealing that HB regularly utilized unlicensed personnel to perform treatment that only a licensed PT or PTA can legally perform and then billed health insurance providers as if the PT/PTAs performed the treatment one-on-one with the patient. CW3 also confirmed that unlicensed employees administer aquatic therapy in the pool area unsupervised by PT/PTAs who are with other patients outside of the pool area. HB bills for the aquatic therapy as if PTs or PTAs performed the aquatic therapy. CW3 stated that each HB facility operated in the same manner and that the principal owners were fully aware of these practices.

Thoreson developed information during the investigation that suggested HB had a profit motive for conducting business in this manner, because HB could generate more revenue if it falsely billed treatments by unlicensed personnel or group therapy treatments as 1-on-1 treatment by a physical therapist. Thoreson learned that, with respect to Highmark, HB had never billed for group therapy after 2014 and was among the top practices in terms of billing for 1-on-1 treatments. Thoreson also learned from CW2 that it would be unusual for a physical therapy practice to not bill for group therapy because it can generally bring in more revenue for the practice as compared to treating one patient at a time.

A corrected affidavit would include information about the agents' analysis of insurance records, in which they found numerous instances where HB's PTs and PTAs had ostensibly billed more than 8 hours per day, and sometimes 10 hours per day. As discussed, the Affiant believed the figure was actually higher, based on the fact that agents did not yet have all of HB's insurance billings for all of its patients' insurance providers. The agents' billing analysis did not

square with HB's hours of operation and information that CW3 had provided about therapists' typical workweek, providing further indicia of erroneous billing.

Investigators had information from CW4 and from SA Cuba, which also inferentially supported the allegation that HB was using unlicensed personnel to administer treatments and (in the case of CW4) billing that time as though 1-on-1 treatment had been provided by a licensed therapist.

Finally, as noted, Thoreson personally interviewed CW1 a few days before submitting his search warrant application. Thoreson was able to verify that CW1 stood by his/her allegations, was alert and oriented, and did not appear to be suffering from any obvious mental health problems at that time.

Based on the entirety of the information laid out in Thoreson's February 21, 2021 affidavit, as corrected herein, a reviewing judge would have ample evidence to support a determination that there was a fair probability evidence of criminal activity would be found in the locations to be searched. Because Defendants failed to make a substantial preliminary showing that Thoreson knowingly or recklessly included false statements or omitted facts that were necessary to magistrate judge's finding of probable cause, no *Franks* hearing was warranted. The Defendants' motion was therefore denied.

### B. Specific Challenges Regarding the Search of the Five Offices and WebPT records

Defendants also challenged the search warrants for the five HB facilities and the WebPT records on the grounds that the warrants were overbroad and lacked particularity relative to four facilities – namely, the offices in Harborcreek, at the West Erie Plaza, in Fairview, and in Warren. Defendants maintained that the agents could not rely on the good faith exception to the

exclusionary rule because the warrants were obviously defective and were procured on the basis of false information and omissions.

The Government took the position that Defendants do not have standing to challenge the WebPT warrant, because they submitted the information in question to a third-party and were advised under the terms of the contract that their information could be shared with law enforcement. As such, the Government argued that Defendants lacked a reasonable expectation of privacy in the WebPT records that were seized. With respect to the warrant for the five HB facilities, the Government asserted that none of the individual defendants had a protected privacy interest in the five facilities. Regardless of the standing issue, the Government maintained that the warrants were not legally deficient and that, even if they were, the agents could have relied on them in objective good faith.

Although the Government's arguments regarding standing have some appeal, the Court did not need to resolve them at this time because, in any event, the warrants were valid and were adequately supported by probable cause.

1. <u>Standard of Review</u>

The Fourth Amendment's warrant provision mandates that "no warrant shall issue, but upon probable cause, supported by oath or affirmation." U.S. Const. Amend. IV. A warrant is overbroad when it permits the search and seizure of items for which there is no probable cause. *United States v. Bowers*, 548 F. Supp. 3d 504, 508 (W.D. Pa. 2021).

Probable cause involves a "practical, commonsense decision whether, given all the circumstances set forth in the affidavit . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Stearn*, 597 F.3d 540, 554 (3d

Cir. 2010); *see Illinois v. Gates*, 462 U.S. 213, 238 (1983); *United States v. Miknevich*, 638 F.3d 178, 182 (3d Cir. 2011). A reviewing magistrate judge must consider the supporting affidavit as a whole, read it in a common sense, nontechnical manner, and not simply consider statements in isolation. *Miknevich*, 638 F.3d at 182; *United States v. Conley,* 4 F.3d 1200, 1206, 1208 (3d Cir. 1993). The focus must be on "what the affidavit includes, not what is missing." *Miknevich*, 638 F.3d at 184. The magistrate judge may draw reasonable inferences based on the information in the affidavit and may infer probable cause based on "the type of crime" and "the nature of the items sought." *United States v. Jones*, 994 F.2d 1051, 1056 (3d Cir. 1993); *United States v. Hodge*, 246 F.3d 301, 305-06 (3d Cir. 2001). She may also give considerable weight to the conclusions of experienced law enforcement officers. *United States v. Whitner*, 219 F.3d 289, 296 (3d Cir. 2000).

When a court reviews a magistrate judge's probable cause determination, the reviewing court must accord the magistrate judge's conclusions "a great deal of deference" and avoid second-guessing those conclusions. *United States v. Ritter*, 416 F.3d 256, 264 (3d Cir. 2005); *see Gates*, 462 U.S. at 236 (magistrate judge's initial probable cause determination is entitled to "great deference"). Even if the district court would have found the affidavit insufficient to support the warrant, it must uphold the magistrate judge's probable cause determination, as long as the magistrate judge had a "substantial basis for concluding that a search would uncover evidence of wrongdoing[.]" *Gates*, 462 U.S. at 236; *Conley*, 4 F.3d at 1205; *Stearn*, 597 F.3d at 554. While the district court is not a mere "rubber stamp," *Bowers*, 548 F. Supp. 3d at 509, "[t]he resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants," *id.* (quoting *Hodge*, 246 F.3d at 305).

2. <u>Analysis</u>

At issue is whether the supporting affidavits contained probable cause for a search of all five HB offices and the entirety of HB's WebPT records relative to those facilities. Because the two affidavits were largely based on the same evidence, the parties have addressed the alleged deficiencies in the two warrants collectively, so the Court will do the same by reference to the affidavit for the five HB offices.

Defendants take issue with the affidavit on multiple fronts. They argue that the affidavit was intentionally and materially misleading based on alleged defects that have already been addressed above in connection with the Court's *Franks* analysis. They argue that CW1 was not a credible witness, that the allegations proffered by CW3 were conclusory and vague, and that the affiant made no effort to show a nexus between the evidence in the affidavit and the non-Summit practice locations. They submit that the affidavit contains only isolated references to the Harborcreek and West Erie Plaza facilities involving tenuous evidence, and no references at all to the Fairview and Warren facilities. Defendants point to the lack of evidence concerning policy manuals or a centralized billing system, or what locations the problematic billing records came from. In short, they suggest that the affidavit improperly relies on speculation to justify a search of the non-Summit facilities.

Having fully considered the Defendants' arguments, the Court finds them unpersuasive. The affidavit has been discussed in detail above and will not be fully rehashed here. However, it is relevant to reiterate the following facts.

First, the affidavit expressly identified each of the five HB offices and established Defendants Aaron Hertel and Michael Brown as the owners who co-founded the practice in 2007. Affidavit. ¶¶5, 8-9, 13. There was one common website which displayed approximately

twenty-five (25) PTs and PTAs working at the five locations.  Id. ¶¶10, 80.  The website listed front office personnel and billing specialists, but not unlicensed support staff such as aides or technicians.  From these facts, the magistrate judge could infer that HB was a singular entity with common ownership and five different locations.

CW1 provided information that s/he was previously employed at HB's Summit office as an unlicensed aide and that, during the course of this employment, s/he was trained to provide physical therapy treatment to patients, and such treatment was billed as though performed by a licensed PT.  CW1 indicated this was occurring on a regular basis and as a way of doing business, and that unlicensed employees also administered aquatic therapy.  CW1 indicated that HB scheduled numerous patients each day and would not be able to treat them all within the workday without aides performing some of the physical therapy treatment that is required to be performed by licensed PTs. CW1 provided source documentation (including photographs of WebPT records) which ostensibly showed instances of overbilling at the Summit office in March and July of 2020.  CW3, a current HB employee at the time, corroborated these allegations and also revealed his/her knowledge that each HB location operates in the same manner, utilizing aides or technicians with patients and billing that time as if it was performed by licensed PTs or PTAs.  Although the affidavit did not expound on the basis of CW3's knowledge that the various HB facilities were all operating in the same manner, a reviewing magistrate judge could reasonably infer by virtue of CW3's employment that CW3 was in a position to have first-hand knowledge of that fact.

Both CW1 and CW3 revealed that "each [HB] location has its own employees, computers, physical therapy equipment, and miscellaneous paperwork/records," including

"clinical notes, patient files, schedules, notes, publications, and calendars."  Affidavit ¶13. These

witnesses also established that each HB office utilizes computers that run WebPT software.

     Thoreson explained in his affidavit that WebPT offers rehab therapy professional web-

based software to facilitate scheduling, documentation, billing, outcomes tracking, business

reporting, and system integrations software.  He noted that "[t]he electronic medical records

(EMR) function allows the WebPT user to create and send specialty-specific documentation,

including initial evaluations, progress notes, daily notes, customizable flowsheets, and discharge

summaries." Affidavit ¶45.  Thoreson detailed in his affidavit how he used CW1's WebPT

source material to analyze HB's billing practice on three different days.  He expected that

WebPT would also have information regarding the use of HB's account, because providers

typically retain certain transactional information about the creation and use of each account on

their system.

     Thoreson explained that WebPT users can log onto their account anywhere from any

web-enabled device and, since WebPT is an internet-based business, HB most likely paid a

monthly or yearly subscription for both software access and data storage. CW3 advised that HB

does not have a stand-alone computer server and patients' records are accessed online through

WebPT.   WebPT's legal counsel confirmed that WebPT houses data for its clients.

     Thoreson indicated in his affidavit that he was investigating numerous crimes, including

conspiracy to defraud the United States, false statements relating to health care matters, wire

fraud, health care fraud, and conspiracy to commit wire and health care fraud.  He explained that,

by the very nature of these crimes, some if not all of the criminal activity had been committed

from within HB's various offices. Thus, a reviewing magistrate judge could infer, based on the

nature of the subject crimes, that evidence of criminal activity would likely be found at HB's

various business offices, within the office computers and other electronic devices, and within the WebPT records related to HB's practice.

As noted, CW3 corroborated CW1's allegation about HB's improper use of aides to conduct therapy and the improper billing of that therapy as though it had been performed by a licensed clinician. CW3 indicated this was occurring relative to both aquatic and non-aquatic therapy. CW3 indicated that he/she had been trained that it is acceptable for aides to engage in treatment activity and that Aaron Hertel and Michael Brown were fully aware of this practice. Although Defendants suggest that little weight should be given to CW3's information in this regard, the allegation was corroborated by the investigators' analysis of billing records obtained from four health insurance providers. The billing records spanned the time period 2014-2020 and included billing information for HB's entire practice. Thoreson's explanation of the billing analysis makes clear that the investigators analyzed multiple days within the universe of the billing data and that the analysis occurred on a company-wide basis. After sorting the data by office location, factoring in the clinicians listed at each location on HB's website, and accounting for the additional billing records that they did not yet possess, the investigators tabulated many instances where PTs or PTAs appeared to be billing more hours than was possible in a given workday.

Moreover, Highmark reported to investigators, based on records spanning 2014 through 2020, that HB was among the top physical therapy practices for CPT billing codes involving one-on-one treatment. Highmark had also reported that HB did not bill a group therapy code even once from 2015 to 2020, which was unusual based on information obtained from CW2 and WebPT's website. Again, this information pertained to HB on a company-wide basis.

The affidavit also outlined information from CW4, who had received treatment at HB's Harborcreek facility on at least 15 occasions in 2018. CW4 reported seeing "Phil" (later identified as an HB Physical Therapist) for only about ten minutes at each of his/her appointments. CW4 also reported regularly receiving treatment from "B team" employees. A reviewing magistrate judge could infer that these "B team" members were likely unlicensed clinicians, because CW4 could not identify any of them on HB's website, and CW3 had indicated that aides/technicians are not displayed on the website. CW4 had observed these same "B team" employees treating other patients. CW4 described the Harborcreek facility as "very busy, pushing through patients…" Affidavit ¶89. The insurance billing data for CW4's visits showed that HB billed 45 minutes of one-on-one PT treatment for nearly all of CW4's sessions, which was not in accordance with the treatment CW4 described. A reviewing magistrate judge could construe this as evidence of improper treatment and billing at the Harborcreek facility.

Finally, the affidavit recounted SA Cuba's visit to the West Erie Plaza facility shortly before the warrant applications were presented. Although less probative than the other evidence, SA Cuba's observations were consistent with the type of things that CW3 and CW4 had reported. SA Cuba reported seeing upwards of 20 clients at the facility, many of whom appeared to be engaged in solitary treatment activity without supervision. Several young females in black shirts were working with patients and, although these employees were masked, SA Cuba could discern upon later inspection that they were not among the licensed clinicians listed on HB's website. A reviewing magistrate judge could infer from this evidence that unlicensed employees were being utilized to treat patients in what appeared to be a very busy practice.

In this Court's estimation, the foregoing information was sufficient to establish a fair probability that evidence of criminal activity would be found at any and each of the five HB

office locations and in the WebPT records pertaining to each of those offices. The Court reaches this conclusion even when accounting for the theoretical corrections discussed above in relation to Defendants' *Franks* motion. Accordingly, the reviewing magistrate judge plainly had a substantial basis for concluding that the warrant applications for the five HB facilities and the WebPT records were supported by probable cause. *Miknevich*, 638 F.3d at 181.

### C. Specific Challenges Relating to Michael Brown's Cell Phone

The warrant application for the five HB facilities included a request to seize and search the cell phones belonging to Defendants Aaron Hertel and Michael Brown. Defendant Brown filed a motion to suppress evidence recovered from his cellphone, which was seized and imaged in connection with the search of the West Erie Plaza facility. Brown asserted that the warrant application did not establish probable cause to believe that evidence of criminal activity would be found on his phone. He further argued that the agents could not rely on the warrant in good faith because it was facially deficient and had been procured on the basis of false information and material omissions.

In addition to the content that has already been discussed, Thoreson's affidavit included the following statements:

> Your affiant knows that cell phones are now ubiquitous in our society. Cell phones often play a critical role in the workplace, facilitating workplace communication and capturing images/videos for training and or treatment purposes. Many, if not most, individuals now carry their cell phone on their person throughout their day. Thus, it is quite likely that Aaron Hertel and Michael Brown will have their cell phone on their person or in close proximity if and when encountered by investigators during the execution of the search warrants at the HB locations. Since Hertel and Brown own and actively manage a very busy physical therapy practice with five office locations, it is quite likely that information about HB relevant to this investigation will be located on their cell phones, including notes, text messages, emails, voicemails, images and or videos and HB financial information. Your affiant seeks authority as part of this search warrant application to seize and search the cell

phones belonging to and utilized by Aaron Hertel and Michael Brown. If their cell phones need to be removed from the HB office location where they are in order to be imaged, every effort will be made to return the cell phones as expeditiously as possible.

Affidavit at ¶100.

Thoreson then provided additional information that was "[b]ased upon [his] experience, training, and background, [his] participation in health care fraud and other investigations, and [his] conversations with other experienced law enforcement against and officers with whom [he has] associated." *Id.* at ¶101. He advised that persons involved in criminal activities frequently attempt to launder their illicit proceeds and often keep financial records and documents related to such transactions in the form of cell phone data (among other things). *Id.* ¶101(g) and (i).  He explained that such individuals also commonly maintain in their cell phones electronic data related to their criminal activities and associates in the form of "schedules, businesses notes, phone numbers, memorandums, books, papers, office files, and business documents." Id. ¶101(h).  Further, such individuals "usually maintain documents related to wealth in their businesses, which are often kept as . . . data in [their] cell phones." Id. ¶101(i).

Defendant Brown has argued that these references are too general and speculative to establish probable cause for the search of his cell phone. He points out that there is no mention in the affidavit of a specific cell phone communication or use in relation to the suspected offenses. He argues that the affidavit provided no facts from which the magistrate judge could infer that evidence of the alleged fraud would be found in his cell phone data.  Without evidence linking his cell phone use to the suspected criminal activity, Brown asserts, the search warrant was insufficient. *See, e.g. United States v. Hanner*, No. 2:05cr385, 2007 U.S. Dist. LEXIS 27161, at *10 (W.D. Pa. Apr. 12, 2007) (search warrant was insufficient where it was not supported by facts connecting the defendant and the alleged offense to the search of a hotel room).  And he

posits that upholding this warrant would effectively gut the probable cause requirement as it relates to all cell phones.

This Court disagrees.  As discussed in detail herein, the affidavit established probable cause to believe that HB and its principals were engaged in a fraudulent billing scheme, which involved using unlicensed aides to treat patients and then billing the treatment as if a licensed PT had conducted the therapy on a one-on-one basis.  Both CW1 and CW3 indicated that aides were regularly used to render physical therapy treatments and that this practice was part of their training.  CW3 advised that Brown was fully aware of the practice and that it occurred at every HB facility.  Accordingly, there was sufficient information in the affidavit to tie Brown to the alleged scheme. Thoreson then explained in his affidavit that, given the ubiquitous nature of cell phones and the critical role they play in the workplace, including facilitating workplace communications, it was likely that Brown would have his cell phone in close proximity or on his person if and when he encountered investigators during the execution of the search warrant. Thoreson further explained that, because Brown was actively involved in the management of HB's very busy physical therapy practice, it was quite likely that relevant information concerning the practice would be found on his cell phone, e.g., in the form of notes, text messages, emails, voicemails, images, videos, and HB financial information.  The affidavit also provided information establishing that WebPT could be accessed through any web-enabled device, which would logically include any smartphone with internet access.  Read as a whole, the affidavit connected Brown to the suspected criminal activity and established a fair probability that evidence of that criminal activity would be found on Brown's cellphone. *See United States v. Brewer*, 708 F. App'x 96, 99-100 (3d Cir. 2017); *United States v. Rashwan*, 684 F. Supp. 3d

347, 356 (E.D. Pa. 2023); *United States v. Johnson*, No. 2:17cr243, 2019 WL 5288015, at *13-15 (W.D. Pa. Oct. 18, 2019).

In arguing otherwise, Brown takes the affiant's statements out of context and asks this Court to examine portions in isolation rather than in the context of the entire document. He also asks the Court to focus on what is missing from the affidavit, rather than what is contained therein. He suggests there must be direct (rather than circumstantial) evidence linking his cell phone to the alleged crime. And he objects to information that Thoreson included based on his knowledge and opinions as an experienced health care fraud investigator. These objections run contrary to established principles – namely, that the affidavit must be read in its entirety in a straightforward, non-technical manner, allowing the magistrate judge to draw reasonable inferences based on common sense, and further allowing the magistrate judge to credit the investigator's expertise. *See Miknevich*, 638 F.3d at 182; *Whitner*, 219 F.3d at 296. When these principles are applied in light of the appropriately deferential standard of review, the Court is satisfied that the reviewing magistrate judge had a substantial basis for finding probable cause to support a search for criminal evidence on Defendant Brown's phone. Nothing raised or discussed in connection with the Court's *Franks* analysis changes this conclusion.

### D. Good Faith Exception

Lastly, even if the warrants for the five HB facilities and the WebPT account were insufficiently supported by probable cause, the Government would be entitled to invoke the good faith exception to the exclusionary rule.

Evidence obtained from the execution of a search warrant that is later found to lack probable cause will be excluded "only in those 'unusual cases' where it" may "deter

unreasonable searches and seizures by law enforcement." *United States v. Caesar*, 2 F.4th 160, 169 (3d Cir. 2021) (citing *United States v. Leon*, 468 U.S. 897, 908, 918 (1984)). Thus, if law enforcement acted in good faith in securing and executing a warrant, the evidence that is seized pursuant to that warrant will not be suppressed even if it is later determined that the probable cause determination was erroneous. *Id.* (citing *Leon*, 468 U.S. at 922).

The test for whether the good faith exception applies is "'whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization." *United States v. Loy*, 191 F.3d 360, 367 (3d Cir. 1999) (quoting *Leon*, 468 U.S. at 922 n.23). Typically, the "mere existence" of a warrant will be enough to show that an officer conducted a search in good faith, *Hodge*, 246 F.3d at 307–08, and will "obviate the need for any deep inquiry into [the] reasonableness" of the officer's reliance on the warrant, *Stearn*, 597 F.3d at 561.

However, there are "rare circumstances," where a warrant may be so flawed that "the officer will have no reasonable grounds for believing that [it] was properly issued," *Caesar*, 2 F.4th at 170 (cleaned up), namely:

> (1) where the magistrate judge issued the warrant in reliance on a deliberately or recklessly false affidavit;
>
> (2) where the magistrate judge abandoned his or her judicial role and failed to perform his or her neutral and detached function;
>
> (3) where the warrant was based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; or
>
> (4) where the warrant was so facially deficient that it failed to particularize the place to be searched or the things to be seized.

*Id.*

Here, Defendants invoked the first and third scenarios in relation to the WebPT and HB facilities warrants. As to the first scenario, Defendants' assertion that the magistrate judge issued the warrants in reliance on a deliberately or recklessly false affidavit is refuted by the Court's prior analysis of Defendants' *Franks* motion. "To trigger the exclusionary rule, law enforcement conduct must be deliberate, reckless, or grossly negligent, or involve recurring or systemic negligence." *United States v. Caesar*, 2 F.4th at 169-70. The Court has determined that Defendants failed to make a substantial showing in this regard. And even if the Court could find fault with Agent Thoreson's actions as they relate to the February 21, 2021 warrants, it would amount to no more than simple negligence. However, "[s]imple isolated negligence" does not warrant suppression. *Id.* at 170 (cleaned up).

Defendants also assert that the warrants were based on affidavits so lacking in indicia of probable cause as to "render official belief in its existence entirely unreasonable[.]" *Zimmerman*, 277 F.3d at 437. However, the "threshold for establishing this exception is a high one," *Messerschmidt v. Millender*, 565 U.S. 535, 547 (2012); *see United States v. Zema*, No. 23-3126, 2024 WL 5251666, at *2 (3d Cir. Dec. 31, 2024). Based upon the Court's prior probable cause analysis as it relates to the various searches, the Court finds that Defendants have not satisfied their heavy burden.

For all the foregoing reasons, Defendants' motions at ECF No. 903 and 910 have been denied. Defendants' request for a *Franks* hearing relative to the February 21, 2021 warrants was also denied. *See* ECF No. 906.

### *Defendants' Motions at ECF Nos. 906 and 909 Pertaining to the Gmail, Yahoo, and Laptop Warrants*[9]

*A. Franks Challenge*

On February 23, 2021, agents executed the search warrants for the five HB office locations and HB's WebPT account. Among the physical items they obtained was a laptop computer and printed emails involving discussions among staff members about compliance-related issues. During the execution of the searches and thereafter, agents questioned numerous HB employees, including a licensed PT who would later be identified as "CW 5."

CW5 was interviewed on February 23 and 25, 2021. During the interviews, CW5 indicated that Aaron Hertel and Michael Brown employ and personally utilize unlicensed technicians to perform work for themselves and/or other licensed PTs or PTAs. CW5 further related that HB did not employ enough licensed PTs and, without the technicians, HB would not be able to bill insurance providers, including Medicare, for the high numbers of patients they treat each day. CW5 stated that employees looked the other way, as Aaron Hertel and Michael Brown owned the practice and were the ones that signed CW5's and the other employees' paychecks. CW5 further revealed that the practice of utilizing technicians to treat patients, and billing that time as if a PT or PTA performed the treatment, has been ongoing at HB for many years. Yahoo Affidavit, ¶12, 92.

On March 2, 2021, investigators interviewed a former HB employee who was then working as a licensed PT at a different physical therapy practice. That individual came to be identified as "CW6." CW6 told investigators that s/he was employed with HB as an unlicensed

---

[9] The content of these three warrants is largely the same as it relates to the Defendants' *Franks* challenges. For present purposes, the Court will cite only to the Yahoo Affidavit at Case No. 1:21-mj-22, unless otherwise noted herein.

technician starting in 2008 and continuing for several years. CW6 reported that, while employed as an unlicensed technician, s/he worked in the pool providing treatment to HB patients. CW6 would complete his/her treatment and either Michael Brown or Aaron Hertel would then complete the billing paperwork as if they had performed the treatment that CW6 actually provided to the patient. Yahoo Affidavit, ¶98.

On March 15, 2021, Thoreson sought Search and Seizure Warrants for information associated with Michael Brown's Yahoo account ("Yahoo Affidavit"), *see* Case No. 1:21-mj-22, and information associated with the Gmail accounts of Aaron Hertel and five other HB employees ("Gmail Affidavit"), *see* Case No. 1:21-mj-21. On May 14, 2021, Thoreson applied for a third warrant to search the digital contents of the laptop seized from HB's West Erie Plaza location ("Laptop Affidavit"). *See* Case No. 1:21-mj-2017. All three of the warrant requests were approved by the reviewing magistrate judges.

The Yahoo, Gmail, and Laptop Affidavits were largely the same as the affidavits Thoreson submitted on February 21, 2021 in support of the warrants for the five HB office facilities and the WebPT records, except with respect to information relating to the particular locations to be searched. But the Yahoo, Gmail, and Laptop Affidavits also contained new information, including the information obtained from CW5 and CW6.

Given the similarities in the warrants, Defendants argued that the Yahoo, Gmail and Laptop Affidavits were tainted by the same *Franks* violations that allegedly tainted the February 21, 2021 warrants. But Defendants also asserted additional *Franks* violations with respect to the new information in the Yahoo, Gmail, and Laptop Affidavits.

With respect to CW6, Defendants argued that Thoreson omitted materially significant information concerning the witness's potential bias. Although his affidavit disclosed the fact that

71

CW6 had been a party to a lawsuit involving Aaron Hertel that was ultimately settled, Yahoo Affid., ¶12, it did not reveal that CW6 had filed a wrongful death lawsuit against Aaron Hertel after CW6's spouse died tragically in an accident involving Hertel's boat.  Defendants contend that CW6 essentially accused Hertel of killing his wife, and this presented the kind of bias and motive for revenge that a reviewing magistrate judge would wish to know.

With respect to CW5, Defendants argued that Thoreson committed an additional *Franks* violation by failing to disclose that some two dozen employees were interviewed at the time agents executed their warrants for the five HB facilities and twenty-three of them refuted or otherwise failed to corroborate the government's allegations of wrongdoing. The Government countered that Defendants had not shown Thoreson was aware of the substance of all the employee interviews at the time he swore out his affidavits, especially considering the scope of the investigation and the lag time between interviews and the compilation of official reports describing those interviews.  Defendants responded that, because Thoreson was the lead agent in charge of the investigation, the information was within his "ken."  *See Wilson v. Russo*, 212 F.3d 781, 788 (3d Cir. 2000) (holding that "omissions are made with reckless disregard if an officer withholds a fact in his ken that '[a]ny reasonable person would have known that this was the kind of thing the judge would wish to know'") (quoting *United States v. Jacobs*, 986 F.2d 1231, 1235 (8th Cir.1993)).

The Government also argued that the omissions were not material and that many of the employee interviews actually produced incriminating evidence that supported a finding of probable cause. Defendants countered that the Government was improperly asking this Court to consider information outside the four corners of the affidavit.

As previously discussed, Defendants are not entitled to a *Franks* hearing unless they first: (1) make a "substantial preliminary showing" that the affiant knowingly or recklessly included a false statement in or omitted facts from the affidavit, and (2) demonstrate that the false statement or omitted facts are "necessary to the finding of probable cause." *United States v. Pavulak*, 700 F.3d 651, 665 (3d Cir. 2012); *United States v. Yusuf*, 461 F.3d 374, 383–84 (3d Cir. 2006).

Turning to the dispositive materiality requirement, the Court finds that Defendants have not demonstrated that the omissions in question were "necessary to a finding of probable cause." For this reason alone, Defendants' request for a *Franks* hearing must be denied.

As previously discussed, we determine the materiality of alleged misstatements or omissions by "excis[ing] the offending inaccuracies and insert the facts recklessly omitted, and then determin[ing] whether or not the "corrected" warrant affidavit would establish probable cause." *Wilson v. Russo*, 212 F.3d 781, 789 (3d Cir. 2000). The Court has previously discussed its view of what the most generous reconstructed affidavit would look like, relative to the February 21, 2021 warrants for the five HB Facilities and WebPT records.  Accordingly, the Court need not repeat that entire analysis here, but will add some observations relating specifically to the Yahoo, Gmail, and Laptop Affidavits.

To begin, the Court notes that it has reviewed the evidence proffered by the defense concerning the favorable employee interviews. The Defendants' evidence (Exhibit G) is a letter that the prosecution sent to all defense counsel in February 2022 providing excerpts from witness statements that were favorable to the defense. See ECF No. 907-7. The prosecution has previously explained that these statements were taken verbatim from the interview reports of investigating agents.

73

Most of the brief excerpts include statements to the effect that the employees had no concerns with the scope of their job duties or that they were never asked to do something that made them feel uncomfortable. But many also involve the employee's denial that they ever engaged in particular conduct or that they were instructed to engage such conduct. *See, e.g.,* ECF No. 907-7 (witness W.A reportedly "indicated that he has never provided therapeutic exercises to patients" and "is always supervised by a PT or PTA. . . ."; N.C. "indicated that she had not been asked to document for treatments that were not provided"; I.C. "indicated that hands on stretching is only performed by a PT or PTA"); Jessica Morphy "indicated . . . that she was not aware of ever being asked to upcharge her billing codes"; Morphy further stated that the "PTs and PTAs are watching the PT techs the entire time the techs interact with patients and PTs does the e-stims not the techs"; D.R. "stated that she was never asked to stretch a patient and she had never seen group therapy at the facility . . . ."; Erin Riffe "stated that she was never instructed to do anything inappropriate in regard to billing" and "also stated that PTs Phil and Bobby would conduct all the evaluations"; J.W. said that "she was never counseled by anyone to bill group therapy as individual therapy.").[10]

---

[10] The Government's Exhibit 1 indicates that many of the employees referenced in the February 2022 letter are also referenced in the United States' disclosure letter, sent in July 2024, which details inculpatory statements made by those same individuals during the course of the investigation. The Government's exhibit also includes actual reports of interviews, which confirm that at least two HB employees provided substantial incriminating information about HB's practices prior to the date that Thoreson applied for the Yahoo, Gmail, and Laptop Affidavits.

Defendants insist that it would be improper for the Court to consider this evidence because the Court's review must be limited to the four corners of the affidavit. But the affidavit states that investigators interviewed HB employees "[d]uring *and after the execution of the search warrants* at HB's five locations," one of whom was CW5. Yahoo Affidavit ¶92. The affidavit also makes clear that CW5 was interviewed on two occasions (February 23 and 25, 2021), the latter of which

Though helpful to the defense, this evidence does not materially undermine the strong showing of probable cause in the warrant applications.

As a general matter, statements that are potentially against a person's own interest tend to carry greater probative force than self-serving denials of wrongdoing. A reviewing magistrate judge would be entitled to consider the nature and circumstances of the employees' statements and accord them appropriate weight in light of the totality of information in the affidavit and common sense. For example, a reviewing judge could consider CW5's statement that HB employees had been looking the other way at the alleged unlawful practices because Aaron Hertel and Mike Brown sign their paychecks. Common sense also dictates that the employees who were interviewed by law enforcement officers could have potentially been motivated to deny wrongdoing for any number of reasons, including loyalty to their coworkers, fear of losing their job, reluctance to be drawn into their employer's potential litigation, and a desire to limit their own exposure to potential criminal liability.

On balance, the exculpatory employee statements do not substantially detract from the probative force of the numerous cooperating witnesses, each of whom independently corroborated one another in their allegations of improper billing practices, including the allegation that unlicensed personnel were being utilized to provide therapeutic services and that

---

occurred after the date of the search warrant executions. In other words, it is clear from the affidavit that the investigation included interviews of multiple HB employees, some of which occurred on site during the search process and some which occurred after. Therefore, if the potentially exculpatory information submitted by the defense is to be considered within Thoreson's "ken," and relevant to a probable cause determination, it is only logical to assume the same about the additional inculpatory evidence that predated the email and laptop warrants. While the Court's analysis does not rely on this additional inculpatory information, it would further support a finding of probable cause.

those services were being billed as though PTs or PTAs had performed the therapy. Two of these witnesses (CW3 and CW5) were current employees of HB and had no evident bias or other motive whatsoever to fabricate their allegations. CW4, a former patient who also had no evident bias or motive to lie, provided information that was inferentially supportive of CW1, CW3, CW5, and CW6.

The exculpatory statements also do not negate the documentary evidence that facially supported the allegations of the various cooperating witnesses. This included the agents' analyses of source material and insurance billing records[11], as well as information obtained about HB's billing patterns. Collectively, this evidence suggested that HB was billing an amount of one-on-one PT treatment that was not feasible under the circumstances. Viewed in totality, the evidence set forth in the affidavit provided strong indicia of probable cause and established a

---

[11] It appears that the Yahoo Affidavit did not include Thoreson's cautionary statement, relative to the insurance records analysis, that "By not including each and every licensed employee, (physical therapists and physical therapy assistants), the data analysis may be misleading and inaccurate." The Court does not consider this omission to be material when read in the context of the corrected affidavit as a whole. From a review of the affidavit, it was clear that: (1) the agents' analysis of the insurance billing data produced an "approximation" of hours billed, (2) the agents could estimate the number of licensed clinicians at each facility based on HB's website information, (3) it was possible employees moved around, but CW3 had informed the agents that the website was generally accurate as to which employees worked where, (4) agents were careful to include both PTs and PTAs in their estimation of each facility's licensed employees, (5) the results of the analysis revealed many instances where physical therapists or assistants billed more than eight hours per day, sometimes billing ten-hour days; (6) the agents lacked an estimated 25%-50% of HB's insurance billings, which would suggest that clinicians might actually billing upwards of 10 to 12 hours per day; (7) this was contrary to other information known to Thoreson about the company's operating hours and the PTs' typical workweek; and (8) the analysis suggested a high likelihood that HB's was significantly inflated and willfully and illegally erroneous.

"fair probability" that evidence of a crime would be found in the places to be searched. *Illinois v. Gates*, 462 U.S. 213, 238 (1983).

As to CW6, the Court agrees that the omitted information -- that CW6 had sued Hertel for the alleged wrongful death of his wife -- is more probative of potential bias than merely being involved in generic litigation. But again, this added potential for bias does not negate the indicia of probable cause that would exist in a corrected affidavit. CW6's information regarding the use of unlicensed technicians for aquatic therapy was corroborated by CW1 and CW3, as well as by the source materials CW 1 provided for July 6, 2020. It was also consistent with Highmark's disclosure that, among some 450 practices that billed Highmark for aquatic 1-on-1 therapy, HB billed under this code the most.

In sum, when the entirety of omissions and alleged misrepresentations highlighted in Defendants' *Franks* motion are considered in the context of a corrected affidavit, the information as a whole is sufficient to support a finding of probable cause. Because Defendants failed to make a substantial showing that the Affiant made false assertions or recklessly omitted information that was material to a finding of probable cause in the Gmail, Yahoo, and Laptop Warrants, Defendants were not entitled to a hearing under *Franks*. The motion for a hearing was therefore denied.[12]

---

[12] To the extent Defendants' *Franks* motion asserts the aforementioned challenges relative to other warrants or the fruits obtained therefrom, the Court's ruling herein applies to those challenges as well.

### B.  Specific Challenges Regarding the Search of the Gmail and Yahoo Accounts

Defendants also challenged the Gmail and Yahoo Warrants on a number of additional grounds.  They asserted that the warrants were overbroad temporally and lack particularity, essentially making them general warrants. They insisted that the agents could not rely on the good faith exception to the warrant requirement because of the warrant's obvious defects.  And they maintained that the agents executed the warrant in an unreasonable manner. The Court addresses these arguments below.

### 1.  Overbreadth

To be valid under the Fourth Amendment, a search warrant must particularly describe the place to be searched and the person or things to be seized.  *United States v. Yusuf*, 461 F.3d 374, 393 (3d Cir. 2006) (quoting U.S. Const. amend. iv). The Fourth Amendment's particularity requirements protect against "general warrants"—warrants authorizing "general, exploratory rummaging in a person's belongings." *United States v. Ninety-Two Thousand Four Hundred Twenty-Two Dollars & Fifty-Seven Cents ($92,422.57),* 307 F.3d 137, 148 (3d Cir. 2002).

A warrant is not unconstitutionally "general" unless it "vest[s] the executing officer with unbridled discretion to conduct an exploratory rummaging ... in search of criminal evidence." *United States v. Karrer*, 460 F. App'x 157, 161 (3d Cir. 2012) (quoting *United States v. Leveto*, 540 F.3d 200, 211 (3d Cir. 2008)). The Fourth Amendment's particularity provisions require the warrant to "identify the specific offense for which the police have established probable cause," "describe the place to be searched," and "specify the items to be seized by their relation to designated crimes." *United States v. Perez*, 712 F. App'x 136, 138-39 (3d Cir. 2017) (quoting *United States v. Galpin*, 720 F.3d 436, 445-46 (2d Cir. 2013)).

Unlike a general warrant, an overbroad warrant "describe[s] in both specific and inclusive generic terms what is to be seized, but ... authorizes the seizure of items as to which there is no probable cause." *Karrer*, 460 F. App'x at 162 (alterations in original, internal quotation marks omitted) (quoting *$92,422.57*, 307 F.3d at 149). To determine whether a warrant is overbroad, courts must "measur[e] the scope of the search and seizure authorized by the warrant against the ambit of probable cause established by the affidavit upon which the warrant issued." *United States v. Christine*, 687 F.2d 749, 753 (3d Cir. 1982). Courts can cure overbroad warrants by "striking from [the] warrant those severable phrases and clauses that are invalid for lack of probable cause or generality and preserving those severable phrases and clauses that satisfy the Fourth Amendment." *$92,422.57, 307* F.3d at 149 (quoting *Christine*, 687 F.2d at 754).

In this case, the Yahoo and Gmail warrants (collectively, the "email warrants") authorized the search of content from the designated accounts dating from 2007 to 2021. Defendants have asserted that the warrants were temporally overbroad because they were lacking in information that would supply probable cause for the seizing of any information prior to 2018. They argue that the only evidence the government presented of any pre-2018 wrongdoing was CW6's claim that, as an unlicensed technician, s/he improperly provided therapy to patients at a single office around 2008. Defendants maintain that this information should be discounted because CW6 was a biased witness whose allegations were too vague and too stale to support a probable cause determination. They further contend that the intervening audits that HB underwent in 2016 and 2018 without incident dispel any notion that evidence of misconduct early in the practice was ongoing. At a minimum, Defendants maintain that the warrant applications provide no basis for seizing emails from before 2018.

79

Defendants' challenge on overbreadth grounds lacks merit. Here, as discussed, the investigating agents developed evidence to suggest that HB had been engaged in a scheme to defraud health insurance providers through the submission of fraudulent billing. Thoreson's affidavit established that this scheme had occurred over an extensive period of time, as borne out by the agents' analysis of insurance billing records from 2014-2020 and information provided by CW1, CW3, CW4, CW5 and CW6, each of whom were employed by, or interacted with, HB at varying points in time. CW5, a then current employee, indicated that the scheme had been ongoing for many years. Thoreson had also been advised that Brown and Hertel were personally aware of the improper billing tactics which were allegedly occurring at every facility on a regular basis as a way of doing business. And CW6 provided information that s/he had participated in the scheme while employed as an unlicensed technician beginning in 2008 and continuing for several years thereafter. Based on this information, agents could reasonably infer that the alleged scheme was endemic to the practice and had been ongoing since its founding in 2007.

While it is true that probable cause cannot be predicted on stale information, *United States v. Zimmerman*, 277 F.3d 426, 433 (3d Cir. 2002), the age of the information supporting a warrant application is not dispositive. *United States v. Harvey*, 2 F.3d 1318, 1322 (3d Cir. 1993) (citations omitted). The Court must consider "other variables such as the nature of the crime and the type of evidence to be seized." *United States v. Lenhart*, No. 1:23-CR-268, 2024 WL 4820783, at *5 (M.D. Pa. Nov. 18, 2024) (citations omitted). Here, the evidence supplied by CW6 was consistent with other information in the case suggesting that the alleged scheme was of a "protracted and continuous nature." *Yusuf*, 461 F.3d at 391-92.

80

The affidavit also established a fair probability that evidence pertaining to the alleged scheme would be found in emails dating back to 2007. Thoreson provided information in his affidavit to establish that employees utilized email accounts to communicate about HB business, including compliance and scheduling matters. This was based on information received from HB employees and on evidence recovered during the February 23, 2021 searches. *See* Gmail Affidavit, ¶¶92-96.

Based on his observations and experience, Thoreson opined that an examination of the email accounts was "likely to uncover . . . communication[s] concerning compliance and billing related topics," as well as "emails regarding income and expenses, employee scheduling, hiring and termination, billing practices, policies and procedures and the general operation" of HB. Gmail Affidavit at ¶ 95. Such e mails would likely "reveal business practices and those employees involved in fraudulent billing." *Id.* ¶ 95. Based on Thoreson's experience as an investigatory agent in the area of health care fraud, the magistrate judge was entitled to credit his conclusions in this regard. *Whitner*, 219 F.3d at 296.

Finally, Thoreson established grounds for inferring that emails even from years ago would still be recoverable, given the prosecution's preservation letters and the nature of the electronically stored information. He explained that both Google and Yahoo allow users to retain emails for years, if not indefinitely, as long as the emails are not deleted from the Company's server and/or the email account has sufficient storage space. Thus, the affidavits established probable cause to believe that evidence of criminal activity would currently reside in the contents of the email accounts dating back to 2007.

This case is therefore distinguishable from those cited by Defendants where the probable cause existed only for a limited time period that was exceeded by the scope of the warrant. *See,*

81

*e.g., United States v. Abboud*, 438 F.3d 554, 576 (6th Cir. 2006)( warrant was overbroad where it authorized the seizure of six years' worth of records but affidavit described only misconduct occurring over a single 3-month period); *United States v. Kow*, 58 F.3d 423, 427 (9th Cir. 1995) (warrant was not sufficiently particular where the "government did not limit the scope of the seizure to ta time frame within which the suspected criminal activity took place").  Because there was a fair probability that emails dating back to 2007 would reveal evidence of the crimes under investigation, the email warrants were not overbroad.

### 2. Lack of Particularity

Defendants have claimed that the email warrants are lacking in particularity in two respects.  First, they claim that the warrants fail to adequately describe what the officers were looking for because, *e.g.*, the warrants did not limit the types of files that could be searched and did not impose any meaningful limitations based on the crimes under investigation.  Second, Defendants object that the warrant application contained no ex-ante restrictions that would minimize the officers' exposure to irrelevant or even privileged data. They suggest that the warrant application should have, *e.g.,* limited the agents' examination to only internal HB emails or to emails only in particular files or folder locations, or to emails that contained key search terms.  By failing to impose these types of limitations, Defendants argue, the email warrants were essentially reduced to general warrants, which are invalid under the Fourth Amendment.

The Fourth Amendment's particularity provisions require the warrant to "identify the specific offense for which the police have established probable cause," "describe the place to be searched," and "specify the items to be seized by their relation to designated crimes." *United States v. Perez*, 712 F. App'x 136, 138-39 (3d Cir. 2017).  A warrant is not unconstitutionally "general" unless it vests the executing officer with "unbridled discretion to conduct an

82

exploratory rummaging" in search of criminal evidence. *Leveto*, 540 F.3d at, 211.  Warrants have

been struck down as general where, *e.g.,* they have authorized the seizure of:

> (1) evidence of "smuggled goods," *Boyd v. United States*, 116 U.S. 616, 6 S.Ct. 524, 29
> L.Ed. 746 (1886); (2) evidence of "obscene materials," *Marcus v. Search Warrant*, 367
> U.S. 717, 81 S.Ct. 1708, 6 L.Ed.2d 1127 (1961); (3) evidence of "books, records,
> pamphlets, cards, lists, memoranda, pictures, recordings, and other written instruments
> concerning the Communist Party of Texas," *Stanford v. Texas*, 379 U.S. 476, 85 S.Ct.
> 506, 13 L.Ed.2d 431 (1965); (4) evidence of "illegally obtained films," *United States v.
> Cook*, 657 F.2d 730 (5th Cir.1981); and (5) evidence of "stolen property," *United States
> v. Giresi*, 488 F. Supp. 445 (D.N.J.1980), aff'd, 642 F.2d 444 (3d Cir.1981).

*Yusuf*, 461 F.3d at 393.

Here, the Defendants' particularity challenge fails because the email warrants were not

general warrants. On the contrary, the search warrants were sufficiently particularized and did

not give the agents unbridled discretion to search the designated email accounts for whatever

evidence they wanted. The warrants here incorporated several attachments. Attachment A

identified the email accounts in question.  Attachment B(I) listed the information to be produced

by the providers, including the contents of the targeted email accounts dating from April 2007 to

present. Attachment B(II) identified the specific items to be seized,[13] the specific criminal

offenses under investigation, and the timeframe in question. The warrants are constitutionally

sufficient because they were limited in time, place, and scope.  *Karrer*, 460 F. App'x at 161

(warrant was not an illegal general warrant because it identified particular devices and file types

---

[13] These include, for example: (a) "Evidence of false statements to health insurance providers" as
further specified in the attachment; (b) Evidence of HB's rules, guidelines, policies, etc. for
medical insurance billing; (c) evidence of HB rules, guidelines, policies, etc. evidencing a focus
on profit over patient care; (d) evidence of HB directives, policies and procedures concerning
patient scheduling, numbers, counts, and volume; (e) evidence concerning knowledge or an
understanding of or training in proper medical insurance billing practices, and numerous other
categories of evidence.

to be searched for evidence of a specific statutory offense and sufficiently identified a time period during which the suspected offenses occurred); *Yusuf*, 461 F.3d at 395 (finding warrants sufficiently particular where they "specified that agents were searching for evidence of several specifically enumerated federal crimes[,]" limited the search to a certain timeframe, and identified the records sought); *see also United States v. Bansal*, 663 F.3d 634, 662 (3d Cir. 2011) (warrants describing several categories of records in defendant's email account, such as billing, payment, and "stored electronic information or files" associated with the account were sufficiently particularized).

    Nor did the warrants' reference to statutory criminal offenses endow the agents with unbridled discretion to determine what constituted evidence of "fraud." Rather, "the inclusion of specific statutory offenses only limits the searching officer's discretion, not expands it." *United States v. Murphy*, No. CR 22-361 (RMB), 2024 WL 3440149, at \*13 (D.N.J. July 17, 2024) (citing *United States v. Graham*, 2022 WL 4132488, at \*4 (D.N.J. Sept. 12, 2022) (finding communications data warrant sufficiently particularized where, among other things, "warrant expressly limited the search to evidence related to the charged crimes")). And in fact, "the Third Circuit has repeatedly found warrants to be particularized when there is a nexus between the evidence sought and the alleged offenses under investigation." *Id.* (citing *Yusuf*, 461 F.3d at 395, and *United States v. Fallon*, 61 F.4th 95, 107-08 (3d Cir. 2023) (finding warrant sufficiently particular where law enforcement sought records relating to "five enumerated federal offenses, identified by statutes")). Cf. *United States v. Wey*, 256 F. Supp. 3d 355, 384 (S.D.N.Y. 2017) (warrants failed particularity requirement where they failed to set forth the crimes under investigation; court noted that "failure to reference the suspected crimes would alone be enough to render the Warrants insufficiently particularized").

Finally, Defendants cited no binding or persuasive authority in support of the search protocols they advocate. On the contrary, as the Government observes, search procedures and protocols are generally not required when searching digital evidence. *See, e.g., United States v. Brooks*, 427 F.3d 1246, 1251 (10th Cir. 2005) (search warrant need not "contain a particularized computer search strategy"); *Murphy*, 2024 WL 3440149, at *12 (D.N.J. July 17, 2024) (noting that "courts have upheld search warrants against particularity challenges where the warrants 'authorize broad searches of electronic data on cellphones and computers"); *United States v. Bowen*, 689 F. Supp. 2d 675, 681 (S.D. N.Y. 2010) (court joining "several other federal courts in holding that the Fourth Amendment does not require a search warrant to specify computer search methodology."); *United States v. Fumo*, 2007 WL 3232112, at *6 (E.D. Pa Oct. 30, 2007) ("[S]earch protocols and keywords do not mark the outer bounds of a lawful search; to the contrary, because of the nature of computer files, the government may legally open and briefly examine each file when searching a computer pursuant to a valid warrant.")).

For these reasons, the email warrants were not lacking in particularity in violation of the Fourth Amendment.

### 3.  Lack of Good Faith

Even if the Gmail and Yahoo Warrants were insufficient, the officers' good faith reliance on the warrant nevertheless precludes suppression.

The exclusionary rule is not an individual right, but a prudential remedy meant to deter law enforcement officials from engaging in unreasonable searches and seizures. *Herring v. United States*, 555 U.S. 135, 141 (2009); *Caesar*, 2 F.4th at 167.  Because the suppression remedy is an "extreme sanction" that carries significant costs, *United States v. Leon*, 468 U.S.

897, 926 (1984), it is utilized as a "last resort," rather than a "first impulse[.]" *Hudson v. Michigan*, 547 U.S. 586, 591 (2006). Accordingly, courts apply the exclusionary rule "only in those unusual cases' where it may achieve its 'remedial objectives': to appreciably deter unreasonable searches and seizures by law enforcement officers." *Caesar*, 2 F.4th at 169 (quoting *Leon*, 468 U.S. at 908).

To trigger the exclusionary rule, law enforcement conduct must be "deliberate, reckless, or grossly negligent," or involve "recurring or systemic negligence." *Herring*, 444 U.S. at 144. Simple, isolated negligence does not warrant suppression. *Davis v. United States*, 564 U.S. 229, 238 (2011). "Thus, the test for whether the good faith exception applies is whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization." *Caesar*, 2 F.4th at 170 (cleaned up).

Defendants have argued that the exception does not apply in this case because (1) the magistrate judge issued the warrants in reliance on deliberately or recklessly false affidavits, (2) the warrants were based on affidavits so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; and (3) the warrants were so facially deficient that they failed to particularize the places to be searched or the things to be seized. *Caesar*, 2 F.4th at 170.

Their first argument is foreclosed by the Court's *Franks* analysis. Because Defendants did not make a substantial showing that any omitted information was material to a probable cause determination, it cannot be said that the magistrate judge issued the warrants in reliance on any allegedly reckless or deliberate omissions. And, in any event, "when good faith is concerned, the proper question is not simply whether the allegedly omitted information was known to the affidavit and relevant to the magistrate's probable-cause inquiry, but also whether

86

the deliberate or reckless omission, if it occurred, was 'so objectively culpable as to require exclusion.'" *United States v. Williams*, 974 F.3d 320, 353 (3d Cir. 2020).  Here, it was not.

The Court also rejects Defendants' other arguments regarding alleged lack of good faith. Based on the Court's previous analysis, even assuming that the subject warrants were overly broad or insufficiently particularized, the Court cannot say that it would have been objectively unreasonable for the agents to rely on the warrants in good faith.  Accordingly, this is not the sort of "unusual" case where application of the exclusionary rule would serve as a valid deterrent.

4.  Unreasonable Execution of the Warrant

Lastly, Defendants argued that suppression is appropriate because the agents were unreasonable in their execution of the email warrants.

Initially, Defendants claimed that the Government unlawfully "seized" their emails by sending preservation letters to Gmail and Yahoo in February 2021, prior to obtaining the email warrants.  Defendants have cited no persuasive authority for this proposition, and other courts have rejected this view.  *See United States v. Dallmann*, 2024 WL 2700759 (D. Nevada, May 25, 2024); *United States v. Colbert*, 2024 WL 2091995 (D. Kansas, May 9, 2024).

Next, Defendants argued that the Government waited too long to obtain the search warrants after sending the preservation letters. The letters were sent on February 21 and 23 of 2021, and Thoreson applied for the email warrants several seeks later on March 15, 2021.  To support their argument, Defendants relied on *United States v. Mitchell*, 565 F.3d 1347 135 (11th Cir. 2009), and *United States v. Smith*, 967 F.3d 198, 202 (2d Cir. 2020). In each of these cases, agents waited several weeks or more after seizing the defendant's equipment (i.e., hard drive or tablet) before applying for a search warrant.  But, unlike in *Mitchell* and *Smith*, where law

enforcement officers actually took possession of the defendant's property, the agents in this case did not effectuate a Fourth Amendment "seizure" merely by issuing preservation letters.

Defendants have also argued that the agents were unreasonable in failing to employ minimization procedures so as to avoid their exposure to irrelevant or privileged material. In prior filings, the Government has explained that it used a filter agent and various search terms to avoid discovery of attorney-client communications. It also limited review of Defendants' emails to the time period predating the February 23, 2021 searches of the five HB offices. One privilege document was discovered and disclosed to the defense with a promise not to use the information (which was irrelevant to these proceedings in any case). Defendants speculate that the Government may have viewed other privileged communications due to the absence of more robust minimization tactics. On balance, the Court is not persuaded that the Government's actions in this regard exceeded the boundaries of the Fourth Amendment.

Defendants' motion to suppress the email warrants was therefore denied.


## **CONCLUSION**

Based upon the foregoing reasons, the Court has denied the Defendants' Motions at ECF Nos. 903, 906, 909, 910, and 911.


Susan Paradise Baxter
United States District Judge


88